# No. 19-3574

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———————

Roslyn La Liberte,
*Plaintiff-Appellant,*

v.

Joy Reid,
*Defendant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF NEW YORK
Case No. 1:18-cv-05398-DLI, Hon. Dora L. Irizarry

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## ROSLYN LA LIBERTE

---

L. Lin Wood
  *Lead Counsel*
Nicole Jennings Wade
G. Taylor Wilson
L. Lin Wood, P.C.
1180 W. Peachtree St., Ste. 2040
Atlanta, GA 30309
Telephone: (404) 891-1402

*Counsel for Plaintiff-Appellant*
*Roslyn La Liberte*

## **TABLE OF CONTENTS**

**TABLE OF CONTENTS** ............................................................................i

**TABLE OF AUTHORITIES** ................................................................. iii

**STATEMENT OF JURISDICTION**.....................................................1

**STATEMENT OF THE ISSUES**.........................................................1

**STATEMENT OF THE CASE**............................................................3

    A.    Local Rule 28.1(b) Summary. .......................................................3

    B.    The Events Giving Rise to Reid's False Accusations. ................................3

    C.    Reid's Background and False Accusations. .................................5

    D.    The Truth and Reid's Reckless Disregard for It............................7

    E.    La Liberte Received Hundreds of Hate Messages. ......................8

    F.    Detailed Procedural History and Rulings Presented for Review. ...............9

**SUMMARY OF ARGUMENT** ..........................................................12

**STANDARD OF REVIEW** ...............................................................20

**ARGUMENT** ....................................................................................21

    I.    The Trial Court Erred in Applying California's Anti-SLAPP Statute Because It Conflicts with the Federal Rules of Civil Procedure and Is Unconstitutional…………………………………………………………21

        A. Second Circuit Precedent Militates Against Applying the Anti-SLAPP Statute ...................................................................23

        B. The Anti-SLAPP Statute Is Unenforceable Under *Shady Grove*. ............25

            i.    The Question in Dispute Is Whether La Liberte's Amended Complaint States a Claim. .......................................................25

            ii.   Rules 8 and 12 Answer the Question in Dispute. ..............26

i

iii. Federal Rules 8, 12 and 56 Do Not Violate the REA .........................30

C.  The California Anti-SLAPP Statute Violates the Constitution................30

II.  The District Court Erred in Holding that La Liberte Is a Limited Purpose Public Figure Plaintiff…………………………………………………………...33

A.  La Liberte Did Not Assume a Position of Prominence in a Public Controversy. ...........................................................................36

B.  Reid's Defamatory Statements Were Not Germane to a Public Controversy. ...........................................................................38

III.  The District Court Erred in Holding that La Liberte Failed to Allege Actual Malice for the June 29 Post……………………………………………… 40

IV.  Through the Juxtaposition of La Liberte's Photograph Alongside Racist Conduct in the 1950s with Reid's Caption, the July 1 Posts Reasonably Convey the Defamatory Gist that La Liberte Engaged in Racist Conduct...45

V.  The Trial Court Erred in Holding that the July 1 Posts Are Protected Opinion, Because the Gist of the July 1 Posts Is the Provably False Accusation that La Liberte Made Racist Comments and Otherwise Engaged in Racist Conduct Towards a Minority Child…………………………… 52

A.  The July 1 Posts Make a Provably False Comparison. ...........................53

B.  The July 1 Posts Imply Undisclosed False Facts. ...................................55

CONCLUSION.................................................................................57

CERTIFICATE OF SERVICE .........................................................58

CERTIFICATE OF COMPLIANCE ................................................59

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015) . 13, 24, 26, 30

*Adelson v. Harris*, 774 F.3d 803 (2d Cir. 2014) .......................................................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................28

*Baker v. Los Angeles Herald Examiner*, 42 Cal. 3d. 254 (1986) ...........................51

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................... 21, 28

*Biro v. Conde Nast*, 622 Fed. App'x 67 (2d Cir. 2015) ...........................................35

*Bose Corp. v. Consumers Union*, 692 F.3d 189 (1st Cir. 1982) .............................41

*Brown v. Board of Education*, 347 U.S. 483 (1954) ...............................................54

*Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711 (1989) .......................................... 16, 35

*Calder v. Jones*, 465 U.S. 783 (1984) ............................................................. 15, 33

*Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018) ........ *passim*

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000) ....................41

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002) ..........................................27

*Church of Scientology of California v. Flynn*, 744 F.2d 694 (9th Cir. 1984)……….
…………………………………………………………………………….45, 46, 52

*Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d. 1113 (C.D. Cal. 1998), *aff'd* 210
F.3d 1036 (9th Cir. 2000) ......................................................................45

*Curtis Publ'g v. Butts*, 388 U.S. 130 (1967) ...........................................................44

*D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270  (C.D. Cal. 2000)
............................................................................................................41

*Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) ..................41

*Davis v. Cox*, 351 P.3d 862 (Wash. 2015) ................................................... 15, 31, 32

*Ernst v. Carrigan*, 814 F.3d 116 (2d Cir. 2016) ................................................. 13, 23

*Forsher v. Bugliosi*, 26 Cal. 3d 792 (1980) ..........................................................45

*Galarpe v. United Airlines, Inc.*, 2918 WL 1586202 (N.D. Cal. Apr. 2, 2018) ......56

*Geary v. Goldstein*, 831 F. Supp. 269 (S.D.N.Y. 1993), *rev'd on other grounds*,
   1996 WL 447776 (S.D.N.Y. Aug. 8, 1996)................................................... 48, 49

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)........................................ passim

*Hanna v. Plumer*, 380 U.S. 460 (1965) ................................................................22

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 419 U.S. 657 (1989)............. 17, 42

*Herbert v. Lando*, 441 U.S. 153 (1979) ................................................................33

*Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250 (N.Y. Ct. App. 1995)..............54

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) ........................................ 18, 34, 38

*In re Gawker Media LLC*, 571 B.R. 612 (Bankr. S.D.N.Y. 2017).........................24

*Intercon Sols., Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015) .... 15, 29

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016)................................40

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y 1998) .......................50

*John Doe 2 v. Superior Ct.*, 1 Cal. App. 5th 1300 (2016) ................................ 20, 55

*Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036 (9th Cir. 1998)................... 46, 52

*Kapellas v. Kofman*, 1 Cal. 3d 20 (1969)................................................................52

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019), *as revised* (Aug. 29, 2019).......
   ................................................................................................. 14, 22, 25

*Leiendecker v. Asian Women United of Minnesota*, 848 N.W.2d 224 (Minn. 2014)
   ............................................................................................................. 1, 31

*Lerman v. Flynt Distrib. Co.*, 745 F.2d 123 (2d Cir. 1984)....................................35

*Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013) ................23

iv

*Liberty Synergistics Inc. v. Microflo Ltd.*, 637 Fed. App'x 33 (2d Cir. 2016) ............
……………………………………………………………………………..13, 23, 24

*Los Lobos Renewable Power, LLC v. Americulture, Inc*, 885 F.3d 659 (10th Cir.),
  *cert. denied sub nom. AmeriCulture, Inc. v. Los Lobos Renewable Power, LLC*,
  139 S. Ct. 591 (2018) ...................................................................................29

*MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117 (1996).....................................53

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013)............... 14, 21, 35, 36

*Makaeff v. Trump Univ., LLC*, 736 F.3d 1180 (9th Cir. 2013)........................ 14, 29

*Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686 (2008) ........................53

*Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881 (9th Cir. 2016).......... 19, 47

*Masson v. New Yorker Magazine, Inc.*, 510 U.S. 496 (1991) ................... 44, 47, 52

*McFarlane v. Sheridan Sq. Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) ................42

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)....................................... 53, 56

*Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240 (S.D.N.Y.
  2014) ..........................................................................................................36

*New York Times, Inc. v. Sullivan*, 376 U.S. 254 (1964) ................................. 33, 41

*O'Connor v. McGraw-Hill*, Inc., 159 Cal. App. 3d 478 (1984) .............................49

*Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248 (2010)....................... 19, 53

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019)................ 21, 41, 42, 43

*Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828 (9th
  Cir. 2018) ...................................................................................................29

*Prendeville v. Singer*, 155 Fed. App'x 303 (9th Cir. 2005)..................................36

*Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d 244 (1984) ................... 17, 42

*Regan v. Sullivan*, 557 F.2d 300 (2d Cir. 1977) ............................................. 48, 49

*Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1977) ......................35

*Scott v. Cooper*, 226 A.D.2d 360 (N.Y. Ct. App. 1996)..........................................54

*Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123 (1985) ....................... 18, 45, 46

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)…. ............................................................................................. 22, 25, 26, 30

*Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941) ........................................................30

*Solano v. Playgirl, Inc.*, 292 F.3d 1078 (9th Cir. 2002) ............................ 41, 49, 50

*Somerset Commc'ns Grp., LLC v. Wall to Wall Advert., Inc.*, 2015 WL 11234155 (W.D. Wash. May 5, 2015)..................................................................................21

*St. Amant v. Thompson*, 390 U.S. 727 (1968)..........................................................42

*Staehr v. Hartford Final Services*, 547 F.3d 406 (2d Cir. 2008)...............................5

*Travelers Casualty Ins. Co. v. Hirsh*, 831 F.3d 1179 (9th Cir. 2016) ....................21

*U.S. ex. rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999) .......................................................................................................... 13, 14

*Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ....................39

*Westmoreland v. CBS Inc.,* 596 F. Supp. 1170 (S.D.N.Y 1984) ............................44

*Wilcox v. Superior Court*, 27 Cal. App. 4th 809 (1994)..........................................32

*Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157 (1979).................................38

*Z.F. v. Ripon Unified Sch. Dist.*, 482 Fed. App'x 239 (9th Cir. 2012)....................36

**Statutes**

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1332 ........................................................................................................1

Rules Enabling Act ("REA"), 28 U.S.C. § 2072……………………………………30

Cal. Civ. Pro. Code § 425.16 ........................................................................ *passim*

O.C.G.A. § 9-11-11.1(b)(1) ......................................................................................25

**Federal Rules of Appellate Procedure**

Federal Rule of Appellate Procedure 4(a)(1)(A) ......................................................1

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8 .................................................................... 26, 27, 28, 30

Fed. R. Civ. P. 9 ....................................................................................27

Fed. R. Civ. P. 12……………………………………………………………*passim*

**Constitutional Provisions**

First Amendment of the United States Constitution………………………… *passim*

Seventh Amendment of the United States Constitution…….………15, 23, 30, 31, 32

Fourteenth Amendments of the United States Constitution …....…15, 23, 30, 31, 32

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 because there was (and is) complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. In its September 30, 2019, Memorandum and Order, the district court ordered that "Defendant's motion [to dismiss and to strike Plaintiff-Appellant Roslyn La Liberte's ("La Liberte") First Amended Complaint for Defamation] is granted in its entirety and the action is dismissed," and served a text Order on October 7, 2019, directing the Clerk of Court to "hold the closure of this case in abeyance" solely to hear Reid's motion for attorneys' fees and costs. (JA264; JA280). Under Federal Rule of Appellate Procedure 4(a)(1)(A), La Liberte timely filed a Notice of Appeal on October 29, 2019, fewer than 30 days after the district court's judgment became final. (JA282). This Court has jurisdiction to hear La Liberte's appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Did the district court err in applying California's anti-SLAPP statute in this diversity case because it is unconstitutional or because the anti-SLAPP statute conflicts with the Federal Rules of Civil Procedure, which answer the question in dispute: whether La Liberte's Amended Complaint states a claim for relief to avoid pretrial dismissal?

