# 19-3574

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

Roslyn La Liberte,

*Plaintiff-Appellant,*

—against—

Joy Reid,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

John H. Reichman
Jason L. Libou
Wachtel Missry LLP
One Dag Hammarskjold Plaza
885 Second Avenue, 47th Floor
New York, New York 10017
(212) 909-9500

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................... iii

STATEMENT OF THE ISSUES................................................ 1

STATEMENT OF THE CASE................................................... 3

    Local Rule 28.1 Summary ................................................ 3

    Statement of the Facts...................................................... 3

SUMMARY OF ARGUMENT................................................ 12

ARGUMENT ................................................................. 18

  I.   THE COURT PROPERLY DISMISSED PLAINTIFF'S
      CLAIM UNDER RULE 12(B)(6)..................................... 18

  II.  THE STANDARDS FOR DISMISSAL UNDER RULE
      12(B)(6) ................................................................. 19

  III. PLAINTIFF HAS NOT PLAUSIBLY PLEADED MALICE....... 20

      A.  La Liberte is a Limited Purpose Public Figure .................. 20

      B.  Plaintiff Has Not Plausibly Alleged Malice With Regard
         to the June 29th Post.............................................. 26

      C.  Plaintiff Did Not Plausibly Plead Malice With Regard to
         the July 1st Posts.................................................. 30

  IV. THE JULY 1ST POSTS ARE NOT ACTIONABLE................ 32

      A.  The July 1st Posts Are Statements Of Opinion .................. 32

      B.  La Liberte's Defamation By Implication Argument Fails ...... 36

         1.  Plaintiff Failed to Plead Defamation by Implication
            and Special Damages ........................................ 37

2. The July 1st Posts Were Not Defamatory By Implication ................................................... 39

V. PLAINTIFF'S CLAIM IS BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT ...................... 42

VI. PLAINTIFF CANNOT SHOW A PROBABILITY OF SUCCESS AS REQUIRED BY THE ANTI-SLAPP STATUTE ............................................................. 48

A. California's Anti-SLAPP Statute ................................ 48

B. The Provisions of the Anti-SLAPP Statute are Substantive and Enforceable ..................................... 51

C. The Anti-SLAPP Statute Is Not Unconstitutional .............. 56

D. La Liberte Has Not Shown a Probability of Success............ 57

VII. REID IS ENTITLED TO RECOVER HER ATTORNEY'S FEES ................................................................. 58

CONCLUSION ............................................................. 60

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

Abbas v. Foreign Policy Group, LLC,
 783 F.3d 1328 (D.C. Cir. 2015) .................................. 40, 52, 59

Adelson v. Harris,
 774 F.3d 803 (2d Cir. 2014) ..................................... 14, 55, 58

Adelson v. Harris,
 973 F.Supp.2d 467 (S.D.N.Y. 2013), aff'd., 876 F.3d 413
 (2d Cir. 2017) ................................................ 19, 33, 34, 51

Aisenson v. American Broadcasting Co.,
 220 Cal.App.3d 146 (Cal. App., 2d Dist. 1990) ......................... 36

Annette F. v. Sharan S.,
 119 Cal.App.4th 1146 (2004)........................................ *passim*

Ascentive, LLC v. Opinion Corp.,
 842 F.Supp.2d 450 (E.D.N.Y 2011) ..................................... 46

Ashcroft v. Iqbal,
 556 U.S. 662 (2009) ................................................ 19, 20

Atlantic Recording Corp. v. Project Playlist,
 603 F.Supp.2d 690 (S.D.N.Y. 2009)..................................... 43

Barnes-Hind, Inc. v. Superior Court,
 181 Cal App. 3d 377 (Cal. App., 6th Dist. 1986)....................... 38

Barrett v. Rosenthal,
 40 Cal.4th 33 (2006) ............................................ 43, 45, 50

Bartholomew v. Youtube LLC,
 17 Cal.App.5th 1217 (Cal. App., 6th Dist. 2017)....................... 39

Bell Atlantic Corp. v. Twombly,
 550 U.S. 544 (2007) .................................................. 20

Biro v. Conde Nast,
 622 Fed.Appx. 67 (2d Cir. 2015)..................................... 25, 26

Biro v. Conde Nast,
    807 F.3d 541 (2d Cir. 2015) .......................................... 21, 27

Brown v. Kelly Broadcasting Co.,
    48 Cal 3d 711 (1989) ...................................................... 23

Burlington Northern R.R. Co. v. Woods,
    480 U.S. 1 (1987) .......................................................... 52

Caranchini v. Peck,
    2018 WL 6173097 (D. Kansas Nov. 26, 2018) .......................... 59

Carbone v. Cable News Network Inc.,
    910 F.3d 1345 (11th Cir. 2018) ........................................ 52

Celle v. Filipino Reporter Enterprises, Inc.,
    209 F.3d. 163 (2d Cir. 2000) ............................................ 33

Cohen v. Facebook, Inc.,
    252 F.Supp.3d 140 (E.D.N.Y. 2017)................................. 44, 45

Condit v. Dunne,
    317 F.Supp.2d 344 (S.D.N.Y. 2004).................................... 46

D.C. v. R.R.,
    182 Cal.App.4th 1190 (Cal. App., 2d Dist. 2010) ...................... 24

Davis v. Cox,
    351 P. 3d 862 (2015) .................................................. 56, 57

DC Comics v. P. Pictures Corp.,
    706 F.3d 1009 (9th Cir. 2013)........................................... 54

Domen v. Vimeo, Inc.,
    2020 WL 217048 (S.D.N.Y. Jan. 15, 2020)........................ 22, 42

East Coast Test Prep LLC v. Allnurses.com, Inc.,
    307 F.Supp.3d 952 (D. Minn. 2018) .................................... 46

Enigma Software Group USA, LLC v. Bleeping Computer LLC,
    194 F.Sup.3d 263 (S.D.N.Y. 2016) .................................... 46

Erie R.R. v. Tompkins,
    304 U.S. 64 (1938) ....................................................... 52

Ernst v. Kaufman,
 50 F.Supp.3d 553 (D. Vt. 2014), <u>appeal dismissed</u> <u>sub nom</u> <u>Ernst v. Carrigan,</u> 814 F. 3d 116 (2d Cir. 2016).................................. 56

Force v. Facebook,
 934 F.3d 53 (2d Cir. 2019) ............................................. 43, 45

Forscher v. Bugliosi,
 26 Cal.3d 792 (1980)..................................................... 39

Franklin v. X Gear 101, LLC,
 2018 WL 3528731 (S.D.N.Y. July 23, 2018) ............................ 44

FTC v. LeadClick Media LLC,
 838 F.3d 158 (2d. Cir. 2016) ................................... 43, 44, 45

Garrison v. State of La.,
 379 U.S. 64 (1964) ...................................................... 21

In re Gawker Media,
 571 B.R. 612 (S.D.N.Y. Bankr. 2017)..................................... 54

Germvan Farming, Inc. v. Lyons,
 24 Cal. 4th 468 (2000) ................................................... 22

Gertz v. Robert Welch, Inc.,
 418 U.S. 323 (1974)............................................. 21, 25, 32

Gilbert v. Sykes,
 53 Cal.Rptr. 752 (2007)................................................... 25

Global Laser Vision Medical Centers, Inc. v. KSWB, Inc.,
 2003 WL 1194115 (Cal. App., 4th Dist. 2003) .......................... 41

Godin v. Schencks,
 629 F.3d 79 (1st Cir. 2010).......................................... 52, 53

Harte-Hanks Communications, Inc. v. Connaughton,
 491 U.S. 657 (1989).................................................. 26, 27

Hassell v. Bird,
 5 Cal.5th 522 (2018) ..................................................... 43

Jackson v. Mayweather,
 10 Cal.App.5th 1240 (Cal. App., 2d Dist. 2017) ........................ 50

Klocke v. Watson,
  936 F.3d 240 (5th Cir. 2019) ............................................... 52

Kuba v. 1-A Agricultural Ass'n,
  387 F.3d 850 (9th Cir. 2004) ............................................... 22

Law Offices of Bruce Altschuld v. Wilson,
  632 Fed.Appx. 321 (9th Cir. 2015) ....................................... 58

Liberty Synergistics Inc. v. Micro Ltd.,
  718 F.3d 138 (2d Cir. 2013) ................................................ 55

Los Angeles Alliance for Survival v. City of Los Angeles,
  22 Cal.4th 352 (2000) ....................................................... 22

Makaeff v. Trump University, LLC,
  736 F.3d 1180 (9th Cir. 2013) ............................................. 53

McCail v. Pataki,
  232 F.3d 321 (2d Cir. 2000) ................................................ 15

Milkovich v. Lorain Journal Co.,
  497 U.S. 1 (1990) ............................................................ 32

National Jewish Democratic Counsel v. Adelson,
  2019 WL 4805719 (S.D.N.Y. Sept. 30, 2019) .......................... 56

Navellier v. Sletten,
  29 Cal.4th 82 (2002) ........................................................ 51

New York Times v. Sullivan,
  376 U.S. 254 (1964) .................................................... 21, 26

United States ex rel. Newsham v. Lockheed Missiles & Space Co.,
  190 F.3d 963 (9th Cir. 1999) ...................................... 52, 53, 54

Northon v. Rule,
  637 F.3d 937 (9th Cir. 2011) ............................................... 58

Palin v. New York Times,
  264 F. Supp. 3d 527 (S.D.N.Y. 2017), rev'd on other grounds,
  940 F. 3d 804 (2d Cir. 2019) ...................................... 29, 30, 31

Palm Springs Tennis Club v. Ranson,
  73 Cal.App.4th 1 (Cal. App., 4th Dist. 1999) ........................... 40

Poole v. Tumblr, Inc.,
  404 F.Supp.3d 637 (D. Conn. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Reader's Digest Ass'n v. Superior Court,
  37 Cal.3d 249 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

Ricci v. Teamsters Union Local 456 et al.,
  781 F.3d 25 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Seldon v. Magedson,
  2012 WL 4475274 (S.D.N.Y. July 10, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,
  559 U.S. 393 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Sierra Breeze v. Superior Court of El Dorado County,
  86 Cal.App.3d 102 (Cal. App., 3d Dist. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . 33

Smith v. Los Angeles Bookbinders Union No 63,
  133 Cal.App.2d 486 (Cal. App., 2d Dist. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . 38

Snyder v. Lamb,
  2003 WL 1194903 (Cal. App., 2d Dist. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

St. Amant v. Thompson,
  390 U.S. 727 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Staehr v. Hartford Financial Services Group, Inc.,
  547 F.3d 406 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 46

Stolz v. KSFM 102 FM,
  30 Cal.App.4th 195 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