1

2.     Did the district court err in holding La Liberte to be a limited purpose public figure, solely on the basis that La Liberte attended and spoke about California Senate Bill 54 ("SB 54") at city council meetings and because her unidentified photograph appeared in an article published by *The Washington Post* regarding SB 54?

3.     Assuming *arguendo* that La Liberte is a limited purpose public figure, did the district court err in holding that La Liberte's Amended Complaint did not plausibly allege that Reid published her June 29, 2018, statements with actual malice, including because the district court failed altogether to address the direct and circumstantial evidence of actual malice alleged by La Liberte?

4.     Did the district court err in holding that Reid's July 1, 2018, statements were non-defamatory, including because the district court failed to employ cardinal rules of construction to ascertain whether the July 1 posts are capable of a defamatory meaning by construing the written caption alongside the juxtaposition of La Liberte's photograph with a famous photograph of racist conduct in 1957 during desegregation?

5.     Did the district court err in holding that Reid's July 1, 2018, statements constituted expressions of protected opinion, including because a reasonable factfinder could conclude that the statements imply an assertion of fact that La Liberte engaged in racist conduct toward a minority child?

2

## <u>STATEMENT OF THE CASE</u>

**A.     Local Rule 28.1(b) Summary.**

On September 25, 2018, La Liberte filed a Complaint, and on November 27, 2018, she filed her First Amended Complaint in the United States District Court for the Eastern District of New York, asserting a defamation claim against Reid who falsely stated that La Liberte screamed "[y]ou are going to be the first deported" and "dirty Mexican!" to a 14-year-old boy at a public forum on SB 54, and then Reid subsequently compared La Liberte pictorially to an infamous protester screaming at an African-American child in Little Rock, Arkansas in 1957, alongside a caption stating, in part, "I can't believe that person screaming at a child, with their face twisted in rage, is real. B[ut] every one of them were. History sometimes repeats. And it is full of rage." (JA007; JA037). As detailed below, the Honorable Dora L. Irizarry granted Reid's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and motion to strike under California's anti-SLAPP statute, Cal. Civ. Pro. Code § 425.16 (the "Anti-SLAPP Statute"). The district court also granted Reid leave to seek attorneys' fees and costs pursuant to the Anti-SLAPP statute.

**B.     The Events Giving Rise to Reid's False Accusations.**

La Liberte is a private citizen residing in California who has lived her life outside of the public eye and who is passionate about this country's immigration policies. (JA042-043 ¶¶ 22, 31-34; JA049 ¶ 75). On June 25, 2018, La Liberte

3

attended a city council meeting in Simi Valley, California (the "Council Meeting") to provide her opinion as a California citizen on SB 54. (JA043 ¶ 35). Hundreds of others attended the Council Meeting. (JA044 ¶ 36). La Liberte's comments to the Simi Valley city council lasted 2 minutes and 12 seconds in a meeting that lasted over 5 hours. (JA044 ¶ 37 and n.7).[1]

During a break in the proceedings, a 14-year-old young man approached La Liberte to discuss their respective views on SB 54. (JA044 ¶ 39). During the interaction, an out-of-context photograph of La Liberte was taken (the "Photograph"). (JA044 ¶ 40).

On June 28, 2018, three days after the Council Meeting, a politically biased teenaged social media activist named Alan Vargas tweeted the Photograph with the following caption:

> "You are going to be the first deported"
> "dirty Mexican"
>
> Were some of the things *they yelled* they yelled [sic] at this 14 year old boy. He was defending immigrants at a rally and was shouted down.

---

[1] As noted by the district court (when it took judicial notice of the Minutes of the City Council, Thousand Oaks, California, as well as La Liberte's summary judgment admission that she had attended – not spoke during – eight city council meetings on the issue), La Liberte's sole public participation on the issue of SB 54 prior to the accusations at issue in this case was limited to exercising her constitution right to participate in local city council meetings as a concerned citizen, and her unidentified photograph was published by *The Washington Post* without any apparent participation by La Liberte.  (JA039 ¶ 8, JA042 ¶ 20, JA043 ¶ 35; JA273).

4

Spread this far and wide this woman needs to be put on blast.

(JA045 ¶ 41; JA096) (emphasis added).

### C. Reid's Background and False Accusations.

It was then that Reid got involved. Reid is a nationally known political commentator and reporter for MSNBC. (JA037 ¶ 1). She is the host of "AM Joy" and "AM Joy Podcast," and her social media following reflects the success of her career; at the time of the subject accusations, she had 1.24 million Twitter followers, 96,600 Instagram followers, and 206,400 Facebook followers. (*Id.*). Reid has a demonstrable and well-known political agenda. (JA038 ¶¶ 6-7). She has been described as the "heroine of the resistance" against President Trump, has authored books focused on race, and is reported to have stated at the time of President Trump's election that she "should have known then that Trump would win" when she heard "a white woman on the elevator praising Mr. Trump for his anti-immigration stance." (JA038 ¶ 7). More recently, Reid described President Trump's "base" as "a racial and religious cult of personality."[2]

---

[2] *See* https://www.realclearpolitics.com/video/2019/12/01/msnbcs_joy_reid_trump_support_becoming_a_racial_and_religious_cult_of_personality.html (last visited Dec. 13, 2019). Consistent with the district court's Order, this Court may take judicial notice of this article. (JA273 (citing *Staehr v. Hartford Final Services*, 547 F.3d 406, 424-25 (2d Cir. 2008)).

Consistent with her own preconceived narrative, biases, and political agenda, Reid took up the baton from Vargas.

*First*, on June 29, 2018, Reid retweeted the Vargas tweet to her approximately 1.24 million Twitter followers verbatim. (JA045 ¶ 42; JA067).[3]

*Second*, on June 29, 2018, Reid published to her 96,600 Instagram followers the following tweet alongside the Photograph:

> He showed up to a rally to defend immigrants. … She showed up too, in her MAGA hat, and screamed, "You are going to be the first deported" … "dirty Mexican!" He is 14 years old. She is an adult. Make the picture black and white and it could be the 1950s and the desegregation of a school. Hate is real, y'all. It hasn't even really gone away."

(the "June 29 Instagram Post") (JA046 ¶ 48, JA069).

*Third,* following up on her June 29 Instagram Post's statement to "[m]ake the picture black and white and it could be the 1950s and the desegregation of a school," on July 1, 2018, Reid published via Instagram and Facebook the following post alongside the Photograph juxtaposed with a famous image of racist conduct in Little Rock, Arkansas during the Jim Crow era:

> It was inevitable that this image would be made. It's also easy to look at old black and white photos and think: I can't believe that person screaming at a child, with their face twisted in rage, is real. B[ut] everyone one of them were. History sometimes repeats. And it is full of rage. Hat tip to @joseiswriting. #regram #history #chooselove.

---

[3] La Liberte is not pursuing a cause of action for this retweet. (JA030, JA034).

(JA047 ¶ 56, JA074, JA076) (the "July 1 Posts").

*Fourth*, on July 2, 2018, following the receipt of a retraction demand from La Liberte's counsel, Reid took down her re-tweet, the June 29 Instagram Post, and the July 1 Posts, and she evasively and equivocally stated as follows with respect to her false accusations: "It appears I got this wrong. My apologies to Mrs. La Liberte and Joseph." (JA048 ¶ 58, JA099).

### D. The Truth and Reid's Reckless Disregard for It.

La Liberte did not scream any racial slurs at the young man in the Photograph, or anyone else. (JA038 ¶ 3, JA049 ¶ 66). In fact, on June 29, 2018, the same day that Reid posted her June 29 Instagram Post, the young man was interviewed by Fox and confirmed that La Liberte "was being civil," that she "was still trying to keep it civil which I appreciate," and "[s]he doesn't deserve it because she was giving her opinion at a place where everyone should be able to say their peace." (JA038 ¶¶ 4-5). A video of the interaction was also made available on July 6, 2018, wherein the young man's mother – standing with her son during the interaction – stated twice that "they are having a civil conversation" and La Liberte and the young man were shown hugging. (*Id.*).

Reid was not present at the Council Meeting and appears not to have even known where the interaction at issue took place at the time of her June 29 Instagram Post. (JA039 ¶¶ 12, JA046 ¶ 51, JA050 ¶ 79). While others were able to contact the

7

individuals who were involved to discover the truth, Reid performed no investigation whatsoever prior to publishing her June 29 Instagram Post falsely accusing La Liberte of yelling disgusting racial slurs at a child. (JA046 ¶ 51, JA050 ¶¶ 81, 83). Instead, preferring to advance her own political agenda, preconceived biases, and personal animus towards President Trump and his supporters, Reid published her false accusations with her sole purported source being the demonstrably biased and unreliable Vargas.  (JA046 ¶ 50, JA050 ¶¶ 80-82, 84, JA051-052 ¶¶ 94-96).

Reid did not stop at merely regurgitating what her sole unreliable, unknown source had tweeted, however: i.e., that an unspecified "they" had "yelled" racial slurs. Instead, Reid deliberately altered Vargas's initial tweet and specifically accused La Liberte of yelling abhorrent racial slurs at a child. (JA046 ¶ 49).[4]

On June 30 and July 1, 2018, La Liberte's son sent separate emails to Reid advising her that her accusations were false and providing her with the Fox article containing the truth. (JA047 ¶¶ 53-54, JA071-72). Despite the Fox article and e-mails, Reid continued publishing her July 1 Posts. (JA047 ¶ 56, JA050 ¶ 85).

### E.    La Liberte Received Hundreds of Hate Messages.

---

[4] To La Liberte's knowledge at the time of filing her Amended Complaint, Reid was the first person to do so. (*Id.*). In the summary judgment portion of Reid's anti-SLAPP motion, she identified a few obscure individuals who also did so on social media. Nonetheless, Reid has not pointed to any member of the media or other public figure who did so, and none that Reid purports to have relied on.