The Paterson Law Firm v. City of Los Angeles,
  2011 WL 1380059 (L.A. Supr. Ct. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

United States v. California,
  921 F.3d 865 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Walker v. Armco Steel, Corp.,
  446 U.S. 740 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Williams v. Moffat,
  2007 WL 4166812 (E.D. Cal. Nov. 20, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Statutes**

47 U.S.C. § 230, Communications Decency Act ("CDA") § 230....... *passim*

47 U.S.C. § 230(c)(1) ................................................... 42, 43

47 U.S.C. § 230(e)(3) ..................................................... 42

47 U.S.C. § 230(f)(2) ..................................................... 44

47 U.S.C. § 230(f)(3) ..................................................... 45

CA Civ. Code § 45a........................................................ 37

CA Civ. Code § 48a........................................................ 37

CA Civ. Code § 425(b)(2)................................................. 51

CA Civ. Code § 425.16 ..................................................... 1

CA Civ. Code § 425.16(b) ................................................ 48

CA Civ. Code § 425.16(b)(1) ............................................. 49

CA Civ. Code § 425.16(e)............................................. 49, 50

**Rules**

Fed. R. Civ. P. 8......................................................... 52

Fed. R. Civ. P. 12........................................................ 52

Fed. R. Civ. P. 12(b)(6) ............................................ *passim*

Fed. R. Civ. P. 56 ....................................................... 53

Fed. R. Civ. P. 57 ....................................................... 52

Federal Rules of Evidence § 201(b) ...................................... 46

Federal Rules of Evidence § 201(c) ...................................... 46

**Other Authorities**

Cal. Const. Art. 1, § 2(a) ........................................... 21, 22

https://soundcloud.com/citizeninterviews/interview-with-roslyn-la-
 liberte (last visited on Feb. 11, 2020)..................................... 6

PAGE(S)

https://www.rcfp.org/introduction-anti-slapp-guide/ (last visited on
 Feb. 11, 2020)........................................................ 54

United States Constitution, First Amendment ..........................*passim*

# STATEMENT OF THE ISSUES

1.     Did the District Court correctly rule pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules" or "FRCP") that plaintiff-appellant was a limited purpose public figure and plaintiff had not plausibly pleaded that the defendant-appellee had acted with actual malice with respect to her June 29th Post?

2.     Did the District Court correctly rule pursuant to Rule 12(b)(6) that defendant-appellee's July 1st Posts were non-actionable statements of opinion?

3.     Did the District Court correctly grant plaintiff's motion to strike pursuant to California's anti-SLAPP statute, CA CIV. §425.16 (the "anti-SLAPP statute" or "Statute") on the ground that plaintiff failed to state a cause of action under Rule 12(b)(6)?

4.     As an alternate ground for dismissal, did the District Court err in not dismissing the amended complaint pursuant to Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230, because the defendant's Posts were not materially different from numerous, prior internet publications?

5.     As an alternative ground for dismissal, did the District Court err in finding that plaintiff had adequately pleaded malice with respect to the July 1st Posts?

6.     As an alternative ground for dismissal, did plaintiff fail to plead defamation by implication and special damages as required by California law?

7.     As an alternative ground for dismissal, if the Court finds that the amended complaint states a cause of action under Rule 12(b)(6), should it strike the action pursuant to the anti-SLAPP statute?

# STATEMENT OF THE CASE

## Local Rule 28.1 Summary

Plaintiff-appellant Roslyn La Liberte's one count amended complaint alleges that the defendant-appellee Joy Reid's June 29th Post and the July 1st Posts are defamatory per se. Defendant moved to dismiss the action under Rule 12(b)(6) and to strike the complaint under California's anti-SLAPP statute. The September 30, 2019 Memorandum and Order of Chief Judge Dora. L. Irizarry (the "Decision") dismissed plaintiff's defamation claim pursuant to Rule 12(b)(6), finding that La Liberte had failed to state a cause of action because she did not plausibly plead malice with respect to the June 29th Post and the July 1st Posts were constitutionally protected statements of opinion. There are also four other alternative bases upon which the District Court could have dismissed this action.

Because the amended complaint fails to state a cause of action, the District Court also granted defendant's motion to strike under the anti-SLAPP statute with leave to move for attorney's fees, which is mandatory under the anti-SLAPP statute. Defendant's motion for attorney's fees is pending.

## Statement of the Facts

The following facts are taken from the allegations in the amended complaint and publicly available publications that this Court and the District Court can take judicial notice of. Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406,

424-25 (2d Cir. 2008) (judicial notice properly taken of published articles, media reports, regulatory filings and press releases) ("[M]atters judicially noticed by the district court are not considered matters outside the pleadings."); see also (Joint Appendix ("JA") at 269); (Plaintiff's Appellate Brief ("Pltf. Br.") at 5, n.2 (citing Staehr)).

Roslyn La Liberte ("La Liberte") is an anti-immigrant activist, who describes herself as "passionate about this country's immigration policies." (JA013, ¶ 33). In 2018, anti-immigrant activists were urging California cities and towns to take positions opposing SB 54, the controversial state law that limits cooperation between California law enforcement officials and federal immigration authorities. (JA100-101, ¶ 14). La Liberte was one of those activists and became one of the faces of the SB 54 opposition. (Id.). A widely circulated photograph of La Liberte was taken in Los Alamitos, California protesting SB 54 with the caption:

> Jeanie Nyuyen, 18, a pre-sanctuary law protester, argues with Rosalyn La Liberte, 69, an anti-sanctuary law protester outside of the Los Alamitos City Hall. (Id.).

Many of the protestors against SB 54 were affiliated with hate groups, who were stoking racial fears. On May 22, 2018, the Southern Poverty Law Center ("SPLC") issued a report entitled "Racism rampart at California City County meetings on sanctuary policies." (JA101, ¶ 6).

The SPLC report states:

> For the past two months, a campaign orchestrated by national anti-immigrant hate group the Federation for American Immigration Reform (FAIR) and its legal arm the Immigration Reform Law Institute (IRLI) has mobilized a small but vocal group of activists hell-bent on pushing city council members in Orange County, and other parts of southern California, to take a stance against the state's sanctuary policies. ...
>
> . . .
>
> FAIR is also quiet on the fact that its orchestrated campaign has **whipped a small band of anti-sanctuary activists from California and elsewhere into a frenzy, with this group traveling from city to city on a nightly basis and stoking racial tensions at city council meetings**. . . . "Anti-sanctuary people showing at city council meetings in OC have become more aggressive and they feel more emboldened to launch racially charged slurs. They have become more aggressive that at times they have physically confronted young people attending city council meetings,"...

(JA101-102, ¶ 6 & JA 145-150).

While we do not know if La Liberte was a member of FAIR or other hate groups, she was one of the anti-immigrant activists who went from city to city protesting SB 54. La Liberte testified against SB 54 at council meetings in Torrance, Hawthorne, Hermosa Beach, and Thousand Oaks, California. (JA102-105, ¶¶ 7-14).

The Simi Valley Council Meeting on June 25, 2018 (the "Council Meeting") was one of La Liberte's stops. The City Council was taking up its prior decision to

support the Trump administration's lawsuit against SB 54. Racial slurs were directed at SB 54 proponents at the Council Meeting. (JA045-046, ¶ 46).

On June 26, 2018, the Ventura County Star published photographs of the Council Meeting, including a photograph of La Liberte apparently screaming at 14-year-old Joseph Luevanos with her hand at her throat in a menacing gesture (the "Photograph"). The caption identified La Liberte by name and gave her city of residence. (JA105-106, ¶ 18). There is no dispute that the Photograph is legitimate. La Liberte gave an interview subsequent to the Council Meeting in which she characterized her conduct at the Council Meeting as an "explosion."[1] While La Liberte's brief to this Court argues that the Photograph is supposedly "out-of-context," (Pltf. Br. at 4 & JA044, ¶ 40), La Liberte never explains what the supposed context was, why she was screaming, or what she was screaming, as a frightened teenager looked on.

On June 26, 2018, Ruth Luevanos, Joseph Luevanos's mother, tweeted:

> Sad to hear Trump supporters booing my 14 year old son, telling him he'll "be deported," "go back to Mexico" and calling Mexicans "rapists." Proud of 350+majority residents who DID respect my son's right to be an active citizen. (JA106, ¶ 19).

The Photograph and accusations of racism against La Liberte spread quickly. One of the most influential tweets came from Resistance Northridge, a grassroots

---

[1] See https://soundcloud.com/citizeninterviews/interview-with-roslyn-la-liberte (last visited on Feb. 11, 2020). The relevant excerpts from plaintiff's interview can be at the following time stamps: 6:24-6:38; 7:08-7:22; and 26:32-27:15; see also JA091 & JA 235.

activist group.  (JA107-108, ¶ 21).  On June 28, 2018, Resistance Northbridge tweeted the Photograph with this comment:

> This horrible woman is Roslyn La Liberte. She yelled at this 14 yr old boy at a Simi Valley City Council mtg who was there to talk about immigration & supporting SB54. This MAGA zealot racist runs RC Design Construction in Woodland Hills. BOYCOTT RC DESIGN https://t.co/ry5rrTGaB2 https://t.co/BJYyIUSNyG

(Id.).

The Resistance Northbridge tweet went viral.  For example, on June 28, 2018 at 9:50 p.m., the singer and actress, Nancy Sinatra retweeted the Resistance Northbridge tweet to her 201,000 twitter followers with the comment: "Roslyn La Liberte represents what's wrong with America."  (JA108, ¶ 23).  The rapper Immortal Technique also retweeted the Resistance Northbridge tweet to his 269,000 Twitter followers on June 28, 2018.  (JA108, ¶ 24).

On June 28, 2018 at 8.51 p.m., Alan Vargas also tweeted the Photograph of La Liberte and said "you are going to be the first deported" and "dirty Mexican" were "some of the things they yelled at this 14 year old boy."  Vargas, added, "spread this far and wide this woman needs to be put on blast." (emphasis added).  (JA045, ¶ 41).  The Vargas tweet also went viral.  A snapshot of the Vargas tweet showed it had at least 78,300 likes and 76,900 comments.  (JA109, ¶ 28).

The Northridge and Vargas tweets continued to be widely distributed on June 29th.  On June 29th at 1:50 p.m., actress and three-time Emmy winner Nadine

van der Velde posted the Photograph of La Liberte with a 1957 photo of Little Rock and Nazis.  She also states that La Liberte screamed racial slurs:

> "You're going to be the first deported!  Filthy Mexican!" screams #RoslynLaLiberte in a hate filled photo reminiscent of other iconic hate filled images.  History is being written.  Roslyn La Liberte has crystallized her place on the wrong side of history for future generations.