8

In the days following Reid's June 29 Instagram Posts and July 1 Posts, La Liberte was subjected to hundreds of hate messages via telephone, text, e-mail, and mail. (JA040 ¶¶ 15-16, JA048 ¶ 60, JA057-65). She was terrified, contacted the police, and wore a wig in public for fear of her safety. (JA042 ¶ 19, JA051 ¶ 93).

### F.   Detailed Procedural History and Rulings Presented for Review.

As a result of Reid's false accusations, La Liberte filed suit on September 25, 2018. (JA007). Following Reid's letter brief requesting a pre-motion conference, (JA027), La Liberte filed a response (JA030), followed by her First Amended Complaint for Defamation. (JA037).

Reid then filed her Motion to Dismiss the Action and Strike Plaintiff's Amended Complaint (the "Anti-SLAPP Motion"). (Dkt. 17-21). Reid's Anti-SLAPP Motion challenged the sufficiency of the factual allegations in the Amended Complaint as well as raised factual challenges pursuant to California's Anti-SLAPP Statute. (Dkt. 21). As a result, La Liberte filed a letter brief requesting discovery on the issue of actual malice, which the district court denied. (JA258, JA262). The district court entered its September 30, 2019, Order granting Reid's Anti-SLAPP Motion on October 7, 2019 (the "Order"). (JA264). La Liberte timely filed her Notice of Appeal on October 29, 2019. (JA282).

The first issue for review is the district court's application of California's Anti-SLAPP Statute in federal court despite its conflict with the Federal Rules of

Civil Procedure and its unconstitutionality. With the exception of taking judicial notice of certain issues, the district court's Order ignored the factual challenges raised by Reid, which went beyond the allegations of the Amended Complaint, instead applying the rule 12(b)(6) standard. (JA268-70).[5] Acknowledging that "the applicability of California's Anti-SLAPP Statute in federal court … is an issue undecided by the Second Circuit," (JA267), the district court ignored the recent trend and followed Ninth Circuit case law re-writing the plain language of the anti-SLAPP statute's "probability" standard as a Rule 12(b)(6) "plausibility" standard, and then purported to apply the Anti-SLAPP Statute. (JA267-68, JA277-78).

The second issue for review is the district court's holding that La Liberte is a limited purpose public figure based upon the court taking judicial notice that La Liberte "attended and spoke about SB 54 at multiple city council meetings around the State of California" and "appeared in a photograph in the Washington Post about the SB 54 controversy." (JA273). More specifically, the district court erred when it held that "it is apparent that Plaintiff injected herself into the forefront of the controversy" given the complete absence of La Liberte assuming or attempting to

---

[5] La Liberte acquiesced in Reid's request to include in the Joint Appendix three affidavits she filed containing extraneous materials in support of her Anti-SLAPP Motion. However, because the district court ruled strictly on the sufficiency of the Amended Complaint and previously denied discovery – preventing the district court from ruling on a summary judgment basis – La Liberte has not burdened this Court with her responsive declarations, but reserves the right to reference same in her reply if and to the extent it becomes necessary.

10

assume special prominence at the forefront of the controversy, through the media or otherwise. (JA274).

Assuming *arguendo* that this Court finds La Liberte to be a limited purpose public figure, the third issue for review is the district court's holding that "Plaintiff fails to allege that Defendant made the [June 29 Instagram Post] with knowledge of its falsity or with reckless disregard for the truth." (JA274 (internal quotations omitted)). The district court failed altogether to discuss La Liberte's factual allegations as well as the applicable legal standard, requiring that the district court consider the direct and circumstantial evidence of actual malice to determine whether La Liberte plausibly alleged Reid's knowledge of falsity or reckless disregard for the truth.

The fourth issue presented for review is the district court's holding that the July 1 Posts "are nondefamatory," because "the juxtaposition of the photographs does not 'make clear that [Plaintiff] is alleged to have engaged in specific racist conduct akin to that demonstrated during desegregation.'" (JA276 (citing Mem. in Opp. p. 17, Dkt. 29)). More specifically, the district court erred when it failed to apply the appropriate legal standard and to consider the context of the July 1 Posts as well as the juxtaposition of the text and the accompanying photographs in the July 1 Posts, holding that they "never mention racial slurs nor do they identify Plaintiff," and while they may "suggest[] that Plaintiff was screaming at a child *or* is a racist,"

11

"such implications are not defamatory." (JA276-77 (emphasis added)). The district court did not answer whether the context and juxtaposition of the July 1 Posts *were capable* of conveying that La Liberte engaged in conduct *that was* racist, but instead usurped the factfinder's role by employing a disjunctive approach that isolated the alleged conduct described via text from the defamatory implication of the photographs.

The fifth and final issue presented for review is derivative of the fourth: whether the district court erred when it held that the July 1 Posts "express nonactionable statements of opinion." (JA275). In doing so, the district court answered only whether its errant construction of the publication's defamatory meaning constituted protected opinion, otherwise ignored controlling law holding that accusations of racist conduct as opposed to generic accusations of racism are capable of being proven false, and ignored the language of the July 1 Posts conveying that Reid possessed knowledge of undisclosed facts.

## **SUMMARY OF ARGUMENT**

The district court erred on five distinct issues, failed to consider controlling law, and misapplied what law it did apply. This Court does not owe the district court deference on any of those issues.

*First*, the district court erred by applying the California Anti-SLAPP Statute because it cannot be applied in federal court since the Federal Rules of Civil

12

Procedure ("Federal Rules") answer the question in dispute. Although the Second Circuit has previously applied a state anti-SLAPP statute, it has not been presented the opportunity to decide whether the California Anti-SLAPP Statute conflicts with the Federal Rules. *Cf. Liberty Synergistics Inc. v. Microflo Ltd.* (*Liberty Synergistics II*), 637 Fed. App'x 33, 34 n.1 (2d Cir. 2016) (noting that this Circuit previously "expressly declined" to answer the question and holding again "we do not reach the issue of whether [California's] anti-SLAPP statute is applicable in federal court.") (brackets in original) (citing *Ernst v. Carrigan*, 814 F.3d 116, 119 n.1 (2d Cir. 2016) (*comparing Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333-37 (D.C. Cir. 2015) (holding that a state anti-SLAPP statute is inapplicable in federal court) *with U.S. ex. rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 973 (9th Cir. 1999) (holding that a state anti-SLAPP statute is applicable)).

The D.C Circuit, Fifth Circuit, and Eleventh Circuit have all determined that anti-SLAPP statutes analogous to California's cannot be applied in federal court on the same bases. In *Abbas*, Justice Kavanaugh correctly analyzed how and why state anti-SLAPP statutes conflict with the Federal Rules of Civil Procedure: "In sum, Federal Rules 12 and 56 answer the same question as the D.C. Anti-SLAPP Act, and those Federal Rules are valid under the Rules Enabling Act. A federal court exercising diversity jurisdiction therefore must apply Federal Rules 12 and 56 instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision." 783

13

F.3d at 1333-37. Last year, the Eleventh Circuit agreed: "Because Rules 8, 12, and 56 are valid under the Rules Enabling Act and the Constitution and govern the same basic question as the Georgia anti-SLAPP statute, the motion-to-strike procedure created by that statute cannot apply in federal court." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1348-58 (11th Cir. 2018). The Fifth Circuit followed suit in *Klocke v. Watson*, 936 F.3d 240, 247 (5th Cir. 2019), *as revised* (Aug. 29, 2019), adhering to the sound reasoning of *Abbas* and *Carbone*.

Even the Ninth Circuit has viewed the application of California's Anti-SLAPP Statute with skepticism, falling one vote of shy of an *en banc* rehearing to excise the statute from its courts. *See Makaeff v. Trump Univ., LLC* (*Makaeff II*)*,* 736 F.3d 1180, 1180, 1188 (9th Cir. 2013). As former Chief Judge Kozinski stingingly observed about the Ninth's Circuit's seminal case enforcing the Anti-SLAPP Statute:

> *Newsham* was a big mistake. Two other circuits have foolishly followed it. I've read their opinions and find them no more persuasive than *Newsham* itself. It's time we led the way back out of the wilderness. Federal courts have no business applying exotic state procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules, our jurisdictional statutes and Supreme Court interpretations thereof. As a three judge panel, *Metabolife* could only do so much, and we are generally bound to follow *Newsham*. But if this or another case were taken en banc, we could take a fresh look at the question. I believe we should.

*Makaeff v. Trump Univ., LLC* (*Makaeff I*), 715 F.3d 254, 275 (9th Cir. 2013) (Kozinsky, C.J. concurring).

14

Here, the district court erroneously rendered the Anti-SLAPP Statute enforceable by rewriting its core provision – transforming its "probability of success" standard into Rule 12(b)(6)'s "plausibility" standard. By supplanting the California legislature's clear words, the district court awarded attorney's fees and costs against La Liberte for bringing this lawsuit. Rewriting the plain language of another state's exotic statute in order to save it and apply its conflicting fee-shifting provision is not the answer. In this issue of first impression for this Circuit, it should join its sister circuits in rejecting the Ninth's Circuit's failed two-decade experiment with applying anti-SLAPP statutes in federal courts.[6]

*Second,* to the extent the district court even considered controlling law on public figure status, it erred in its application of that law. California's Anti-SLAPP

---

[6] The Anti-SLAPP Statute also violates the Fourteenth and Seventh Amendments of the United States Constitution. There is no rational basis for singling out defamation plaintiffs for unequal treatment from all other plaintiffs. First Amendment defendants already receive all the protection afforded to them by the law and the Supreme Court, including through the protections of the actual malice standard and opinion standards. *See Calder v. Jones*, 465 U.S. 783, 790-91 (1984) (holding that applying First Amendment protections to a jurisdictional analysis would result in an impermissible "double counting"). California's Anti-SLAPP Statute also impermissibly requires trial judges to weigh competing facts and inferences, eliminating a plaintiff's Constitutional right to a jury trial on disputed issues of material fact. *Cf. Leiendecker v. Asian Women United of Minn.*, 895 N.W.2d 623, 634-37 (Minn. 2017) (ruling that Minnesota's anti-SLAPP statute violates the state's constitutional right of trial by jury); *Davis v. Cox*, 351 P.3d 862, 295-96 (Wash. 2015) (ruling that Washington's anti-SLAPP statute violates the state's constitutional right of trial by jury); *Intercon Sols., Inc. v. Basel Action Network*, 791 F.3d 729 (7th Cir. 2015) (applying *Davis*).

Statute was specifically designed to protect citizens like La Liberte for expressing their views at public forums such as city council meetings. In this case, Reid and the district court used La Liberte's limited public participation in local government, *as a mere private citizen*, as a sword to render her a limited purpose public figure. Endorsing the district court's findings that individuals who attend city council meetings and/or express their sentiments on pending legislation at such meetings for a few minutes, along with hundreds of others, are now public figures presents an undue danger to individuals' reputations and expressly contradicts the stated purpose of the California Anti-SLAPP Statute: "The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." Cal. Civ. Proc. Code. § 425.16(a).