(JA110, ¶29).  The van der Velde tweet was retweeted at least 2,088 times, including by the actress Debra Messing.  (JA111, ¶ 30).

On June 29, 2018 at 1:10 p.m., David Hogg, the well-known anti-gun activist and Parkland student, retweeted the Vargas tweet.  Hogg had 900,000 followers.  (JA111, ¶ 31).

Reid retweeted the Vargas tweet on June 29, 2018 at 2:55 p.m.  In the amended complaint, La Liberte falsely alleges that Vargas tweet, "had not received much attention." until it was retweeted by Reid on June 29, 2018 and then went "viral." (JA045, ¶ 43).  This is simply false as the irrefutable evidence above shows.

On the evening of June 29, 2018, Reid republished on Instagram the Photograph and the gist of what Vargas and countless others had previously said about the hate shown at the Council Meeting (the "June 29th Post").  The June 29th Post reads:

> He showed up to rally to defend immigrants. …
> She showed up too, in her MAGA hat, and

8

> screamed, "You are going to be the first deported"
> … "dirty Mexican!" He is 14 years old. She is an
> adult. Make the picture black and white and it
> could be the 1950s and the desegregation of a
> school. Hate is real, y'all. It hasn't even really
> gone away.

(JA046, ¶ 48 & JA068-069).

La Liberte alleges that this was the first time that anyone put the racist slurs "in La Liberte's mouth." (JA046, ¶ 49). This too is demonstrably false. Putting aside that the Vargas tweet did exactly that by tweeting the Photograph and saying this woman [La Liberte] had to be put on blast, at least 8 individuals, including Nadine van der Velde, published comments on Twitter, Instagram, and Facebook alleging that La Liberte made the racial slurs. (JA167, ¶ 13 & JA168-171). In addition, over 150 other individuals accused La Liberte of being racist. (JA167, ¶ 14 & JA172-255).

Before, at, and around the Instagram Post, the controversy around La Liberte continued to grow, independent of Reid. On June 29, 2018 at 8:11 p.m., Soledad O'Brien of CNN retweeted the Vargas tweet. (JA113-114, ¶ 37). On June 30, 2018 at 4:03 a.m., the journalist, cultural critic, and television personality Touré Neblett shared the Vargas tweet and tweeted his 190,000 followers:

> In the picture below you see an adult woman screaming
> at a 14 yo [sic] child. Roslyn La Liberte, a MAGA
> zealot racist who runs RE Design Construction in
> California. Wow.

(JA114, ¶ 38).   Neblett's tweet had 6,000 retweets, including by the actress Rosanna Arquette, and over 5,500 likes.  (JA114, ¶ 39).

On June 30, 2018, CNN's Ana Navaro tweeted:

> Oh look, here is today's racist dujour.  Does she have a name, or should we call her, #RedHatHarriet?

(JA114, ¶ 40).  Ana Navaro has over 1.1 million twitter followers.  Her tweet had at least 9,600 retweets and 16,400 likes. (JA114, ¶ 41).

On July 1, 2018, Reid posted on Instagram and Facebook the Photograph alongside a 1957 photograph taken when African-American children were first integrating Little Rock Central High School (the "July 1st Posts"). (JA047, ¶ 56 & JA073-076).   The images in the July 1st Post were a republication of what journalist Jose Antonio Vargas had previously posted.   Reid then added the following comment, adding a "hat tip" to those who previously had posted the dual images:

> It was inevitable that this image would be made. It's also easy to look at old black and white photos and think:  I can't believe that person screaming at a child, with their face twisted in rage, is real.  By every one of them were.   History sometimes repeats.   And it is full of rage.   Hat tip @joseiswriting.  #regram #history #chooselove.

(JA074 & JA076).

The amended complaint alleges that on Saturday, June 30, 2018 and Sunday, July 1, 2018, La Liberte's son emailed Reid stating she should take a "second look

at the story" and that La Liberte "did not yell anything racist towards her." (sic) (JA047, ¶¶ 53 & 54).  La Liberte does not allege that Reid saw those emails.

On July 2, 2018, the same day that Reid received "a retraction demand from La Liberte's counsel, Reid deleted her Publications and issued the following apology:

> It appears I got this wrong.  My apologies to La Liberte and Joseph.

(JA048, ¶ 58 & JA099).

There nevertheless remain substantial questions about what La Liberte was screaming.  On July 3, 2018, Ruth Luevanos, the mother of the 14 year old boy in the Photograph, tweeted this about the Vargas tweet:

> I will verify that this tweet is absolutely accurate.  These things WERE shouted at this meeting.  My son DID get shouted down, threatened with deportation, harassed with a selfie stick and called racist slurs while he gave his speech.

(JA 116, ¶ 47) (emphasis added).

Joseph Luevanos's aunt, Dr. Norma Hernandez, tweeted this after Reid issued her apology:

> No apologies needed.  Fox News misrepresented my nephew's story.  This woman did shout at him and the exchange was NOT civil.  Fox News cut out the most important part.

(JA 117, ¶ 48).

Alan Vargas also did not back down from his original post, tweeting:

> There are those who say the tweet I posted is false and
> I'm a liar and blast me with the [F]ox 11 story.  Well I
> just got in contact with the family of the 14 year old.
> And the mother had this to say "everything [Vargas]
> wrote was true and [Vargas] can quote me on that."

(JA 117, ¶ 49).

## SUMMARY OF ARGUMENT

The September 30, 2019 Memorandum and Order of Chief Judge Dora. L. Irizarry (the "Decision") correctly dismissed plaintiff's defamation claim pursuant to Rule 12(b)(6) and California's anti-SLAPP statute, finding that La Liberte had failed to state a cause of action because she did not plausibly plead malice with respect to the June 29th Post and the July 1st Posts, which were constitutionally protected statements of opinion. (JA264-281).  There are also four other alternative bases upon which the District Court could have dismissed this action.

There is no dispute that ugly, racial slurs were shouted at the Council Meeting by the opponents of SB 54.  It was widely reported that La Liberte was one of the persons making those racist slurs.  An attendee of the Council Meeting, Alan Vargas, tweeted the menacing Photograph of La Liberte with the comment: "you are going to be the first deported" and "dirty Mexican" were "some of the things they yelled at this 14 year old boy."  Vargas, added, "spread this far and

wide this woman needs to be put on blast." The Photograph, the Vargas tweet, and other earlier tweets regarding La Liberte went viral.

Defendant's June 29th Post republished the Photograph and the essence of the Vargas tweet on Instagram. Reid's July 1st Posts republished the Photograph on Instagram and Facebook alongside an image of children attempting to integrate Little Rock Central High School in 1957. She added a comment that "History sometimes repeats. And it is full of rage," along with the hashtag #chooselove. Reid did not identify La Liberte by name in any of her posts (collectively, the "Posts" or "Publications").

La Liberte sued Reid, and Reid alone, for allegedly being the first person to falsely accuse her "of making racist statements and of being a racist" despite the fact that countless other persons had publicly and vocally accused La Liberte of making racial slurs and identified her by name prior to the Posts. While the amended complaint alleges that La Liberte did not make racial slurs at the Council Meeting, she also has never explained at whom and what she was screaming or why her hands were holding her throat in such a menacing way.

Bizarrely, La Liberte's brief principally argues that the District Court erred in applying the anti-SLAPP statute because the Statute is unconstitutional and conflicts with the Federal Rules. The Decision, however, clearly and unambiguously dismissed the action pursuant to Rule 12(b)(6) and only granted the

motion to strike under the anti-SLAPP statute on that basis. (JA267-268). This Court and numerous other courts have uniformly granted motions to strike or dismiss under anti-SLAPP statutes when a complaint fails to state a cause of action, and awarded attorney's fees pursuant to those statutes. Adelson v. Harris, 774 F 3d 803, 809 (2d Cir. 2014). La Liberte is trying to manufacture an issue that simply does not exist. The Court need only consider whether the anti-SLAPP statute is unconstitutional or conflicts with the FRCP, if it does not believe that there are grounds for dismissal under Rule 12(b)(6).

La Liberte also argues that the District Court erred in finding that La Liberte was a limited purpose public figure and that she had not plausibly alleged actual malice, a requirement for a defamation claim. An individual who injects herself into a public controversy becomes a limited purpose public figure. As an anti-immigration activist who testified all over California, including at the Council Meeting, about SB 54, La Liberte meets this test. The District Court also correctly held that La Liberte failed to plausibly allege malice as Reid neither knew her June 29th Post was false nor had substantial doubts to its truth. (JA274-275). At the time of the June 29th Post, there: (i) was an eyewitness who identified La Liberte as making racial slurs; (ii) was the Photograph backing up the eyewitness account; (iii) were other posts identifying La Liberte as making the racial slurs; and (iv) was no evidence available to Reid contradicting any of the aforementioned evidence.

While La Liberte claims that Reid was motivated by her animus towards Donald Trump supporters wearing MAGA hats, a political motive also cannot provide a sufficient basis for finding actual malice under either federal or California law. Ironically, it could not be clearer that this lawsuit is politically motivated. La Liberte has not sued the countless other persons, including celebrities and journalists, who identified La Liberte by name, revealed her personal contact information, and accused her of racism and making racial slurs. Instead, she has chosen to target a prominent, African-American progressive.

The District Court also correctly held that July 1st Posts are statements of opinion, constituting nothing more than Reid's belief that the rage shown at the Council Meeting is comparable to the rage shown in Little Rock in 1957. (JA275-276). Contrary to La Liberte's argument, no actionable defamatory facts can be implied from the July 1st Posts.

This Court is also "free to affirm an appealed decision or any ground, which finds support in the record regardless of the ground upon which the trial court relied." McCail v. Pataki, 232 F.3d 321, 323 (2d Cir. 2000) (citation omitted). There are four alternate grounds for dismissal. First, Section 230 of the Communications Decency Act precludes any liability for publications, such as the Posts, which are not materially different from previously published internet

content. The District Court erred in not finding that Reid was immune from liability under Section 230.

Second, the District Court erred in finding that the weekend emails sent by La Liberte's son plausibly establishes a basis for malice with respect to the July 1st Posts. Plaintiff does not allege that Reid had seen the weekend emails sent to a company account (and Reid has specifically denied, under oath, that she had seen them). (JA256, ¶ 2). Further, putting aside that the emails were sent from a biased source without personal knowledge, they contain no information that undercuts or contradicts the content of the July 1st Posts, which concerns the rage shown at the Council Meeting.

Third, the amended complaint fails to plead defamation by implication and special damages as required by California law. The amended complaint only alleges defamation per se, that the July 1st Posts "accused La Liberte of making these racist statements and of being a racist." (JA019, ¶ 66). This is obviously wrong; the July 1st Posts say no such thing. In her brief to this Court, La Liberte now argues a new, unpleaded theory — that the July 1st Posts are defamatory when considered with Reid's other Posts and the history and back-story of the 1957 Little Rock photograph.