Holding that average private citizens have voluntarily subjected themselves to false and defamatory abuse by public figures on account of their minimal and effectively unknown public participation – even without voluntary participation in the media to sway public opinion – in the absence of proving actual malice, cannot be the law. And it is not the law. Public figure status is reserved for those who "have assumed roles of special prominence in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *see also Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711, 745 (1989) ("A fairly high threshold of public activity is necessary to elevate

a person to public figure status."); *Reader's Digest Assn. v. Superior Ct.*, 37 Cal. 3d 244, 254-55 (1984) (holding that "courts should look for evidence of affirmative actions by which purported 'public figures' have thrust themselves *into the forefront of particular controversies*") (emphasis added). The district court did not identify any voluntary media participation by which La Liberte sought to influence public opinion or otherwise assumed special prominence on SB 54.

*Third*, assuming *arguendo* that La Liberte is a limited purpose public figure, the district court erred when it failed to consider La Liberte's allegations constituting a plausible case of actual malice, and it erred by failing to consider the cumulative weight of La Liberte's allegations. *See, e.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 419 U.S. 657, 668 (1989) (holding "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence"). La Liberte cumulatively alleged:

- Reid is herself biased and possesses personal animus toward President Trump's supporters;

- Reid was not present at the Council Meeting, but relied solely on an unreliable teenaged social media activist with the same political bias as Reid;

- Despite her sole source's bias, Reid failed to perform any investigation whatsoever;

17

- Despite failing to perform any investigation whatsoever, Reid deliberately altered and manipulated her sole source quote to make it appear more condemnatory that it truly was by changing Vargas's statement that an unidentified "they" had "yelled" to La Liberte, herself, "screamed" racial slurs;

- Cumulatively, Reid's conduct amounted to a purposeful avoidance of the truth, where she failed in any manner to check the truthfulness of her accusations despite materially altering the quote of her sole biased source.

La Liberte's allegations meet the exceedingly low plausibility burden required at the pleading stage for actual malice, which calls into question a subjective state of mind and therefore "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) (internal citations omitted).

*Fourth*, the district court erred when it failed to properly construe the July 1 Posts and assess whether the photograph and caption, independently or collectively, are capable of a defamatory meaning (even if they are also capable of a non-actionable meaning). *Cf. Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123, 1131 (1985) ("[O]ur inquiry is not to determine whether the publication may have an innocent meaning but rather to determine if it reasonably conveys a defamatory meaning.") (internal citations omitted). Instead, the district court analyzed the July 1 Posts' caption and photograph disjunctively rather than conjunctively, in its

18

strained effort to avoid finding a defamatory meaning. *See, e.g., Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 890 (9th Cir. 2016) ("This disingenuous approach overlooks the fact that a photograph itself can convey both an implicit and an explicit message[; …] a visual depiction can be the life of expression.") (internal citations omitted). Read together, the side-by-side photograph of La Liberte next to universally understood racist *conduct* during desegregation, individually and collectively alongside Reid's caption of the photograph, is reasonably capable of conveying that La Liberte made inappropriate racist *comments* to a minority child and/or was otherwise engaged in racist *conduct* – not merely blandly labeling La Liberte a racist.

*Fifth*, because the district court erred in properly construing the reasonable defamatory meaning of the July 1 Posts, it similarly erred in assessing whether that meaning is capable of being proven true or false. The district court held that using the epithet "racist" is non-actionable opinion, but it was only able to do so by wrongfully concluding that the July 1 Posts merely labeled La Liberte a racist in some abstract sense. As set forth above, the July 1 Posts reasonably convey that La Liberte was engaged in racist conduct. The pillar of a defamatory statement is that it is false and therefore capable of being proven so. And conduct is an event that either happened or did not. *Cf. Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248, 1262 (2010) (holding a publication was actionable because it went beyond "general

statements charging a person with being racist" to "expressly accus[ing plaintiff] of engaging in racist *firings*," and referring "to Overhill's *conduct* as 'racist and discriminatory abuse against Latina women immigrants.'") (emphasis in original).

The defamatory meaning of the July 1 Posts – that La Liberte engaged in racist conduct – is capable of being proven false. And, to the extent this Court finds that the juxtaposition of the photographs and the caption do not contain an explicit or implicit statement of fact, then it is plain from the language of the July 1 Posts that Reid is conveying her unstated knowledge of additional defamatory facts supporting her statements, which is an independently dispositive basis to reject her opinion defense. *Cf. John Doe 2 v. Superior Ct.*, 1 Cal. App. 5th 1300, 1314 (2016) (holding an opinions is actionable when based on facts regarding the plaintiff "that have not been stated by the defendant but give rise to the inference that there are undisclosed facts that justify the forming of the opinion."). The July 1 Posts clearly convey that an event involving racist conduct by La Liberte occurred, and to the extent she does not fairly describe that event, she leaves her implied knowledge unstated.

## **STANDARD OF REVIEW**

When reviewing the grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must "review a district court's grant of a motion to dismiss the complaint on the pleadings de novo and 'constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all

20

reasonable inferences in the plaintiff's favor.'" *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted). A complaint "must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 810 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A well-pleaded complaint will include facts that 'raise a right to relief above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

The review of grant of a motion to strike pursuant to California's Anti-SLAPP Statute is likewise de novo, with all reasonable inferences drawn in favor of the non-movant. *See Makaeff I*, 715 F.3d at 261; *Somerset Commc'ns Grp., LLC v. Wall to Wall Advert., Inc.*, 2015 WL 11234155, at *3 (W.D. Wash. May 5, 2015) (considering Washington's anti-SLAPP statute).

## **ARGUMENT**

### I.    **The Trial Court Erred in Applying California's Anti-SLAPP Statute Because It Conflicts with the Federal Rules of Civil Procedure and Is Unconstitutional.**

Reid attempts to leverage California's Anti-SLAPP Statute to absolve herself – a prominent media figure – of the duty to refrain from spreading false speech. The Anti-SLAPP Statute violates the sanctity of the federal courts, as Judge Kozinski of the Ninth Circuit frankly observed: "Ever since we allowed them to take root, anti-SLAPP cases have spread like kudzu through the federal vineyards." *Travelers Casualty Ins. Co. v. Hirsh*, 831 F.3d 1179, 1182 (9th Cir. 2016). This Court should

21

join with the D.C. Circuit, Fifth Circuit, Seventh Circuit, Tenth Circuit, and Eleventh Circuit to prevent the pernicious spread of anti-SLAPP statutes in federal courts.

In diversity cases "federal courts are to apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).  The Supreme Court has a "familiar" "framework" for deciding whether a Federal Rule must be applied instead of a state statute. First, a court must "determine whether [the Federal Rule] answers the question in dispute," and whether the state statute conflicts with the Federal Rule as it "attempts to answer the same question."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). "[T]he test of whether a conflict between the Federal Rules and a state statute exists is not whether it is logically possible for a court to comply with the requirements of both, but whether the Federal Rules in question are sufficiently broad to control the issue before the court."  *Klocke*, 936 F.3d at 247 (internal quotation marks omitted).

Further, the Federal Rules impose comprehensive rather than minimum pleading requirements. Rules 8, 12, and 56 "provide a comprehensive framework governing pretrial dismissal and judgment." *Carbone*, 910 F.3d at 1351. These rules "contemplate that a claim will be assessed on the pleadings alone or under the summary judgment standard; there is no room for any other device for determining whether a valid claim supported by sufficient evidence [will] avoid pretrial dismissal." *Id.*  If there is a conflict, the Rule applies "unless it exceeds statutory

22

authorization or Congress's rulemaking power." *Id.* A court need "not wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid." *Id.*

Because valid Federal Rules answer the question in dispute, the Court should reverse the district court's holding that the Anti-SLAPP Statute is enforceable in federal court.

Moreover, the Anti-SLAPP Statute is facially unconstitutional because it violates the Seventh Amendment's right to a jury trial and the Fourteenth Amendment's equal protection guarantees.

### A. Second Circuit Precedent Militates Against Applying the Anti-SLAPP Statute

Contrary to Reid's suggestion below, the Second Circuit has never allowed California's Anti-SLAPP Statute to take root in this Circuit. Reid cited to *Liberty Synergistics Inc. v. Microflo Ltd.* (*Liberty Synergistics I*), 718 F.3d 138 (2d Cir. 2013) to support her contention that the Anti-SLAPP Statute "must be considered." But Reid ignored this Court's subsequent opinion in the same case confirming that it did "not reach the issue of whether California's anti-SLAPP statute is applicable in federal court," including because the court did not determine if the statute conflicts with the Federal Rules. *Liberty Synergistics II*, 637 Fed. App'x at 34 n.1 (internal brackets omitted); *see also Ernst v. Carrigan*, 814 F.3d 116, 122 (2d Cir. 2016).

*Liberty Synergistics I* suggests this Court would hold that the Anti-SLAPP Statute does not apply in federal court. First, *Liberty Synergistics I* assumed

appellate jurisdiction based on the collateral order doctrine rather than applying the Anti-SLAPP Statute's provision permitting interlocutory appeal. Second, *Liberty Synergistics I* held that the Anti-SLAPP Statute "is not a substantive immunity from suit." 718 F.3d at 148 n.9 (internal quotation marks omitted). This sets California's Anti-SLAPP Statute apart from the Nevada anti-SLAPP statute, which the this Courtt applied, in part, because Nevada's statutory language expressly made it an "immunity from civil liability." *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (observing that a state may "define the defenses to . . . [a] claim, including the defense of immunity," as Nevada did in N.R.S. § 41.650). In any event, *Liberty Synergistics II* post-dates *Adelson*, and made it imminently clear that this Court has not decided the issue. *Liberty Synergistics II*, 637 Fed. App'x at 34 n.1.

Prior to the district court's decision below, the only court within the Second Circuit that squarely considered California's Anti-SLAPP Statute held that it conflicted with the Federal Rules and thus cannot be applied in federal court. *See In re Gawker Media LLC*, 571 B.R. 612 (Bankr. S.D.N.Y. 2017). There, the court resoundingly rejected the application of the Anti-SLAPP Statute under the same reasoning the D.C. Circuit articulated in *Abbas*.[7] *Id.* at 625-33 (holding "that even

---

[7] The D.C. anti-SLAPP statute at issue in *Abbas* is the functional equivalent of California's Anti-SLAPP Statute, requiring the plaintiff to demonstrate that "'the claim is likely to succeed on the merits.'" *Abbas*, 783 F.3d at 1331 (quoting D.C. Code § 16–5502(a)).

though the California anti-SLAPP statute is substantive under *Erie*, the literal application of the special motion procedures conflict with Rule 56 (and Rule 12 …) and does not apply" in federal court).