California law distinguishes defamation per se from defamation by implication or innuendos, i.e., when a statement becomes defamatory only through

reference to explanatory material or extrinsic information outside the four corners of a publication. The latter must be specifically pleaded along with special damages and because Plaintiff did not plead defamation by implication or special damages in her amended complaint, she cannot save her claim on this basis. Further, La Liberte cannot show, as she must to plead defamation by implication, that any of the knowledge and/or information about the history and back-story of the 1957 Little Rock photograph, which is not contained within the four corners of Reid's July 1st Posts, was widely known.

Fourth, if the District Court had not dismissed the action pursuant to Rule 12(b)(6), it could have dismissed Plaintiff's claim under the anti-SLAPP statute because La Liberte cannot demonstrate a probability of success on the merits.

# ARGUMENT

## I. THE COURT PROPERLY DISMISSED PLAINTIFF'S CLAIM UNDER RULE 12(B)(6)

Plaintiff's principal argument is that the District Court erred in applying the anti-SLAPP statute because it is unconstitutional and conflicts with the Federal Rules by allowing for the pre-discovery dismissal of the action. Plaintiff appears to be reading a different decision from the one the District Court actually rendered. The District Court dismissed the amended complaint pursuant to Rule 12(b)(6) standards and could not have been clearer about this:

> Defendant submitted supporting declarations and attached exhibits as part of her motion to strike, suggesting that defendant intends to extend the Court's analysis beyond the pleadings. However, defendant's primary substantive argument challenging the merits of plaintiff's claim are based on plaintiff's failure to plead a defamation cause of action sufficiently. As such, the Court need not refer to any of the evidence submitted by defendant in deciding whether plaintiff has set forth a legally sufficient claim. The same is true for the additional documentary evidence plaintiff attached in opposition to defendant's motion to strike. defendant's motion to strike is construed as challenging the legal sufficiency of plaintiff's claims. <u>Therefore, the Court analyzes both defendant's motion to dismiss and motion to strike under the procedural standards of Rule 12(b)(6)</u>.

(JA268) (emphasis added).

Federal courts, including those in this Circuit, have uniformly found that when a complaint fails to state a cause of action under Rule 12(b)(6) it is also

grounds for dismissal under the broader, more lenient standards for dismissal under some anti-SLAPP statutes. <u>Adelson v. Harris,</u> 973 F.Supp.2d 467 (S.D.N.Y. 2013), <u>aff'd.</u>, 876 F.3d 413 (2d Cir 2017). The only substantive portion of the anti-SLAPP statute applied by the District Court was its fee shifting provision. As set forth more fully in Point VII, <u>infra</u>, there is no reasonable argument to be had that this provision conflicts with the Federal Rules or is unconstitutional.

Because the amended complaint is not viable under Rule 12(b)(6), the issue of whether the anti-SLAPP statute conflicts with the Federal Rules is moot. <u>Adelson</u>, <u>supra</u>, 973 F.Supp.2d at 476 (dismissing the defamation claims, deeming plaintiff's request for discovery moot because the complaint was legally deficient, and awarding mandatory attorney's fees under Nevada's anti-SLAPP statute).

## II. THE STANDARDS FOR DISMISSAL UNDER RULE 12(B)(6)

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). "[A] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (citations omitted).

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, supra, 556 U.S. at 679.

### III. PLAINTIFF HAS NOT PLAUSIBLY PLEADED MALICE

Plaintiff argues that the District Court erred in finding that (i) La Liberte is not a limited purpose public figure and therefore does not have to allege or demonstrate actual malice; and (ii) the amended complaint plausibly alleges actual malice. La Liberte is wrong on both points.

### A. La Liberte is a Limited Purpose Public Figure

Both federal constitutional protections and California law applies when considering whether La Liberte is a limited purpose public figure.

Under federal law, public figures suing for defamation must do more than prove that the statements about them were false. They must also prove by "clear and convincing evidence" that the statements were "made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it

was false or not." <u>New York Times v. Sullivan</u>, 376 U.S. 254, 279-80 (1964); <u>Biro v. Conde Nast</u>, 807 F.3d 541, 544-45 (2d Cir. 2015). Because free debate inevitably leads to some mistaken statements and punishment of these statements would chill the freedom of speech, reckless disregard requires a "high degree of awareness of … probable falsity[.]" <u>Garrison v. State of La.</u>, 379 U.S. 64, 74 (1964).

In <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974), the Supreme Court recognized two different categories of public figures with respect to constitutionally protected speech. The first is the "all purpose" public figure who has "achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." <u>Id.</u> at 351. The second is the "limited purpose" public figure who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." <u>Id.</u>

The constitutional defenses to defamation actions involving a public figure do not preclude more rigorous state law protections. Indeed, the free speech clause in Article I, Section 2(a) of the California Constitution affords greater protection and broader rights to its citizens sued for defamation than is afforded under the United States Constitution. It states:

> Every person may freely speak, write and publish his or
> her sentiments on all subjects, being responsible for the

abuse of this Right.  A law may not restrain or abridge
liberty of speech or press.

CAL. CONST. ART. 1, § 2(a).

This liberty of speech clause is more protective of speech than its federal counterpart.  Los Angeles Alliance for Survival v. City of Los Angeles, 22 Cal.4th 352, 365-366 (2000); see also  Kuba v. 1-A Agricultural Ass'n, 387 F.3d 850, 856 (9th Cir. 2004) ("The California Constitution provides protections for speakers in some respects broader than provided by the First Amendment of the Federal Constitution.").  "As a general rule … article I's free speech clause and its right to freedom of speech are not only as broad and as great as the First Amendment's, they are even 'broader' and 'greater.' " Germvan Farming, Inc. v. Lyons, 24 Cal. 4th 468, 491 (2000) (citations omitted); see also Domen v Vimeo, Inc., 2020 WL 217048 (S.D.N.Y. Jan. 15, 2020) ("This provision of the California Constitution [Article 1, section 2(a)] grants broader rights to free expression than the First Amendment to the U.S. Constitution, and applies beyond state actors to private actors in certain limited circumstances.").

Consistent with its broad protection of free speech, California has a more expansive view of who is a limited purpose public figure than the minimum First Amendment requirements.  A limited purpose public figure is anyone who has "undertaken some voluntary act through which (s)he seeks to influence the

resolution of the public issues involved." Reader's Digest Ass'n v. Superior Court, 37 Cal.3d 249, 253-54 (1984).[2]

This test was correctly spelled out in the District Court's decision:

> "The limited purpose public figure is an individual who voluntarily injects him or herself or is drawn into a specific public controversy, thereby becoming a public figure on a limited range of issues." Ampex Corp. v. Cargle, 128 Cal. App. 4th 1569, 1577 (2005). To determine whether an individual is a limited purpose public figure, the Court must apply a three-pronged test: (1) there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants; (2) the plaintiff must have undertaken some voluntary act through which she sought to influence resolution of the public issue, and, in this regard, it is enough that the plaintiff seeks to thrust herself into the public eye; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. Id.

(JA272-273).

A "public controversy" has been defined as "'a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." Annette F. v. Sharan S., 119 Cal.App.4th 1146, 1164 (2004) (citations omitted). "If the issue was being debated publicly and if it had

---

[2] La Liberte relies heavily on Brown v. Kelly Broadcasting Co., 48 Cal 3d 711 (1989), for the proposition that La Liberte is not a public figure. That case could not be more different. The plaintiff in Brown was a contractor who was accused of shoddy work. He did nothing to involve himself in a public controversy in a public forum. Further, the issue in Brown was much different, whether CA Civ. Code § 417 (3) "provides a special public-interest privilege to the news media." Id. at 724.

foreseeable and substantial ramifications for nonparticipants, it was a public controversy." Id.

By appearing all over California to testify against SB 54, La Liberte "voluntarily injected herself into the public controversy and invited attention and comment" with respect to her activities. (JA273-274). La Liberte actively sought to influence not only the Simi Valley Council, but also cities throughout California with respect to a SB 54, a very public controversy. As the District Court held, "[t]he passage of SB 54 was a matter of statewide concern that spurred public debates, litigation, and protests that thus, was a matter of public controversy. (JA273); see D.C. v. R.R., 182 Cal.App.4th 1190, 1226 (Cal. App., 2d Dist. 2010) (holding that matters that affect many people beyond the direct participants are considered issues of public interest); see also, United States v. California, 921 F.3d 865, 873 (9th Cir. 2019) (affirming the denial of the federal government's request for a preliminary injunction against the enforcement of SB 54)." (JA273).

Plaintiff also argues that she is not a public figure because the misconduct she is accused of is not germane to SB 54. To the contrary, the District Court correctly determined that "the allegedly defamatory publications are germane to Plaintiff's participation in the controversy. Specifically, the June 29th and July 1st Posts center on Plaintiff's actions at the Council Meeting in opposition to the

passage of SB 54. Accordingly, Plaintiff is a limited purpose public figure and is subject to the actual malice standard." (JA274).

Further, the racism expressed by anti-immigration protestors is itself an issue of on-going public concern. An almost identical argument to La Liberte's was rejected in Stolz v. KSFM 102 FM, 30 Cal.App.4th 195 (1994) ("plaintiff argues that at the time of defendants' broadcast, there was no public concern regarding plaintiff condoning racist remarks over the air... However, plaintiff takes too narrow a view."). Because the Posts relate directly to La Liberte's conduct at a public meeting with respect to a public controversy, La Liberte is a limited purpose public figure under California law.

This is not to say that La Liberte does not also meet the limited purpose public figure test under federal law. In Biro v. Conde Nast, 622 Fed.Appx. 67, 69 (2d Cir. 2015), this Court affirmed the four-part federal test to determine if a claimant is a limited purpose public figure, analyzing whether a claimant: (i) invited public attention to her views in an effort to influence others prior to the incident that is the subject of litigation; (ii) voluntarily injected herself into a public controversy related to the subject of the litigation; (iii) assumed a position of prominence in the public controversy; and (iv) maintained regular and continuing access to the media. See also Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52 (1974); Gilbert v. Sykes, 53 Cal.Rptr. 752, 762 (2007).

By testifying eight times around the state (JA102-105, ¶¶ 7-14), giving media interviews <u>before</u> the publications of the Posts, sitting down for an hour-long interview with an independent reporter just after the Photograph went viral, but before the Posts were published,[3] and making herself an out-sized presence at public events opposing SB 54, where she was photographed both at the Council Meeting and as part of a national story by *The Washington Post* about anti-immigration activists (JA101, ¶ 5 & JA119-148), La Liberte is also a limited purpose public figure under federal law.