### B. The Anti-SLAPP Statute Is Unenforceable Under *Shady Grove.*

### i. The Question in Dispute Is Whether La Liberte's Amended Complaint States a Claim.

The question in dispute is whether La Liberte's Amended Complaint states a claim for relief to avoid pretrial dismissal.[8] *See Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018) ("The question in dispute is whether Carbone's complaint states a claim for relief supported by sufficient evidence to avoid pretrial dismissal.").[9] Like *Shady Grove*, the question cannot be framed in terms of the filing of an anti-SLAPP motion or the specific requirements of the state law in question.  *See Shady Grove*, 559 U.S. at 399 (framing "[t]he question in dispute" as "whether Shady Grove's suit may proceed as a class action"). The Court

---

[8] In the most recent circuit opinion refusing to apply an analogous anti-SLAPP statute in federal court, the Fifth Circuit framed the question as "what are the circumstances under which a court must dismiss a case before trial?" *Klocke*, 936 F.3d at 245.

[9] *Carbone* analyzed Georgia's anti-SLAPP statute, which is functionally analogous to California's, as it provides a motion to strike mechanism requiring the plaintiff to establish a "probability" of "prevail[ing] on the claim." *See Carbone*, 910 F.3d at 1348 (quoting O.C.G.A. § 9-11-11.1(b)(1)).

25

must instead focus on the fundamental disagreement: whether La Liberte stated a claim that cannot be dismissed.

### ii.   Rules 8 and 12 Answer the Question in Dispute.

Rules 8 and 12 answer whether La Liberte can proceed with her claim based on the facts she pleaded.[10] *See Abbas*, 783 F.3d at 1333–34 (finding D.C.'s anti-SLAPP statute and Federal Rules 12 and 56 answer the same question).  The Anti-SLAPP Statute attempts to answer the same question but does so by requiring the court to "consider the pleadings" and determine if "the plaintiff has established that there is a *probability* that the plaintiff will prevail on the claim,"  Cal. Civ. Proc. Code § 425.16(b) (emphasis added).  Because federal law and state law answer the same question, and Rule 12 is sufficiently broad to cover the point in dispute, the Anti-SLAPP Statute cannot be enforced in federal court.

*Shady Grove* again informs the analysis.  The Supreme Court held that Rule 23 answered the question in dispute because "it provides a one-size-fits-all formula for deciding the class-action question." 559 U.S. at 399.  The Supreme Court then reasoned that "because . . . [the state law] attempts to answer the same question—

---

[10] Because the district court construed the Anti-SLAPP Motion as "challenging the legal sufficiency of Plaintiff's claims" and thus analyzed Reid's "motion to strike under the procedural standards of Rule 12(b)(6)," (JA268), La Liberte focuses on the Anti-SLAPP Statute's various conflicts with Rules 8 and 12, but as also explained herein, the Anti-SLAPP Statute conflicts with Rule 56 and the Federal Rule's cohesive framework for pretrial dispositive motions.

26

*i.e.,* it states that Shady Grove's suit 'may *not* be maintained as a class action' because of the relief it seeks—it cannot apply in diversity suits." *Id.* (emphasis in original).

Here, the Federal Rules are broad, unavoidable, and answer whether La Liberte can proceed with her claim based on the Amended Complaint. Under Rule 8, a complaint must satisfy three components to state a claim for relief:

> (1) "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support"; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the relief sought."

*Carbone*, 910 F.3d at 1352 (quoting Fed. R. Civ. P. 8). And, "[b]y negative implication, the enumeration of this series of requirements excludes other requirements that must be satisfied for a complaint to state a claim for relief. *Id.* (citing *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)).[11]

Rule 8 works hand in glove with Rule 12(b)(6), which along with Rule 12(c), provides the only mechanism for testing whether the pleadings set forth a meritorious claim: i.e., whether a complaint fails "to state a claim upon which relief

---

[11] When the Federal Rules raise the bar for pleading, they do so specifically in Rule 9's list of "special matters"—which does not include defamation claims or First Amendment concerns. *See* Fed. R. Civ. P. 9.

can be granted." Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) thus answers whether a La Liberte may proceed with her claim based on the facts she pleaded.

Moreover, the Anti-SLAPP Statute conflicts with Rules 8 and 12(b)(6) because the Anti-SLAPP Statute's "probability" standard imposes a heavier burden at the pleadings stage. "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Asking for *plausible* grounds… *does not impose a probability requirement* at the pleading stage . . . ." *Compare Twombly*, 550 U.S. at 545 (emphasis added) *with* Cal. Civ. Proc. Code § 425.16(b) (requiring probability). Under Rules 8 and 12(b)(6), "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is *improbable*." *Id.* (emphasis added). "The anti-SLAPP statute abrogates that entitlement in cases that fall within its ambit by requiring the plaintiff to establish that success is not merely plausible but probable." *Carbone*, 910 F.3d at 1353.

The lower court erroneously attempted to rewrite the Anti-SLAPP Statute by erasing its "probability" standard and instead importing Rule 12(b)(6)'s plausibility standard into the state-law statute.  In so doing, the lower court followed the Ninth Circuit's misguided attempt to maintain uniformity in its decisions by fitting a square peg into a round hole. *See Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med.*

28

*Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018) (deciding to graft a 12(b)(6) standard onto the Anti-SLAPP Statute). The Ninth Circuit itself is deeply conflicted about its role as the trailblazer that allowed anti-SLAPP statutes into federal courts. In *Makaeff II*, the court was one vote shy of an *en banc* rehearing that would have likely undone its erroneous precedent enforcing anti-SLAPP statutes. 736 F.3d at 1180, 1188. *Makaeff II* provided the following rationale for denying the petition and adhering to Ninth Circuit precedent, which either does not apply to this Court or no longer applies at all: "the panel opinion faithfully follows our circuit's precedent, creates no inter-circuit split, does not present an issue of exceptional importance, and . . . the contrary result would create a circuit split . . . ." *Id.* at 1180. A robust circuit split now exists—with the majority of circuits that have weighed in refusing to enforce an anti-SLAPP statute[12]—and this Circuit is not bound by the force of the Ninth Circuit's precedent.

"In short, Rules 8, 12, and 56 express 'with unmistakable clarity' that proof of probability of success on the merits 'is not required in federal courts' to avoid

---

[12] While the D.C. Circuit, Fifth Circuit, and Eleventh Circuit's opinions discussed above are most applicable given the analogous anti-SLAPP statutes at issue, the Seventh Circuit and Tenth Circuit have also refused to enforce anti-SLAPP statutes. *See Los Lobos Renewable Power, LLC v. Americulture, Inc*, 885 F.3d 659, 673 (10th Cir.), *cert. denied sub nom. AmeriCulture, Inc. v. Los Lobos Renewable Power, LLC*, 139 S. Ct. 591, 202 L. Ed. 2d 427 (2018) (refusing to apply New Mexico's anti-SLAPP statute); *Intercon Sols., Inc. v. Basel Action Network*, 791 F.3d 729, 732 (7th Cir. 2015) (refusing to apply the anti-SLAP statute of the State of Washington).

pretrial dismissal . . . ." *Carbone*, 910 F.3d at 1351 (quoting *Hanna*, 380 U.S. at 470)). Under *Shady Grove*, they therefore govern in diversity cases unless they violate the Rules Enabling Act. *Id.*

### iii. Federal Rules 8, 12 and 56 Do Not Violate the REA

Turning to *Shady Grove's* second step, Rules 8 and 12 govern unless they were adopted in violation of the Rules Enabling Act ("REA"), 28 U.S.C. § 2072. *Shady Grove*, 130 S. Ct. at 1442. "The test [is]…whether a [federal] rule really regulates procedure." *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941). Notably, the Supreme Court has "rejected every statutory challenge to [the validity of] a Federal Rule that has come before" it. *Shady Grove*, 559 U.S. at 408. Rules 8 and 12 are valid under the REA, as they are quintessentially procedural—regulating the judicial process for pleading and pre-trial adjudication of a claim. *See Carbone*, 910 F.3d at 1357 (holding that Rules 8, 12, and 56 "affect[ ] only the process of enforcing litigants' rights and not the rights themselves") (internal quotation marks omitted); *Abbas*, 783 F.3d at 1337 (Rule 12 and is valid under the REA).

Accordingly, the Act cannot be applied in federal courts because it directly collides with the valid Rules 8 and 12—which answer the question in dispute.

### C. The California Anti-SLAPP Statute Violates the Constitution.

The grant of the Anti-SLAPP Motion should also be reversed because the Anti-SLAPP Statute violates the Seventh Amendment and Fourteenth Amendment.

The Seventh Amendment requires that the right to a jury trial on disputed issues of material fact "be preserved inviolate." Yet, the Anti-SLAPP Statute violated this mandate by explicitly directing courts to "consider . . . supporting and opposing affidavits" to determine if a plaintiff meets the burden of establishing a "that the plaintiff will prevail on the claim." Cal. Civ. Proc. § 425.16(b).

Other courts have found that anti-SLAPP statutes violate the Seventh Amendment. *See*, *e.g.*, *Davis v. Cox*, 351 P.3d 862 (2015). In *Davis*, the Supreme Court of Washington found that because its state's anti-SLAPP statute "provides a burden of proof concerning whether the evidence crosses a certain threshold of proving a likelihood of prevailing on the claim," the statute impermissibly "creates a truncated adjudication of the merits of a plaintiff's claim, including nonfrivolous factual issues, without a trial." *Id.* at 867. The court held that "[s]uch a procedure invades the jury's essential role of deciding debatable questions of fact . . . violat[ing] the right of trial by jury." *Id.* at 874; *see also Leiendecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 232–33 (Minn. 2014) (finding constitutionality question not before it, but remarking on the impossibility of applying the constitutional avoidance doctrine).[13]

---

[13] La Liberte acknowledges that the anti-SLAPP statutes in these cases included a "clear and convincing" standard of review, while California's Anti-SLAPP Statute has a "probability" of prevailing on the claim standard. But each of the statutes require a judicial weighing of disputed facts that intrudes on the province of the jury.

While some courts have enforced anti-SLAPP statutes, they have done so either without discussion of Seventh Amendment implications or through the doctrine of constitutional avoidance, which "requires [the court] to choose a constitutional interpretation of a statute over an unconstitutional interpretation when the statute is genuinely susceptive to two constructions." *Davis*, 351 P.3d at 867. By grafting onto their anti-SLAPP statutes a standard akin to a Rule 12 or Rule 56 standard, these courts avoid the obvious conflict between the Seventh Amendment and the anti-SLAPP statutes' design. *See, e.g.*, *Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 823 (1994) (holding that plaintiff must make out prima facie showing after crediting all of his evidence).