**B.** **Plaintiff Has Not Plausibly Alleged Malice With Regard to the June 29ᵗʰ Post**

<u>New York Times</u>, <u>supra</u>, 376 U.S. at 279-80, requires a showing that the allegedly false statement was made with "actual malice." The existence of actual malice turns on the defendant's <u>subjective belief</u> as to the truthfulness of the allegedly false statement. <u>Reader's Digest</u>, <u>supra</u>, 37 Cal.3d at 257. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968); <u>Biro v Conde Nast</u>, <u>supra</u>, 622 Fed.Appx. at 69-70. "[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." <u>Harte-Hanks</u>

---

[3] <u>See</u> n.1, <u>supra</u>.

Communications, Inc. v. Connaughton, 491 U.S. 657, 667-68 (1989) ("Harte-Hanks").

In the aftermath of Iqbal, this Circuit has recognized that a public figure must "plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." Biro v. Conde Nast, 807 F.3d 541, 546 (2d Cir. 2015) (citations omitted). La Liberte argues that the "cumulative weight" of her allegations present a plausible case for actual malice. (Pltf. Br. at 17). The entirety of La Liberte's "cumulative" evidence is that Reid did not independently investigate what La Liberte said, was motivated by her animus towards Donald Trump and Trump supporters wearing MAGA hats, and altered the Vargas tweet. (Id. at 17-18).

The cumulative weight of La Liberte's allegation is not even featherweight, legally or factually. The Vargas tweet included the Photograph with the statement "spread this far and wide this woman needs to be put on the blast," thereby clearly identifying La Liberte as the woman in the Photograph making the racial slurs. There is no substantive difference between the Vargas tweet and the June 29th Post and the so-called "alteration" of the tweet provides no evidence of malice. Legally, the "[f]ailure to investigate before publishing, even when a reasonably prudent person would have done so," is not sufficient to establish reckless disregard." Harte-Hanks, supra, 491 U.S. at 688.

La Liberte summarily argues that there is "direct and circumstantial evidence of defendant's malice. (Pltf. Br. At 17-18). There is neither. La Liberte cannot cite to a single piece of evidence that Reid saw, or even could have seen, that would have alerted Reid that La Liberte was being wrongly accused. At the time of the June 29th Post, this was the state of play: racial slurs were made at the Council Meeting, there was Vargas's eyewitness account that La Liberte was the one screaming racial slurs, there was the Photograph documenting La Liberte screaming at a teenage Mexican-American, there were numerous other posts identifying La Liberte as the person making the racial slurs, and there was no evidence available to Reid to contradict any of this. If defendant had "investigated" the truth of the Vargas tweet, she would only have verified it as countless others were accusing La Liberte of making racial slurs. On top of all this, defendant immediately apologized and took down the Publications on the first day she learned there was an issue with respect to what La Liberte was screaming at the Council Meeting (something La Liberte still refuses to enlighten us about). (JA048, ¶ 58 & JA099).

As the District Court correctly held, La Liberte's allegations do not plausibly meet the malice test — that Reid "knew or could infer that Vargas' account of the interaction was inaccurate. Thus, there is no indication that defendant had any

serious doubts about the veracity of the information used in creating the June 29th Post." (JA275).

La Liberte relies heavily on <u>Palin v. New York Times Co</u>, 940 F.3d 804 (2d Cir 2019) to argue that she plausibly alleged malice. The allegations in <u>Palin</u> are light years away from this case and <u>Palin</u> provides no reason for reversing the District Court.

This Court began its analysis in <u>Palin</u> by importantly noting that "[w]e agree with the district court that political opposition alone does not constitute actual malice . . ." <u>Id.</u> at 814. The allegations in <u>Palin</u>, however, went far beyond that and plausibly alleged that statements were published with knowledge that they were false. The defendant had been the editor-in-chief of magazines, which had published "numerous articles" directly contradicting what he subsequently wrote. <u>Id.</u> at 813-14. Further, the defendant had a long history of being "personally hostile towards Palin." <u>Id.</u> at 814.

Contrast that with what we have here: there is no allegation that Reid knew La Liberte; there was <u>no</u> public evidence, much less evidence actually published by Reid, that contradicted the June 29th Post, and there was substantial evidence that La Liberte had made racial slurs, including the Photograph, showing La Liberte's "explosion" while a horrified teenager looked on.

In fact, when you get right down to it, plaintiff's argument, which is so toxic to our political discourse, is that malice can be shown because Reid is a liberal. To perhaps state the obvious, Reid's political points of view do not make Reid's acts "malicious." Just to the contrary, this alleged motivation reinforces the conclusion that Reid's actions were constitutionally protected speech. "[A] sharp attack on a disfavored political figure… has [n]ever been enough to prove actual malice." Palin v. New York Times, 264 F. Supp. 3d 527, 537 (S.D.N.Y. 2017), rev'd on other grounds, 940 F. 3d 804 (2d Cir. 2019) (citation omitted). A political motive "cannot provide a sufficient basis for finding actual malice… For 'it is hardly unusual for publications to print matter that will please their subscribers; many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity.' " Id. (citation omitted).

## C. Plaintiff Did Not Plausibly Plead Malice With Regard to the July 1st Posts

The District Court should also have found that plaintiff had not adequately pleaded malice with respect to the July 1st Posts. It found that plaintiff made a "plausible" malice claim because La Liberte's son allegedly sent emails to Reid on the weekend of Saturday, June 30th and Sunday, July 1st. The Saturday June 30, 2019 email asked Reid to take a "second look at the story you posted" and says there is a news interview "which shows the young man in a news interview saying

my mom was 'civil' and did not yell anything racist towards <u>her</u>." (JA071) (emphasis added). The Sunday July 1st email was not substantive. (JA072).

These emails do not plausibly establish malice for numerous reasons. First, there is no allegation that Reid had seen the weekend emails and Reid has specifically denied, under oath, seeing them; on Monday, July 2, 2018 — the same day that Reid first learned of any information raising doubts about whether La Liberte had made racial slurs at the Council Meeting — Reid both took down the Publications and issued an apology. (JA256-257, ¶¶ 2-4). Reid's rapid apology and the deletion of the Publications is very clear and convincing evidence of her <u>lack</u> of malice. "Such behavior is much more plausibly consistent with making an unintended mistake and then correcting it than with acting with actual malice." <u>Palin</u>, <u>supra</u>, 264 F.Supp.3d at 537.

Second, the emails, even if seen by Reid, do not establish malice. Putting aside that the email was sent by someone without any personal knowledge, and with an obvious (and understandable) desire to protect a parent, it contains no information that undercuts or contradicts what was actually said in the July 1st Posts (there was rage shown at the Council Meeting ) or even what plaintiff argues is "implied" by the Posts (La Liberte made racial slurs). The emails do not deny that La Liberte made racial slurs; they only state that she did not make them to "her," whomever "her" is; do not deny that the Photograph of La Liberte

screaming at the Council Meeting with her hand at her throat is accurate; do not explain what La Liberte was screaming in the vicinity of a frightened, Hispanic teenager; and do not deny that despicable, hateful conduct occurred at the Council Meeting. There is nothing in the emails, if they were seen by Reid, that would have or should have given her second thoughts about opining that the rage shown at the Council Meeting was history repeating itself.

## IV. THE JULY 1ST POSTS ARE NOT ACTIONABLE

### A. The July 1st Posts Are Statements Of Opinion

"Under the First Amendment there is no such thing as a false idea." Gertz, supra, 418 U.S. at 339. As the United States Supreme Court explained in Gertz, "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Id. at 339-40.

A "statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990). "A statement on matters of public concern must be provable as false before liability can be assessed." Id. at 2. To that end, California courts consistently have held that defamation lies only for false statement of fact and opinions are not actionable. See Decision, at JA275 (citing Okun v. Superior Court, 29 Cal.3d. 442, 450 (1981)).

The determination of whether allegedly defamatory statement constitutes fact or opinion is a question of law. <u>Celle v. Filipino Reporter Enterprises, Inc.</u>, 209 F. 3d. 163, 176 (2d Cir. 2000); <u>Adelson</u>, <u>supra</u>, 973 F. Supp 2d at 487;  <u>Sierra Breeze v. Superior Court of El Dorado County</u>, 86 Cal.App.3d 102  (Cal. App., 3d Dist. 1978).  Given the importance of the First Amendment principles at stake, "[w]here the question of truth or falsity is a close one, a court should err on the side of non-actionability." <u>Celle</u>, <u>supra</u>, 209 F.3d at 188 (quoting <u>Liberty Lobby, Inc v. Dow Jones & Co.</u>, 838 F.2d 1287, 1292 (D.C. Cir. 1988))." <u>Adelson</u>, <u>supra</u>, 973 F.Supp.2d at 487.

The amended complaint alleges that the July 1st Posts "accused La Liberte of making these racist statements ad of being a racist."  (JA048-049, ¶ 65).  This is, of course, demonstrably untrue.  As the District Court succinctly and correctly stated:

> According to the Amended Complaint, the July 1st Posts accuse Plaintiff of yelling racial slurs at the boy at the Council meeting.  However, the July 1st Posts never mention racial slurs or do they identify Plaintiff.  In sum, the July 1st Posts make no factual allegations about the interaction between Plaintiff and the boy.

(JA276).

The District Court also correctly found that the July 1st Posts do not imply that Defendant had additional knowledge of undisclosed facts:

> It is not apparent that the subjects of either image are engaging in the specific racist conduct at issue, namely uttering racial slurs.  Moreover, the publication does not

> imply that Defendant had additional knowledge of undisclosed facts about the use of racial slurs. Rather, the July 1st Posts compares the Council Meeting to that of 1957 Little Rock Arkansas without implying additional facts unavailable to the reader. See, Gardner v. Martino, 563 F.3d 981, 988, (9th Cir. 2009) (observing that a defamatory opinion implies the existence of objective facts not available to the listener).

(Id.).

La Liberte argues "to the extent the Court finds the photographs alone did not convey a defamatory meaning, Reid's caption makes the defamatory meaning inescapable." (Pltf. Br. at 50). In fact, the caption completely undercuts plaintiff's argument. The caption refers to hatred, not racism, and even has the hashtag #chooselove. The caption merely opines that the undeniable rage shown at the Council Meeting is comparable to the rage shown in Little Rock. As the District Court held, this is not a statement of opinion that cannot be treated as true or false. (JA275-276).