This Court should follow Washington' Supreme Court and decline to save the Anti-SLAPP Statute from its constitutional infirmity. *See Davis*, 351 P.3d at 871 (holding that it was neither reasonable nor possible to impose a summary judgment analysis onto the anti-SLAPP as matter of construction). The Anti-SLAPP Statute unreasonably invades La Liberte's constitutional right to have a jury determine disputed facts in a non-frivolous case.

Moreover, the Anti-SLAPP Statute violates the Equal Protection Clause of the Fourteenth Amendment because it lacks a rational basis for singling out victims of defamation for unequal treatment. The Anti-SLAPP Statute is explicitly based on encouraging and protecting First Amendment rights. The Supreme Court has refused

32

to grant additional procedural protections under the First Amendment for defamation defendants, lest the Court engage in "a form of double counting." *Calder v. Jones*, 465 U.S. 783, 789–90 (1984) (holding that "the potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits," and that the Court has "declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in substantive laws.") (citing *New York Times, Inc. v. Sullivan*, 376 U.S. 254 (1964), *Gertz*, 418 U.S. 323, *Herbert v. Lando*, 441 U.S. 153 (1979)). Because the Anti-SLAPP Statute engages in unreasonable "double counting" of the First Amendment, it has no rational basis and deprives La Liberte and others of equal protection under the law.

## II. The District Court Erred in Holding that La Liberte Is a Limited Purpose Public Figure Plaintiff.

The district court erred in holding that La Liberte is a limited purpose public figure based on its erroneous factual finding that La Liberte thrust herself to the forefront of a public controversy simply by participating in local city council meetings and its erroneous determination that Reid's accusations of racist misconduct were germane to a public controversy. Under the district court's reasoning, any individual exercising her right to speak during local governmental

meetings would be treated as a public figure under defamation law – which would be contrary to established law.

The Supreme Court has established the standard for deeming an otherwise private individual a limited public figure for defamation litigation. *See Gertz*, 418 U.S. 323. In *Gertz*, the Supreme Court rejected the idea that an individual can become a limited public figure if she has not "assume[d] **special prominence** in the resolution of public questions." *Id.* at 351 (emphasis added). Any private individual subjected to the higher standard of establishing actual malice must publicly "invite attention and comment" or have "assumed an 'influential role in ordering society.'" *Id.* at 345. *Gertz* rejected the application of the limited public figure status where the plaintiff

> played a minimal role at the coroner's inquest, and his participation related solely to his representation of a private client. He took no part in the criminal prosecution…. Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome.

*Id.* at 352; *see also Hutchinson*, 443 U.S. at 135-36 (1979) (rejecting contention that plaintiff, a state employee who had conducted research and published papers under grants from NASA and other federal agencies, was a limited public figure regarding his receipt of federal funds for research projects where plaintiff had "at no time assumed any role of public prominence in the broad question of concern about

expenditures"; where "[n]either his applications for federal grants nor his publications in professional journals can be said to have invited that degree of public attention and comment on his receipt of federal grants essential to meet the public figure level"; and where plaintiff "did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure").

This Court has determined that prior to holding a private individual to the heightened standard of establishing actual malice, the defendant must satisfy a 4-part test by establishing that the plaintiff has:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Biro v. Conde Nast*, 622 Fed. App'x 67, 69 (2d Cir. 2015) (quoting *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984)). Reid bears the burden of proving that La Liberte is a limited public figure. *See, e.g.*, *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1346 (S.D.N.Y. 1977). "A fairly high threshold of public activity is necessary to elevate a person to public status." *Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711, 745 (1989).[14]

---

[14] Whether a plaintiff in a defamation action is a limited public figure is "a pure constitutional question." *Makaeff I*, 715 F.3d at 270. Federal courts, however, routinely cite state law as part of their analysis.

### A. La Liberte Did Not Assume a Position of Prominence in a Public Controversy.

To become a limited public figure, La Liberte "must have '**thrust [herself] to the forefront**' of that controversy 'in order to influence the resolution of the issues involved.'" *Makaeff I*, 715 F.3d at 267 (emphasis added) (citing *Gertz*, 418 U.S. at 345). Thus, a "limited public figure" has been defined as someone "who has '**achieved fame or notoriety** based on their role in a particular public issue.'" *Prendeville v. Singer*, 155 Fed. App'x 303, 305 (9th Cir. 2005) (citation omitted) (emphasis added). However, a person "is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Z.F. v. Ripon Unified Sch. Dist.*, 482 Fed. App'x 239, 240-41 (9th Cir. 2012) (citation omitted). A defendant "must show more than mere newsworthiness to justify application of the demanding burden" of proving actual malice. *Id.* at 241. Additionally, "the Second Circuit has held that **continuous access to the media** to seek public attention with respect to the controversy makes an individual more likely to be a limited purpose public figure." *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 251 (S.D.N.Y. 2014) (emphasis added).

The only facts identified by the district court to support its holding are (1) La Liberte attended eight city council meetings regarding SB 54, and (2) La Liberte's photograph was included in an article published by the Washington Post – without

36

even identifying her by name, much less including any statement by her. (JA273). These facts are insufficient to justify treating La Liberte as a limited public figure. Indeed, deeming La Liberte a public figure based on nothing more than the simple exercise of her right as a citizen to speak to local government – along with hundreds of other interested citizens – would be antithetical to the framework establishing the distinction between public and private figures. *See, e.g.*, *Bell v. Nat'l Republican Cong. Comm.*, 187 F. Supp. 2d 605, 613 (S.D.W. Va. 2002) (rejecting treatment of campaign volunteer as limited public figure: "His expression may touch on public concerns and may be intended to affect public opinion, but a common citizen's political speech does not thrust him into the public limelight and subject him to the same torrent of criticism that the candidates themselves must bear. Political speech is a common right commonly exercised. . . . Legal recognition that such minimal engagement in a political campaign makes one a limited-purpose public figure for purposes of a defamation analysis would serve to chill citizen participation in the political process and further the lamentable trend toward public passivity. Citizens need not weigh the value of participating in the electoral process against the risk of being libeled.").

La Liberte did not assume any "**special prominence** in the resolution" of any public issue and did not "engage[] the **attention of the public** in an attempt to influence the resolution of the issues involved." *Wolston v. Reader's Digest Ass'n,*

*Inc.*, 443 U.S. 157, 168 (1979) (emphasis added); *see also Hutchinson*, 443 U.S. at 135 (no limited public figure where plaintiff "did not thrust himself or his view into public controversy to influence others"). She spoke for two minutes and twelve seconds of an over five-hour meeting during which hundreds of other citizens also spoke. (JA044 ¶ 37 and n.7; https://simivalley.granicus.com/MediaPlayer.php?view_id=5&clip_id=2102 (at minute marker 04:17:45-04:19:57). Prior to the defamatory statements, La Liberte had not sought or received any media attention, aside from the one published photograph that did not even identify her by name, and she had no access to the media – much less the "regular and continuous" access required by the Second Circuit. La Liberte did nothing more than exercise her right as a citizen to speak for a few minutes to voice her personal opinion to local government alongside hundreds of others. None of this amounts to La Liberte thrusting herself to the **forefront** of a controversy or that she had continuous access to the media.

If La Liberte were deemed a limited public figure as a result of this minimal exercise of her rights as a citizen, every one of the countless individuals who exercises their civic duty by speaking for a few minutes to local government representatives would be deemed limited public figures – that is not the law.

**B.      Reid's Defamatory Statements Were Not Germane to a Public Controversy.**

A limited purpose public figure only is considered as such "for a **limited** range of issues." *Gertz*, 418 U.S. at 351 (emphasis added). The standard is "whether a reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy and **whether the alleged defamation related to that controversy**." *Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d 1287, 1298 (D.C. Cir. 1980) (emphasis added).

The district court concluded that the public issue is "[t]he passage of SB 54." (JA273). With one sentence, the district court cursorily concluded that Reid's defamatory statements are "germane" to this exceedingly broad topic because they "center on Plaintiff's actions at the Council Meeting in opposing the passage of SB 54." (JA274). This analysis – such as it is – is incorrect.

Reid's false accusations of racial misconduct are completely unrelated to SB 54 or to La Liberte's participation in the Council Meeting. The fact that Reid's accusations that La Liberte screamed racial slurs at a minor relate temporally to the Council Meeting is insufficient to render the Accusations "germane" to the public issue of "[t]he passage of SB 54." *See Waldbaum*, 627 F.2d at 1298 ("Misstatements wholly unrelated to the controversy … do not receive the New York Times protection."). If Reid were permitted to transform La Liberte into a limited public figure for accusations of racist conduct based solely on La Liberte's participation in a Council Meeting, then no citizen who participates in local government would have

39

any expectation of privacy on any topic. *See, e.g.*, *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) ("The purpose of the germaneness inquiry is to ensure that the allegedly defamatory statement—whether true or not—is related to the plaintiff's role in the relevant public controversy. This ensures that publishers cannot use an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life.").

Reid has not satisfied her burden to establish that La Liberte is a limited public figure, and La Liberte therefore should be treated as a private figure who is not required to establish actual malice to succeed on her defamation claim.

## III. The District Court Erred in Holding that La Liberte Failed to Allege Actual Malice for the June 29 Post.

Assuming *arguendo* that La Liberte must establish actual malice, the district court erred in concluding that she "fails to allege" actual malice with respect to the June 29 Instagram Post. The district court applied an erroneous definition of actual malice and incorrectly concluded that "the Amended Complaint is void of any allegations that Defendant **knew or could infer** that Vargas' account of the interaction was inaccurate." (JA275 (emphasis added)). That is not the standard for proving actual malice – much less the standard for pleading a plausible claim of actual malice.

This Court has held that actual malice "simply means the statement was 'made with knowledge that it was false or with reckless disregard of whether it was false

40

or not.'" *Palin*, 940 F.3d at 816; *see also Sullivan*, 376 U.S. at 280 (actual malice is defined as publishing "with knowledge" that a publication "was false **or with reckless disregard** of whether it was false or not" (emphasis added)). Thus, the Amended Complaint must include allegations that, at a minimum, "give rise to a plausible inference that [defendant] was recklessly disregarding the truth when [s]he published" the Accusations. *Palin*, 940 F.3d at 814.