La Liberte also argued to the District Court that the July 1st Posts were defamatory because they falsely accused La Liberte of screaming at a child in rage. Plaintiff has now rejiggered her argument to say that La Liberte was accused of making a "verbal assault." (Pltf. Br. at 50). Such linguistic gymnastics cannot save her claim. An accusation of someone "screaming" is not defamatory. See Williams v. Moffat, 2007 WL 4166812, at *4 (E.D. Cal. Nov. 20, 2007) (holding that the mere allegation of "yelling and screaming" without more does not

substantively allege a defamatory statement under California law). Whether you call it screaming or a verbal assault, the District Court got it exactly right in rejecting this argument:

> Moreover, assuming that the publication suggests that plaintiff was screaming at a child or is a racist, such implications are not defamatory. *See, Williams v. Moffat,* No. 07-cv-0095, 2007 WL 4166812, at *4 (E.D. Cal. 2007) (holding that the allegation of "yelling and screaming" without more does not sufficiently allege a defamatory statement under California law); *Overhill Farms, Inc. v. Lopez,* 190 Cal. App. 4th 1248, 1262 (2010) (holding that general statements accusing a person of being a racist does not constitute a provably false assertion of fact). Thus, plaintiff fails to allege that the July 1st Posts set forth provable facts necessary to sustain a viable defamation cause of action.

(JA276-277).

Importantly, La Liberte does not even dispute that she was screaming at the Council Meeting, describing her own conduct as an "explosion," which she apologized for.[4]  Indeed, in her carefully crafted and parsed declaration to the District Court, La Liberte does not even explain what she was screaming, who she was screaming at, or why she was screaming with her hand at her throat in a menacing gesture.[5]

La Liberte claims that the Photograph conveys a derogatory meaning. "Photographs are not actionable if they are fair and accurate depictions of the

---

[4] See n.1, supra.
[5] See JA004, Doc. 25-1, Declaration of Roslyn La Liberte (e-filed Jan. 14, 2019).

person and scene in question, even if they place the person in a less than flattering light … [.]" <u>Aisenson v. American Broadcasting Co.</u>, 220 Cal.App.3d 146, 161 (Cal. App., 2d Dist. 1990).

The District Court correctly found that the July 1st Posts were nonactionable, constitutionally protected statements of opinion. They do not accuse La Liberte of making racist slurs and constitute nothing more than Reid's opinion that the rage shown at the Council Meeting was comparable to the rage shown in Little Rock.

**B.** **La Liberte's Defamation By Implication Argument Fails**

La Liberte keeps moving the goalposts in an attempt to make the July 1st Posts actionable. The amended complaint alleges defamation <u>per</u> <u>se</u> — that the July 1st Posts "accused La Liberte of making these racist statements and of being a racist." (JA049, ¶ 65). There is no defamation by implication allegation or reference to outside information.

In her brief to this Court, La Liberte makes a new argument that was not in her pleadings and not raised before the District Court — that the July 1st Posts become defamatory when considered with Reid's other Posts and with knowledge about the history and back-story of the 1957 Little Rock photograph. This new theory had to be pleaded in the amended complaint along with special damages, and this Court should not even consider it. The theory is also meritless.

1. **Plaintiff Failed to Plead Defamation by Implication and Special Damages**

CA Civil Code § 45a provides that: "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code."

"A libel may be per se or per quod. Where the statement is defamatory on its face, it is said to be libelous per se, and actionable without proof of special damage. But if it is covert defamation, i.e., if the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the 'innuendo') to make its meaning clear, it is not libelous per se, and is not actionable without pleading and proof of special damages." Snyder v Lamb, 2003 WL 1194903, at * 6 (Cal. App., 2d Dist. 2003).

Special damages are defined in CA Civil Code § 48a as follows:

> (d)(2) "Special damages" means all damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel, and no other.

Under La Liberte's new found theory, the July 1ˢᵗ Posts are not defamatory per se, but defamatory by implication. Because La Liberte has not pleaded defamation by implication and did not seek leave to amend her complaint for a second time, her new defamation by implication claim should not be considered by this Court. "If there is a libel per se, it should be unnecessary to plead extrinsic facts; the defamation should be as apparent to the court as to the reader. But in the case of a libel per quod the plaintiff cannot assume that the court has access to the reader's special knowledge of extrinsic facts and must specially plead and prove those facts." Barnes-Hind, Inc. v. Superior Court, 181 Cal App. 3d 377, 387. (Cal. App., 6th Dist. 1986).

La Liberte has also failed to plead special damages because she has not identified "the amounts of money" she allegedly spent as a result of the defamation. See Smith v. Los Angeles Bookbinders Union No 63, 133 Cal.App.2d 486, 494-95 (Cal. App., 2d Dist. 1955) ("It is well settled that special damage must be averred with particularity" and the allegation that plaintiffs 'have been injured * * * in their trade, business and occupation by reason of the publication* * * in the sum of One Hundred Thousand Dollars($100,000.00)' is not enough. "). Because La Liberte has not pleaded defamation by implication or special damages and did not seek leave to do so, her claim with respect to the July 1ˢᵗ Posts must be dismissed.

## 2.    The July 1st Posts Were Not Defamatory By Implication

If this Court considers La Liberte's unpleaded defamation by implication theory, it should reject it.

For there to be a defamation by implication, it must be "either apparent from the language used or of such a character as to require the statement and proof of extrinsic facts, (inducement, colloquium and innuendo) to show its meanings."  In the last case, proper allegations and proofs of the facts necessary to make the meaning of the language apparent will be required.'" Forscher v. Bugliosi, 26 Cal.3d 792, 803 (1980) (citation omitted).  "A court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction.  That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader." Bartholomew v Youtube LLC, 17 Cal.App.5th 1217, 1227 (Cal. App., 6th Dist. 2017) (internal quotations and citations omitted).

 "Just as the court must refrain from a 'hair-splitting analysis' of what is said in an article to find an innocent meaning, so must it refrain from scrutinizing what is not said to find 'a defamatory meaning which the article does not convey to a lay reader.' " Forsher, supra, 26Cal.3d at 803 (citation omitted).    Whether a

publication is reasonably capable of conveying a defamatory meaning is a question of law. Palm Springs Tennis Club v. Ranson, 73 Cal.App.4th 1, 5-6 (Cal. App., 4th Dist. 1999) (stating that it is a legal question whether a statement would be considered defamatory by an average reader).

Because imposing liability for publishing truthful statements is at odds with protections for free speech, defamation by implication claims are also subject to strict limits and demand rigorous scrutiny. Abbas v. Foreign Policy Group, LLC, 783 F.3d 1328, 1333 (D.C. Cir. 2015), 783 F. 3d at 476 (making a defamation by implication claim "requires an especially rigorous showing" and the plaintiff's defamation by implication claim would "ensure a substantial amount of speech that is essential to marketplace of ideas and would dramatically chill the freedom of speech . . .") (quoting Chapin v. Knight-Ridder, 993 F.2d 1087, 1092–93 (4th Cir. 1993) ("[B]ecause the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true.")).

La Liberte maintains that the July 1st Posts are defamatory when considered with Reid's other posts and the history and back-story of the 1957 Little Rock photograph. A reader would have to know about (i) Reid's other publications; (ii) the history of Little Rock desegregation, an event that occurred 62 years ago — before approximately 84% of the population was either not born or less than four

years old (Kaiser Family Foundation); and (iii) that the white student was not just looking hateful, but making racial slurs, something that is not evident in the photograph in the July 1st Posts. La Liberte has not pleaded, and cannot show, that any of these things were "widely known." See <u>Global Laser Vision Medical Centers, Inc. v. KSWB, Inc.</u>, 2003 WL 1194115, at \*21 (Cal. App., 4th Dist. 2003) (dismissing complaint when plaintiff presented no evidence that a "fact" was "widely known" to consumers viewing the broadcast)

La Liberte's argument is further undercut by the existence of another "iconic" image from Little Rock showing the white teenager actually screaming with her mouth wide open. This image was posted by Nadine van der Velde before any of Reid's posts. (JA110, ¶29). By contrast, the image in the July 1st Post does not show the teenager shouting anything. The average or lay reader would not know that there was another Little Rock photograph of a white teenager screaming, that the white teenager was screaming racial slurs, and that Reid had previously accused La Liberte of making racial slurs.

The July 1st Posts simply do not imply that La Liberte was making racial slurs. As the District court correctly concluded:

> Contrary to plaintiff's argument, the juxtaposition of the photographs does not "make clear that [Plaintiff] is alleged to have engaged in specific racist conduct akin to that demonstrated during desegregation."

(JA276).

## V. PLAINTIFF'S CLAIM IS BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT

Defendant moved to dismiss the amended complaint pursuant to the Communications Decency Act ("CDA"), 47 U.S.C. § 230 ("Section 203"), which immunizes internet content providers from liability for publishing "information by another information content provider." The District Court declined to dismiss the amended complaint on this basis because "the amended complaint sufficiently pleads that the defamatory publications were authored and originally posted by defendant." (JA272). The issue, however, is not whether a defendant posted or authored a publication, which is almost always the case in a defamation action, but rather whether the publication is materially different from a prior internet publication.

Section 230(c)(1) provides: "No provider <u>or user</u> of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Section 230(e)(3) states: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). If Section 230 immunity applies, then any defamation claim brought under State law must be dismissed. <u>Vimeo, Inc.</u>, <u>supra</u>, 2020 WL 217648, at *9.

Congress enacted Section 230 to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." FTC v. LeadClick Media LLC, 838 F.3d 158, 173 (2d. Cir. 2016) ("LeadClick") (quoting 47 U.S.C. § 230(b)(2)). Section 230 confers "blanket immunity from tort liability for online republication of third party content." Barrett v. Rosenthal, 40 Cal.4th 33, 57 (2006).

"[The] text of Section 230(c)(1) should be constructed broadly in favor of immunity." Force v. Facebook, 934 F.3d 53, 64 (2d Cir. 2019). "Courts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly." Atlantic Recording Corp. v. Project Playlist, 603 F.Supp.2d 690, 699 (S.D.N.Y. 2009); Barrett, supra, 40 Cal.4th at 39 (stating all of the immunity provisions within Section 230 "have been widely and consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source."). "A limited construction of section 230 would conflict with Congress's goal of facilitating online discourse," subject internet users to the same common law defamation standards, and "chill online speech." Hassell v. Bird, 5 Cal.5th 522, 539 (2018). "[A] plaintiff defamed on the internet can sue the original speaker, but typically cannot sue the messenger." Poole v. Tumblr, Inc., 404 F.Supp.3d 637, 641 (D. Conn. 2019) (citations and internal quotations omitted)

To be immune from liability under Section 230, a defendant need show that: (1) she is a user of an interactive computer service, (2) the claim is based on information provided by another information content provider, and (3) the claim treats the defendant as the publisher or speaker of that information. LeadClick, supra, 838 F.3d at 173.