Direct evidence of actual malice "is extremely difficult to obtain, so actual malice may be proven by circumstantial evidence, given the totality of the circumstances surrounding the publication." *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1277-78 (C.D. Cal. 2000); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("Malice may be proved inferentially[.]") (quoting *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1085 (9th Cir. 2002) ("A court typically will infer actual malice from objective facts. These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.") (quoting *Bose Corp. v. Consumers Union*, 692 F.3d 189, 196 (1st Cir. 1982)). There are numerous types of circumstantial evidence that can combine to establish actual malice. "[E]vidence of **negligence**, of **motive and of intent** may be adduced for the purpose of establishing, **by cumulation and by appropriate inferences**, the fact of

41

a defendant's recklessness or of his knowledge of falsity," and factors that may be considered include "[a] **failure to investigate**,"[15] "anger and **hostility** toward the plaintiff," and "reliance on **sources known to be unreliable . . . or known to be biased** against the plaintiff." *Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d 244, 257-58 (1984) (emphasis added); *see also McFarlane v. Sheridan Sq. Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996) (plaintiff is "entitled to an aggregate consideration of all [her] evidence, construed most favorably to" her) (citations omitted).

In *Palin*, this Court recognized that actual malice can be established through the cumulation of circumstantial evidence:

> Palin's overarching theory of actual malice is that Bennet had a "pre-determined" argument he wanted to make in the editorial. Bennet's fixation on this set goal, the claim goes, led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false. The PAC contains allegations that paint a plausible picture of this actual-malice scenario. . . .
>
> … And that plausible inference of reckless disregard is strengthened when added to Palin's allegations that Bennet had reason to be personally biased against Palin and pro-gun positions in general. When properly viewed in

---

[15] "Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." *Harte-Hanks Comms, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (citations omitted); *see also St. Amant v. Thompson*, 390 U.S. 727, 730 (1968) (finding purposeful avoidance sufficient to show actual malice where defendant relied on biased source, failed to interview key witnesses, and otherwise failed to investigate claim of unreliable source).

the plaintiff's favor, a reasonable factfinder could conclude this amounted
to more than a mistake due to a research failure.

*Palin*, 940 F.3d at 813, 814-15.

Similarly in this case, La Liberte has pleaded a plausible theory of actual
malice that, based upon Reid's experience as a journalist, her pre-existing bias
toward President Trump supporters, and her blind reliance on a biased source, Reid
either knew that the Accusations were false or was reckless as to whether they were
false. The Amended Complaint alleges, *inter alia*, that: (1) Reid "has a
demonstrable, extreme, and well-publicized bias against President Donald Trump,
his supporters, and the Republican Party" (JA038 ¶ 7); (2) Reid "was not present at
the Council meeting" and "was not even aware that the interaction occurred at a City
Council meeting" (JA039 ¶ 12, JA050 ¶ 79); (3) Reid "had not a single source to
support her malicious claim that La Liberte screamed racial slurs at a minor while
discussing immigration policy" (JA039 ¶ 12; *see also* JA050 ¶¶ 81-82); (4) Reid
relied solely on "a teenage social media activist named Alan Vargas, also with a
demonstrable political bias and agenda" (JA045 ¶ 41); (5) Reid "published her June
29 Twitter Post with the entirely unreliable Alan Vargas tweet as her sole source and
made her June 29 Instagram Post without any source at all" (JA038 ¶ 7); (6) on June
30 and July 1, La Liberte's son emailed Reid providing her with evidence that her
Accusations were inaccurate, but Reid did not retract her statements (JA047 ¶¶ 53-
54; *see also* JA050 ¶ 85); (7) Reid failed to verify her claims "in order to advance

43

her own political and professional agenda" (JA050 ¶ 84; *see also* JA052 ¶¶ 96-98); and (8) despite failing to perform any investigation whatsoever, Reid deliberately altered and manipulated her sole source quote to make it appear more condemnatory that it truly was by changing Vargas's statement that an unidentified "they" had yelled to an accusation that La Liberte "screamed" racial slurs (JA046 ¶¶ 48-49).

Cumulatively, Reid's conduct amounted to, at the very least, a purposeful avoidance of the truth, whereby she failed in any manner to check the truthfulness of her Accusations despite materially altering the quote of her sole biased source. *See Curtis Publ'g v. Butts*, 388 U.S. 130, 156-57 (1967) (failure to investigate the truth of unreliable source's allegations may support finding of actual malice). These allegations, taken individually and certainly when considered cumulatively, are more than sufficient to establish a plausible claim of actual malice. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 510 U.S. 496, 511-25 (1991) (actual malice where defendant deliberately alters source quote, "which alteration results in a material change in the meaning conveyed"); *Westmoreland v. CBS Inc.,* 596 F. Supp. 1170, 1176 (S.D.N.Y 1984) (malice may be established when defendant "knowingly or recklessly misstates the evidence to seem more convincing or condemnatory than it is" or if "it distorts statements of witnesses so that they seem to say more than in fact was said"). Reid's ill will towards Trump supporters further reinforces that she acted with actual malice.

IV. **Through the Juxtaposition of La Liberte's Photograph Alongside Racist Conduct in the 1950s with Reid's Caption, the July 1 Posts Reasonably Convey the Defamatory Gist that La Liberte Engaged in Racist Conduct.**

The court's obligation in assessing defamatory meaning is not to determine whether, in the judge's estimation, the publication contains a non-defamatory meaning, but is instead to determine whether the publication is reasonably capable of a defamatory meaning when viewed through the lens of the average reader – an inquiry driven by the context of the publication as a whole. *Cf. Church of Scientology of California v. Flynn*, 744 F.2d 694, 696 (9th Cir. 1984) ("'[T]his court's inquiry is not to determine if the communications may have an innocent meaning but rather to determine if the communication reasonably carries with it a defamatory meaning. … Thus, the district court's decision cannot be upheld on this ground if 'by reasonable implication a defamatory meaning may be found in the communication.'") (quoting *Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980)); *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d. 1113, 1120 (C.D. Cal. 1998), *aff'd* 210 F.3d 1036 (9th Cir. 2000) ("'To discern whether a statement has a defamatory meaning, [it is] interpret[ed] from the standpoint of the average reader, … judging the statement not in isolation, but within the context in which it is made.'") (internal citations omitted); *Selleck*, 166 Cal. App. 3d at 1131 (1985) ("It is error for a court to rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning.") (internal citations omitted).

45

The defendant is liable for "what is explicitly stated as well as what insinuation and implication can be reasonably drawn from the publication." *Selleck*, 166 Cal. App. 3d at 1131. And while "[d]efamation actions cannot be based on snippets taken out of context," "[b]y the same taken, not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action." *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998) (internal citation omitted). If the July 1 Posts are reasonably capable of a defamatory meaning, the issue is for the jury to ultimately decide. *Flynn*, 744 F.2d at 696 ("The existence of a defamatory meaning is generally a question of fact for the jury.").

The district court did not engage in this well-defined and established inquiry. Instead, the district court overtly avoided construing the July 1 Posts in their complete context, which included their use of both language and visual aids to convey a defamatory meaning:





**joyannreid** It was inevitable that this image would be made. It's also easy to look at old black and white photos and think: I can't believe that person screaming at a child, with their face twisted in rage, is real. By every one of them were. History sometimes repeats. And it is full of rage. Hat tip to @joseiswriting. #regram #history #chooselove

Load more comments

**canadiannurseratchet** As a WW I can never

**6,575 likes**

14 HOURS AGO

Log in to like or comment.

(JA087). The district court committed reversible error by failing to consider the meaning conveyed by the side-by-side photographs themselves, as well as failing to consider the meaning of the photographs in combination with the caption. As the Ninth Circuit recently stated:

> This disingenuous approach overlooks the fact that a photograph itself can convey both an implicit and an explicit message and that the headline, caption and photograph taken together are also a statement. As the Supreme Court observed in a similar context, "words and punctuation express meaning. Meaning is the life of language." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). . . . Likewise, a visual depiction can be the life of expression.

*Manzari,* 830 F.3d 881, 890.

In an oft-used expression, a picture is worth a thousand words. Thus, it is no surprise that the use of a photograph may itself constitute libel "as long as the implication is itself one that a reasonable person would draw and the implication is actionable." *Geary v. Goldstein*, 831 F. Supp. 269, 277 (S.D.N.Y. 1993), *rev'd on other grounds*, 1996 WL 447776 (S.D.N.Y. Aug. 8, 1996) ("Regarding defendants' first assertion, that the juxtaposition of two pieces of videotape is not a 'statement,' numerous decisions have held that the implication derived from photographs can be actionable.") (internal citations omitted); *see also Regan v. Sullivan*, 557 F.2d 300, 308-09 (2d Cir. 1977) ("Moreover, it is clear that publication of a photograph can constitute libel ....") (internal citation omitted).

The July 1 Posts convey a defamatory meaning on two individually dispositive bases: (1) the juxtaposition of La Liberte's Photograph alongside a photographic depiction of racist conduct during desegregation conveys that La Liberte was making racist *comments* toward a minority child or was otherwise engaged in racist *conduct*; and/or (2) the photographs alongside Reid's caption convey that La Liberte was making racist *comments* toward a minority child or was otherwise engaged in racist *conduct*.

As an initial matter, there can be no doubt that the photograph of racist conduct in 1957 Little Rock, Arkansas is universally understood to be an *act of racism*. Placing La Liberte's Photograph alongside the Little Rock photograph

48

speaks for itself, without further textual elaboration by Reid. *Cf. Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1083 (9th Cir. 2002) ("It is well-established that '[a] defendant is liable for what is insinuated as well as for what is stated explicitly.'") (quoting *O'Connor v. McGraw-Hill*, Inc., 159 Cal. App. 3d 478 (1984)). It is a clear statement that La Liberte is the modern-day equivalent of the 1957 woman who, with racial animus, was verbally assaulting an African-American child.

It is well settled that photographs can themselves be defamatory, particularly when displayed in a disreputable context. *See Solano*, 292 F.3d at 1080-84 (use of plaintiff's photograph in bathing suit on cover of Playgirl magazine was itself capable of harm to plaintiff's reputation because the magazine's nature itself would allow "a jury [to] reasonably … conclude that that Playgirl cover conveyed the message that Solano was not the wholesome person he claimed to be, that he was willing to – or was 'washed up' and had to – sell himself naked to a women's sex magazine.")*; Regan*, 557 F.2d at 308-309 ("[S]howing of appellant's picture as part of a 'rogues' gallery'" may carry "with it the clear implication that the person portrayed is a criminal," which "is a question for the jury."); *Geary*, 831 F. Supp. at 270-77, n.9 (rejecting the assertion that plaintiff "has no defamation claim because defendants made no statement about her" where juxtaposition of two videotapes conveyed she had "willingly participated in a pornographic video segment," because

there is "no basis on which to distinguish between implications made by juxtaposed images and those made by juxtaposed statements.").

As in *Solano*, *Regan*, and *Geary*, Reid created a context for La Liberte's Photograph – placing it side-by-side with a photograph of one of the most notorious racist acts of the 20th Century – thereby casting a defamatory pall that conveyed La Liberte was engaged in the verbal assault of a child because of his race. Thus, the district court's findings that Reid did not explicitly use the words "La Liberte engaged in racist conduct akin to that demonstrated during desegregation" is immaterial to ascertaining the defamatory meaning of the July 1 Posts.