Each of these criteria for immunity is met here. La Liberte's claim treats Reid as the publisher of the Posts; it is the basis for her claim. Reid was also a user of an interactive computer service. Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). "The statute defines 'interactive computer service' expansively . . . to effectuate the statute's speech-protective purpose." Ricci v. Teamsters Union Local 456 et al., 781 F.3d 25, 28-29 (2d Cir. 2015). Instagram and Facebook fall squarely within the definition of an interactive computer service. Cohen v. Facebook, Inc., 252 F.Supp.3d 140, 156-57 (E.D.N.Y. 2017) (Facebook is an interactive computer service); Franklin v. X Gear 101, LLC, 2018 WL 3528731, at *19 (S.D.N.Y. July 23, 2018) (Instagram is an interactive computer service).

Reid was also a "user" of Instagram and Facebook. Section 230 "immunizes individual 'users' of interactive computer services." <u>Barrett</u>, <u>supra</u>, 40 Cal.4th at 40. The term "user" simply refers to "anyone using an interactive computer service, without distinguishing between active and passive use." <u>Id.</u> at 43. Congress has exempted from liability anyone "who actively selects and posts material based on its content." <u>Id.</u> at 62.

Finally, the term "information content provider," "means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Here, the "information content providers" were Vargas, Nadine van der Velde, and countless others.

A republication does not have to be <u>verbatim</u> to obtain immunity under Section 230. A defendant "will not be held responsible unless it assisted in the development of what made the content unlawful." <u>LeadClick</u>, <u>supra</u>, 838 F.3d at 174; <u>see</u> <u>also</u> <u>Force v. Facebook</u>, <u>supra</u>, 934 F. 3d at 68 (quoting <u>LeadClick</u>). Even where, as plaintiff claims, the reposting of content causes a plaintiff harm, the speaker is immune from liability under Section 230. <u>Cohen</u>, <u>supra</u>, 252 F.Supp.3d at 157-58 (holding that Facebook was not liable for offensive content provided by Hamas that incited terrorist attacks). A defendant must have altered the

"substance, meaning, or purpose" of prior, initial content for there to be liability. See Seldon v. Magedson, 2012 WL 4475274, at *17 (S.D.N.Y. July 10, 2012).

Because a publisher is always the creator and author of a publication, the test under Section 230 is whether the publication is materially different from a prior publication. See Ascentive, LLC v. Opinion Corp., 842 F.Supp.2d 450, 475-476 (E.D.N.Y 2011). Under Rule 12(b)(6) motion, the District Court could and should have taken judicial notice of all the other posts and publications that accused La Liberte of being a racist and making racial slurs. Staehr, supra, 547 F.3d at 424-25. When a publication is submitted to show its existence and not for the truth of its contents, it "does not run afoul of the rule that a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6)." Id. (citation omitted); see also Federal Rules of Evidence § 201(b), (c); East Coast Test Prep LLC v. Allnurses.com, Inc., 307 F.Supp.3d 952, 967 (D. Minn. 2018) (ruling that, in a CDA § 230 immunity case, courts may simply take judicial notice of archived internet documents); Enigma Software Group USA, LLC v. Bleeping Computer LLC, 194 F.Sup.3d 263, 295 & n.27 (S.D.N.Y. 2016) (holding that, in a CDA § 230 case, courts may take judicial notice of statements posted on a public internet forum); Condit v. Dunne, 317 F.Supp.2d 344, 357 (S.D.N.Y. 2004) (considering on a motion to dismiss audio recordings and

transcripts of television shows because these materials "aid the Court in its determination of whether plaintiff states a claim for relief").

The June 29th Post merely repeated what countless others had previously published before her, including Vargas and at least eight other individuals who specifically stated that La Liberte made racial slurs at the Council Meeting. (JA167, ¶ 13 & JA168-171). The Fox television interview cited by La Liberte also provides further proof of this. (JA008, ¶ 5). According to La Liberte, the June 29, 2018 interview was published "contemporaneously" with the first of the Publications, the Instagram Post, which means that the interview took earlier than that. (Pltf. Br. at 15). Because the interview addressed whether La Liberte was being vilified, falsely accused of making defamatory statements, and threatened with a boycott, it conclusively establishes that the accusations against La Liberte had been published and gone viral <u>before</u> the defendant's Publications.

La Liberte alleges that the June 29th Post was materially different from all prior publications because Reid was supposedly "the very first person to put [the racial slurs] in La Liberte's mouth." (JA046, ¶ 49). As shown above, this allegation, which is the linchpin of La Liberte's claim, is demonstrably false and belied by incontrovertible documentary evidence. Prior to the June 29th Instagram Post: (i) at least 8 individuals specifically stated that La Liberte made the racial slurs at the Council Meeting, including the van der Velde tweet cited above

(JA167, ¶ 13 & JA168-171); (ii) more than 150 other tweets and publications had accused La Liberte of racism (JA167, ¶ 14 & JA172-255); and (iii) <u>the Vargas tweet included the Photograph with the statement "spread this far and wide **this woman** needs to be put on the blast," thereby clearly identifying the woman in the Photograph as the person making the racial slurs and thus "put[ting] the words in La Liberte's mouth</u>."

La Liberte's claim regarding the July 29th Post is barred by Section 230 of the CDA.

## VI. PLAINTIFF CANNOT SHOW A PROBABILITY OF SUCCESS AS REQUIRED BY THE ANTI-SLAPP STATUTE

As noted earlier, the District Court dismissed the action pursuant to Rule 12(b)(6). If this Court does not affirm the dismissal under Rule 12(b)(6), it should, in the alternative, dismiss the action under the anti-SLAPP statute because La Liberte cannot show a probability of success on the merits.

## A. California's Anti-SLAPP Statute

California's anti-SLAPP statute was enacted to provide an efficient procedural mechanism for the early and inexpensive dismissal of non-meritorious claims arising from a person's right of petition or free speech in connection with a public issue. CA CIV. § 425.16(b); <u>Annette F.</u>, <u>supra</u>, 119 Cal.App.4th at 1159. A defamation claim arising from a communication in connection with a public issue shall be stricken "unless the court determines that the plaintiff has established that

there is a probability that the plaintiff will prevail on the claim." CA CIV. § 425.16(b)(1).

Deciding an Anti-SLAPP motion "requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds that such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." Annette F., supra, 119 Cal.App.4th at 1159 (citations omitted).

"A defendant may meet her burden of establishing that the complaint 'arises from' protected activity by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)." Id. (quoting City of Cotati v. Cashman, 29 Cal.4th 69, 78 (2002)). CA CIV. § 425.16(e) broadly defines protected speech as follows:

> (e) As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of

> the constitutional right of petition or the constitutional
> right of free speech in connection with a public issue or
> an issue of public interest.

In determining whether a cause of action falls within the scope of subdivision (e), courts must broadly construe the anti-SLAPP Statute. Annette F., supra, 119 Cal.App.4th at 1160.

The Posts come within each of the last three prongs of Section 425.16(e). They were "made in connection with an issue under consideration or review by a legislature, executive or judicial body or any other official proceeding authorized by law." The Simi Valley Council was considering whether to join the Trump administration's opposition to SB 54. The Posts also were "made in a place open to the public or a public forum in connection with an issue of public interest." CA CIV. § 425.16(e). "Web sites accessible to the public… are public forums for purposes of the anti-SLAPP statute." Barrett, supra, 40 Cal.4th at 41, n.4; Jackson v. Mayweather, 10 Cal.App.5th 1240, 1252 (Cal. App., 2d Dist. 2017). Facebook and Instagram are each public forums and Reid's Posts involved matters of public interest — immigration, sanctuary cities, the hatred shown by anti-immigrant protestors, and public civility.

Finally, the Posts fall squarely within the "constitutional right of free speech in connection with a public issue or an issue of public interest." Just as La Liberte

attended the Council Meeting to exercise her First Amendment right, Reid had the right to comment on La Liberte's statements and conduct at the Council Meeting.

When a publication falls within the protections of Section 425.16(e), a plaintiff must be able to show a probability of success on the merits, and a court need not take a plaintiff's allegations as true. Navellier v. Sletten, 29 Cal.4th 82, 88-89 (2002) (a plaintiff must put forth *prima facie* evidence to substantiate its claims and show a "reasonable probability" of recovery). The Court "shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." CA CIV. § 425(b)(2).

## B. The Provisions of the Anti-SLAPP Statute are Substantive and Enforceable

Plaintiff broadly argues that anti-SLAPP statutes, such as California's, should not be applied in federal court and are unconstitutional. No federal court has ever held that the anti-SLAPP statutes are unconstitutional or generally inapplicable. This Court has already ruled to the contrary. Adelson v. Harris, 876 F.3d 413, at 715 ("We affirm both the district court's denial of Appellant's request for additional discovery and the district court's application of the anti-SLAPP statute to this case."). There is no basis for this Court to be the first to do so.

The dispute in the Circuits is only over whether the procedure for early dismissal of defamation claims prior to discovery conflicts with the FRCP. The D.C, Fifth, and Eleventh Circuits have found these specific provisions conflict

with, and must give way to the FRCP.  Carbone v. Cable News Network Inc., 910 F.3d 1345 (11th Cir. 2018) (the motion-to-strike provision in Georgia's anti-SLAPP statute conflicted with Rules 8, 12, and 57 of the FRCP by requiring proof of probability of success on the merits before discovery.); Abbas, supra, 783 F.3d at 1333 (holding that D.C.'s special motion to dismiss provision in its anti-SLAPP statute conflicts with the FRCP); Klocke v. Watson, 936 F.3d 240, 247 (5th Cir. 2019).

The Ninth and First Circuits have a contrary view, finding that the motion-to-strike provisions are not inconsistent with the FRCP and contain substantive provisions designed to protect the right of free speech. Godin v. Schencks, 629 F.3d 79, 87-92 (1st Cir. 2010); United States ex rel. Newsham v Lockheed Missiles & Space Co., 190 F.3d 963, 973 (9th Cir. 1999) ("Newsham").  The Ninth and First  Circuits have the better argument.

In deciding whether a state law applies, a federal court must first determine if there is a "direct collision" between the state law and a federal rule. Walker v. Armco Steel, Corp., 446 U.S. 740, 749–50 (1980); Burlington Northern R.R. Co. v. Woods, 480 U.S. 1, 4–5 (1987); see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 398 (2010).  If there is no "direct collision," the court must then balance state and federal interests and examine whether the state law confers substantive or procedural rights pursuant to Erie R.R. v. Tompkins,

304 U.S. 64 (1938).  The <u>Erie</u> rule has "twin aims": "the discouragement of forum shopping and the avoidance of the inequitable administration of the law[.]" <u>Newsham</u>, 190 F.3d. at 973.