Further, to the extent the Court finds that the photographs alone did not convey a defamatory meaning, Reid's caption makes the defamatory meaning inescapable. *See, e.g.*, *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 364 (S.D.N.Y 1998) ("A photograph which is otherwise an accurate picture of a plaintiff may nonetheless be actionable where the caption suggests something defamatory and false about the plaintiff.") (internal citations omitted). Reid's caption to the July 1 Posts states: "It's also easy to look at old black and white photos and think: I can't believe that person screaming at a child, with their face twisted in rage, is real. B[ut] every one of them were. History sometimes repeats. And it is full of rage." (JA087). Thus, Reid's caption confirmed what was reasonably conveyed by the photographs themselves:

La Liberte engaged in the same type of hateful racist conduct universally understood to have occurred during desegregation, as typified by the screaming woman in 1957.

The district court's attempt to avoid this interpretation amounts to nothing more than hand waving, finding that "the juxtaposition of the photographs does not 'make clear that [Plaintiff] is alleged to have engaged in *specific racist conduct* akin to that demonstrated during desegregation." (JA276). Even if that were true – and it is not – the particulars of the racist conduct La Liberte purportedly engaged in is irrelevant to whether there was a defamatory meaning. The accusation that La Liberte actually engaged in racist conduct, at all, is sufficient.

Moreover and although unnecessary to find defamatory meaning in this instance, from a contextual standpoint, Reid was merely riffing off of her prior June 29 Instagram Post, and expressly so: "Make the picture black and white and it could be the 1950s and the desegregation of school." (JA084). That is exactly what she did in her July 1 Posts – published a black and white photo purporting to show racist conduct during desegregation – as she expressly acknowledged in her July 1 Posts by giving a "[h]at tip to @joseiswriting." (JA087). Thus, the July 1 Posts were published within the context of Reid's previous express accusation that La Liberte screamed specific racial slurs at a minority child. *Cf. Baker v. Los Angeles Herald Examiner*, 42 Cal. 3d. 254, 261 (1986) ("This contextual analysis demands that the courts look at … the knowledge and understanding of the audience to whom the

51

publication was directed. … It must be read as a whole in order to determine its import and the effect it was calculated to have on the reader, and construed in the light of the whole scope and apparent object of the writer .…") (internal citations omitted). The July 1 Posts were merely a continuation of the conversation started by Reid during her June 29 Instagram Post, in which she expressly accused La Liberte of screaming racial slurs at a minority child.[16]

## V. The Trial Court Erred in Holding that the July 1 Posts Are Protected Opinion, Because the Gist of the July 1 Posts Is the Provably False Accusation that La Liberte Made Racist Comments and Otherwise Engaged in Racist Conduct Towards a Minority Child.

The district court incorrectly held that the July 1 Posts are protected opinion based on its findings that the July 1 Posts "make no factual allegations about the interaction between Plaintiff and the boy" and that they "compare[] the Council Meeting to that of 1957 Little Rock Arkansas without implying additional facts unavailable to the reader." (JA276). The Supreme Court has made clear that there is no "wholesale defamation exemption for anything that might be labeled 'opinion'"

---

[16] To the extent the Court believes that the caption itself is non-defamatory, it "is well settled that the 'arrangement and phrasing of apparently non-libelous statements' cannot hide the existence of a defamatory meaning." *Flynn*, 744 F.2d at 696 (quoting *Kapellas v. Kofman*, 1 Cal. 3d 20, 33 (1969)); *Kaelin*, 162 F.3d 1036, 1040 ("By the same token, not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action.") (citing *Masson*, 501 U.S. at 510). The caption itself cannot eliminate the defamatory meaning of the side-by-side photographs.

because "expressions of 'opinion' may also imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 2, 18 (1990).

Additionally, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Id.* at 18–19.

### A.    The July 1 Posts Make a Provably False Comparison.

Although the district court recognized that the July 1 Posts explicitly "compare[]" the Council Meeting to 1957 Little Rock Arkansas, the district court nevertheless erroneously determined that the July 1 Posts did not make "factual allegations" about the interaction.  As discussed *supra*, an accusation of racist misconduct is a factual accusation capable of being proven true or false: "This either happened or it did not." *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 728 (2008); *see also Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248 (2010) (holding that "general statements charging a person with being racist … without more … constitute mere name calling," but the publication at issue was factual as it "contains language which expressly accuses [plaintiff] of engaging in racist *firings*," and "refers to Overhill's *conduct* as 'racist and discriminatory abuse against Latina women immigrants.'").[17]  The defamatory meaning of the July 1 Posts – that La Liberte engaged in racist misconduct – is capable of being proven false.

---

[17] *See also MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117, 126-27 (1996)

There is no question that the 1957 photograph depicts racist misconduct – it is an iconic photograph of the desegregation of Little Rock Central High School as the "Little Rock Nine" braved a jeering and violent crowd opposed to the mandate of *Brown v. Board of Education*, 347 U.S. 483 (1954). *See, e.g.,* https://www.nps.gov/nr/travel/civilrights/ak1.htm (last visited Dec. 17, 2019). It has become known as "The Scream Image." *See* http://webapp1.dlib.indiana.edu/archivesphotos/results/item.do?itemId=P0026600 (last visited Dec. 17, 2019). The 1957 Scream Image was initially published on the front page of the *Arkansas Democrat* and "quickly spread throughout the country." *See* "The Story Behind the Little Rock Nine 'Scream Image,'" *avail. at* https://www.history.com/news/the-story-behind-the-famous-little-rock-nine-scream-image (last visited Dec. 17, 2019). It is "one of the most famous images of the civil rights era," and it turned the girl who was "screaming" into "an infamous symbol of the bigotry of Jim Crow and the intolerance faced by the students who tried to go to school that day." *Id.* It was named one of the Top 100 photographs of the Twentieth Century by Associated Press, and it has continued to generate stories

---

(statement that "appellant was acting in a racist manner in his official capacity as district attorney" held actionable); *Scott v. Cooper*, 226 A.D.2d 360, 360-61 (N.Y. Ct. App. 1996) (accusation of "racial discrimination" did "not constitute personal opinion"); *Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250, 261 (N.Y. Ct. App. 1995) (accusations plaintiff "was anti-Semitic and biased in her treatment of Jew[s]" held actionable).

about the two women involved since it was taken, including being the subject of a book. *See, e.g.*, "Elizabeth Eckford and Hazel Bryan: the story behind the photograph that shamed America," The Telegraph*, avail. at* https://www.telegraph.co.uk/news/worldnews/northamerica/8813134/Elizabeth-Eckford-and-Hazel-Bryan-the-story-behind-the-photograph-that-shamed-America.html (last visited Dec. 17, 2019).

Comparing La Liberte to Hazel Bryan, the woman screaming in the Scream Image, is undoubtedly making a factual comparison capable of being proven true or false – either La Liberte was screaming racial slurs and/or verbally assaulting a child based on race like Bryan, or she was not. Certainly La Liberte has pleaded a plausible claim that the comparison of these two photographs makes a factual statement capable of being proven true or false.

### B. The July 1 Posts Imply Undisclosed False Facts.

Additionally, the July 1 Posts cannot be protected opinion because they imply undisclosed false facts. "Actionable statements of opinion are the mixed type, where an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant but gives rise to the inference that there are undisclosed facts that justify the forming of the opinion." *John Doe 2 v. Superior Ct.*, 1 Cal. App. 5th 1300, 1314 (2016).

55

Reid stated in the comment accompanying the photographs that "it was inevitable that this image would be made." (JA087). Although she does not explain the inevitability in her July 1 Posts, Reid advised her followers in her earlier post to "[m]ake the picture black and white and it could be the 1950s and the desegregation of a school." (JA084). Reid went on to state in her July 1 Posts that it is easy to look at old photos and think: "I can't believe that person screaming at a child, with their face twisted in rage, is real. By [sic] every one of them were. History sometimes repeats. And it is full of rage." (JA087). By stating that "it was *inevitable*" and/or by implying her personal knowledge that the event was "real," Reid implied knowledge of undisclosed defamatory facts justifying her accusation. *See, e.g., Milkovich*, 497 U.S. at 18 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth"). The case of *Galarpe v. United Airlines, Inc.*, 2918 WL 1586202 (N.D. Cal. Apr. 2, 2018), is instructive, holding that the use of the word "egregious" implied the existence of undisclosed, defamatory facts regarding the plaintiff's racist creation of a noose. *Id.* at *5.

Based on Reid's language in comparing the two photographs, La Liberte has plausibly alleged that Reid implied knowledge of undisclosed defamatory facts— particularly about the undisclosed words that La Liberte had uttered. That is, Reid conveyed that La Liberte was spewing racial slurs, was engaged in a racially

motivated verbal assault, or that La Liberte was engaging in race-based oppression and discrimination when Reid told her followers that "history" was "repeat[ing]" with La Liberte's "screaming at a child" like Hazel Bryan, who screamed racial slurs at an African-American student to prevent the desegregation of a school system.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Roslyn La Liberte respectfully requests that the Court reverse the district court's judgment dismissing her defamation claim against Defendant-Appellee Joy Reid and remand this case so that the parties can proceed to discovery.

Dated: December 18, 2019                        Respectfully submitted,

s/L. Lin Wood

L. LIN WOOD
   *Lead Counsel*
NICOLE JENNINGS WADE
G. TAYLOR WILSON
L. LIN WOOD, P.C.
1180 W. Peachtree St., Ste. 2040
Atlanta, GA 30309
Telephone: (404) 891-1402

*Counsel for Plaintiff-Appellant*
*Roslyn La Liberte*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Opening Brief of Plaintiff-Appellant Roslyn La Liberte, along with the accompanying Joint Appendix with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on December 18, 2019. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>s/ L. Lin Wood</u>
L. Lin Wood
L. LIN WOOD, P.C.
1180 West Peachtree St.
Suite 2400
Atlanta, GA 30309
404-891-1402

58

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limits of Fed. R. App. P. 32 and Local Rule 32.1 because, excluding the parts of the document exempted by Fed. R. App. R. 32(f):

[X] this brief contains 13,991 words
[ ] this brief uses monospaced type and contains [state number of] lines

This brief complies with the typeface and type style requirements because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font; or
[ ] this brief has been prepared in a monospaced typeface using [identify word processing program] in [identify font size and type style].

Dated: December 18, 2019        <u>s/ L. Lin Wood</u>
L. Lin Wood
L. LIN WOOD, P.C.
1180 West Peachtree St.
Suite 2400
Atlanta, GA 30309
404-891-1402