The anti-SLAPP statute does not "directly collide" with the Federal Rules. <u>Newsham</u>, 190 F.3d at 973; <u>Makaeff v. Trump University, LLC</u>, 736 F.3d 1180, 1182 (9th Cir. 2013).  <u>Newsham</u> recognized that the anti-SLAPP statutes do not interfere with the federal rules and indeed, "serve similar purposes, namely the expeditious weeding out meritless claims before trial." 190 F.3d at 972.   In <u>Makaeff</u>, the Ninth Circuit found no direct collision because California's anti-SLAPP statute "supplements rather than conflicts" with the Federal Rules by creating a "separate and additional theory upon which certain kinds of suits may be disposed of before trial."  <u>Makaeff</u>, 736 F.3d at 1182.

The First Circuit also recognized that the Maine's anti-SLAPP statute "does not seek to displace the Federal Rules or have Rules 12(b)(6) and 56 cease to function." <u>Godin</u>, <u>supra</u>, 629 F.3d at 88.  Anti-SLAPP statutes are a "supplemental and substantive rule to provide added protections, beyond those in Rules 12 and 56, to defendants who are named as parties because of constitutional petitioning activities." <u>Id.</u>

There should be little question that the motion to strike provision in the California anti-SLAPP statute provides substantive rights under <u>Erie</u> and its

progeny.  As detailed above, SLAPP suits, are filed not to win but to intimidate "by increasing the cost of litigation to the point that the citizen party's case will be weakened or abandoned," thereby chilling the exercise of First Amendment rights. See Newsham, supra, 190 F.3d at 970.  Anti-SLAPP statutes protect First Amendment rights by allowing defendants to obtain swift dismissals of SLAPP suits and discouraging plaintiffs from bringing meritless lawsuits to silence their critics by permitting the recovery of fees.  In 2019, at least thirty states and the District of Columbia have adopted some version of an anti-SLAPP statute.[6]  As the Ninth Circuit has said: "It would be difficult to find a value of a 'high[er] order' than the constitutionally protected rights to free speech and petition that are at the heart of" anti-SLAPP statutes. DC Comics v. P. Pictures Corp., 706 F.3d 1009, 1015–16 (9th Cir. 2013) (quoting Perry v. Schwarzenegger, 591 F.3d 1147, 1155–56 (9th Cir. 2010)). Even the courts that declined to apply the motion to strike or dismiss provisions in anti-SLAPP statutes, have found that anti-SLAPP statutes provide substantive rights and benefits.  See In re Gawker Media, 571 B.R. 612, 628 (S.D.N.Y. Bankr. 2017) ("[T]he Court concludes that the California anti-SLAPP statute is substantive under Erie").

The "twin-aims" of Erie weigh heavily in favor of applying anti-SLAPP statues in federal court.  If the anti-SLAPP statute was not fully enforced, it would

---

[6] See https://www.rcfp.org/introduction-anti-slapp-guide/ (last visited on Feb. 11, 2020).

frustrate the protections provided for under California law, and put the federal courts at risk of being inundated by defamation suits that belong in state courts. Given that New York is the media capital of the country, if this Court accepts plaintiff's arguments, this Circuit would soon become the forum of choice for plaintiffs residing in states with anti-SLAPP statutes.

The Second Circuit's decisions in <u>Adelson v Harris</u>, <u>supra</u>, and <u>Liberty Synergistics Inc. v. Micro Ltd.</u>, 718 F. 3d 138 (2d Cir. 2013) ("Liberty Synergistics 1"), suggest that the Second Circuit should side with the Ninth and First Circuits. In <u>Adelson</u>, the Second Circuit stated: "Many courts have held that [anti-SLAPP] Statutes, including the one here, are to be applied. . ." 774 F.3d at 809. <u>Liberty Synergistics 1</u> held that the anti-SLAPP Statute is designed "to shield certain defendants from the burden of litigation," and provide for "expeditious dismissal" of claims governed by the Statute. 718 F. 3d at 151 & 154. This Court allowed an interlocutory appeal of the denial of a motion to strike, as provided for in the anti-SLAPP Statute, even when the Federal Rules limit such appeals. A state's "procedural" rule can be "substantive for purposes of federal diversity jurisdiction" <u>Id.</u> at 152.

Further, other district courts in this Circuit have applied anti-SLAPP statutes based on California's Statute. <u>Adelson v. Harris</u>, <u>supra</u>, <u>aff'd</u>, 774 F.2d 803 (2d Cir. 2014) (awarding attorney's fees under Nevada's anti-SLAPP Statute, which is

based on California's); <u>Ernst v Kaufman</u>, 50 F.Supp.3d 553 (D. Vt. 2014), <u>appeal dismissed</u> <u>sub nom</u> <u>Ernst v. Carrigan,</u> 814 F. 3d 116 (2d Cir. 2016) (applying the motion to strike provision in Vermont's anti-SLAPP statute). Vermont's anti-SLAPP statute is based upon California's. <u>Ernst v. Carrigan</u>, 814 F.3d at 121.

## C. The Anti-SLAPP Statute Is Not Unconstitutional

Plaintiff argues that the anti-SLAPP statute is unconstitutional, that "other Courts have found that anti-SLAPP statues violate the Seventh Amendment of the U.S. Constitution. There is, in fact, no such case. A recent Southern District decision upheld the constitutionality of Nevada's anti-SLAPP statute, which is based upon California's. <u>See</u> <u>National Jewish Democratic Counsel v. Adelson</u>, 2019 WL 4805719 (S.D.N.Y. Sept. 30, 2019) (rejecting the argument that applying the anti-SLAPP statute violates the Supremacy Clause). To paraphrase that decision, La Liberte "must take [California] law as [s]he finds it. <u>Id.</u> at *5 (alteration to original).

La Liberte cites a Washington State Court case, <u>Davis v Cox</u>, 351 P. 3d 862 (2015), which involved the Washington State constitution and held that the motion-to-strike provision violated the right to a jury trial under Washington State constitution. The Court in <u>Davis</u> also specifically distinguished Washington's provision from California's statute:

> And the relevant provisions of the two statutes at issue –
> their burden of proof standards – are notably different.

> California's statute provides that a plaintiff defeats a defendant's motion by establishing "*a probability* that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1) (emphasis added). By contrast, our statute expressly ratchets up the plaintiffs evidentiary burden, requiring the plaintiff to establish "by *clear and convincing evidence a probability* of prevailing on the claim. [citation omitted] (emphasis added).

Id. at 869.

There have likely been thousands of cases involving the Statute and none have found it unconstitutional. The only case we have found that addresses plaintiff's constitutional argument has rejected it. The Paterson Law Firm v. City of Los Angeles, 2011 WL 1380059, at *4 (L.A. Supr. Ct. 2011).[7]

## D.    La Liberte Has Not Shown a Probability of Success

The record establishes that plaintiff has little, if no, probability of success. La Liberte's case is based on a series of false, unprovable allegations: that Reid was the first person who identified La Liberte as making racial slurs; that La Liberte's conduct at the Council Meeting had received little attention prior to the Posts; that Reid was aware of evidence that put into question whether La Liberte had made the racial slurs; and that anyone seeing the July 1st Posts would somehow magically know that La Liberte was being accused of saying racist things. The amended complaint is riddled with falsehoods, which are belied by irrefutable

---

[7] To the extent that the Court is willing to consider whether the constitutional argument advanced by plaintiff has any merit, defendant respectfully requests leave to brief the issue more thoroughly, which cannot be done here due to space constraints.

documentary evidence, all of which a rudimentary Google search would have uncovered. This obviously politically motivated suit is exactly the kind of case California had in mind when it established a framework for the early dismissal of meritless defamation actions where a plaintiff cannot show a probability of success.

## VII. REID IS ENTITLED TO RECOVER HER ATTORNEY'S FEES

The anti-SLAPP statute mandates an award of attorney's fees if a successful motion to strike is made, even if an action was commenced in good faith. The District Court awarded Reid her attorney's fees and this Court should award defendant her attorney's fees with respect to this appeal.

While there is a dispute among the Circuits about the applicability of "procedural" aspects of anti-SLAPP statutes, there is <u>no dispute</u> that mandatory fee shifting provisions are enforceable. As this Court has stated, "the specific state anti-SLAPP provisions applied by the district court – <u>immunity from civil liability and mandatory fee shifting seem to us unproblematic</u>." and do not conflict with any federal rule. <u>Adelson v. Harris</u>, <u>supra</u>, 774 F.3d at 809 (emphasis added); <u>see also</u> <u>Law Offices of Bruce Altschuld v. Wilson</u>, 632 Fed.Appx. 321, 322 (9th Cir. 2015) ("We have repeatedly held that the anti-SLAPP provisions governing attorneys' fees apply to state-law claims in federal court."); <u>Northon v. Rule</u>, 637 F.3d 937, 938-39 (9th Cir. 2011) (upholding mandatory fee-shifting provision of

Oregon's anti-SLAPP Statute, which was modeled after California's) ("The entitlement to fees and costs enhances the anti-SLAPP law's protection of the state's 'important, substantive' interests."); <u>Caranchini v. Peck</u>, 2018 WL 6173097, at \*\*4-7 (D. Kansas Nov. 26, 2018) (citing <u>Adelson</u> with approval and holding that the Kansas anti-SLAPP statute, which has similar burden- and fee-shifting provisions, is applicable in federal diversity suit) ("If this court declined to apply the Act, it would encourage forum shopping and result in inequitable application of the law, the two goals of the *Erie* doctrine."). Even in <u>Abbas</u>, <u>supra</u>, when the Court did not apply the motion to strike portion of the DC's anti-SLAPP statute, the court stated that had "the D.C. council simply wanted to permit courts to award attorney's fees to prevailing defendants in these kinds of defamation cases, it easily could have done so." 783 F.3d at 1335.

The Court should not disturb the District Court's award of attorney's fees and should award the defendant the fees and costs she incurs in this appeal.

## **<u>CONCLUSION</u>**

The Court should dismiss the appeal, affirm the District Court's decision, and award defendant her attorney's fees and costs.

Dated:      New York, New York
              February 12, 2020

**WACHTEL MISSRY LLP**

By: /s *John H. Reichman*
       John H. Reichman
       Jason L. Libou
       885 Second Avenue, 47th Fl.
       New York, New York 10017
       (212) 909-9500
       reichman@wmllp.com
       jlibou@wmllp.com
       *Attorneys for Defendant-Appellee*
       *Joy-Ann Reid*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 13,740 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated:      New York, New York
             February 12, 2020

                       **WACHTEL MISSRY LLP**

By: /s   *John H. Reichman*
      John H. Reichman
      Jason L. Libou
      885 Second Avenue, 47th Fl.
      New York, New York 10017
      (212) 909-9500
      reichman@wmllp.com
      jlibou@wmllp.com
      *Attorneys for Defendant-Appellee*
      *Joy-Ann Reid*