# No. 19-3574

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———————

ROSLYN LA LIBERTE
*Plaintiff-Appellant,*

v.

JOY REID
*Defendant-Appellee.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF NEW YORK
Case No. 1:18-cv-05398-DLI, Hon. Dora L. Irizarry

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT

---

L. LIN WOOD
L. LIN WOOD, P.C.
1180 West Peachtree St., Ste. 2040
Atlanta, GA 30309
Telephone: 404-891-1402
Facsimile: 404-506-9111

NICOLE JENNINGS WADE
G. TAYLOR WILSON
WADE, GRUNBERG & WILSON, LLC
1230 Peachtree St. NE, Ste. 1900
Atlanta, GA 30309
Telephone: 404-600-1153
Facsimile: 404-969-4333

*Counsel for Plaintiff-Appellant*
*Roslyn La Liberte*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ................................................................................... 1

ARGUMENT ......................................................................................... 5

I.      The District Court's Application of the Anti-SLAPP Statute's Special Motion to Strike Procedure and Award of Attorney's Fees Conflicts with the Federal Rules and Should Be Reversed. ...................................... 5

II.     The California Supreme Court Strictly Applies SCOTUS Precedent Requiring Plaintiffs to Attain "Special Prominence" to Accord Public Figure Status. .......................................................................................... 8

      A.    California Does Not Impose Heightened Protection from Liability for Defamation. ..................................................................... 9

      B.    California Applies SCOTUS Precedent for Determining Public Figure Status. ............................................................................... 11

      C.    Lower Court Decisions in California Are Not Binding Precedent ....................................................................................... 15

      D.    La Liberte Did Not Attain Special Prominence. ............................. 16

III.    The CDA Is Inapplicable Because Reid Authored the Posts and Is Therefore an "Information Content Provider" as to All Accusations. ...... 16

IV.    The July 1st Posts Are Defamatory on Their Face Without Resort to Extrinsic Facts. ................................................................................. 19

V.     The July 1 Posts Are Not Protected Opinion Because They Convey Provably False Accusations that La Liberte Engaged in Racist Misconduct. ....................................................................................... 21

VI.    La Liberte Plausibly Alleged Actual Malice with Regard to All of Reid's False and Defamatory Accusations ........................................... 25

CONCLUSION .................................................................................... 28

CERTIFICATE OF SERVICE ............................................................... 29

CERTIFICATE OF COMPLIANCE ....................................................... 30

i

# TABLE OF AUTHORITIES

**Cases**

*Arce v. Kaiser Found. Health Plan, Inc.*, 181 Cal. App. 4th 471 (2010)................21

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015)....................................................25

*Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711 (1989) ...................... 9, 10, 11, 14

*Burns v. Neiman Marcus Grp., Inc.*, 173 Cal. App. 4th 479 (2009) .......................21

*Campanelli v. Regents of Univ. of Cal.*, 44 Cal. App. 4th 572 (1996) ...................22

*Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163 (2d Cir. 2000) ...................22

*Edwards v. Hall*, 234 Cal. App. 3d 886 (1991) ......................................................11

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008).................................................................................................18

*Gertz v. Robert Welch, Inc.*, 481 U.S. 323 (1974) ...................... 3, 11, 12, 13, 14, 16

*Gross v. New York Times Co.*, 82 N.Y.2d 146 (1993).............................................22

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989)....................25

*Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728 (2003) ..................................6

*Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398 (6th Cir. 2014) ........................................................................................................................ 17, 18

*Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254 (1998)...............................................14

*Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019) ............................................. 6, 7, 8

*Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850 (9th Cir. 2004) ..........................................9

*Los Angeles All. for Survival v. City of Los Angeles*, 22 Cal. 4th 352 (2000)...........9

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013)............................7, 15

*McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97 (2007)...............................20

*McKee v. Cosby*, 139 S. Ct. 675 (2019).................................................................26

*New York Times v. Sullivan*, 376 U.S. 254 (1964) .................................................13

*Olson v. Auto. Club of S. California*, 42 Cal. 4th 1142 (2008) ................................5

*Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248 (2010)..............................24

*Pep v. Newsweek, Inc.*, 553 F. Supp. 1000 (S.D.N.Y. 1983) ..................................27

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *amended*, 897 F.3d 1224 (2018), *cert. denied*, 139 S. Ct. 1446 (2019) ..........................................................................................................1, 7

*Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d 244 (1984) .............. 12, 14, 15

*Rudnick v. McMillan*, 25 Cal. App. 4th 1183 (1994) ..............................................15

*Seldon v. Magedson*, 2012 WL 4475274 (S.D.N.Y. Jul. 10, 2012) ........................18

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)....8

*Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281 (2011)........... 17, 18

*St. Amant v. Thompson*, 390 U.S. 727 (1968)................................................... 25, 27

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999)..........................................................................................................8

*Vegod Corp. v. American Broadcasting Cos.,* 25 Cal. 3d 763 (1979) . 13, 14, 15, 16

*Williams v. Moffat*, 2007 WL 4166812 (E.D. Cal. Nov. 20, 2007).........................24

*Z.F. ex rel M.A.F. v. Ripon Unified School Dist.*, 2011 WL 356072 (E.D. Cal. Feb. 2, 2011) ..................................................................................................................22

**Statutes**

Cal. Civ. Proc. Code § 425.16(c)(1) ........................................................ 2, 5, 6, 7, 8

Communications Decency Act, 47 U.S.C. § 230 ............................ 5, 16, 17, 18, 19

**Rules**

Fed. Rule Civ. P. 12(b)(6)............................................................................ 1, 5, 6, 7

# **INTRODUCTION**

Defendant-Appellee Joy Reid ("Reid") responds to this appeal by mixing, matching, and misrepresenting fundamental First Amendment principles governing the critical issues in this case, and by resorting to purported facts outside the 12(b)(6) record to be considered by this Court.

The latter highlights the need for this case to proceed to discovery for the development of a full factual record. There are limits to the Court's ability to take judicial notice, and Reid baldly ignores those limitations, including by relying on declarations and the truth of the matter asserted in various internet publications. To consider such extraneous facts, the district court would have been required to grant discovery prior to issuing a ruling on a summary judgment motion. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *amended*, 897 F.3d 1224 (2018), *cert. denied*, 139 S. Ct. 1446 (2019) ("[W]hen an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, … discovery must be allowed … before any decision is made by the court."). This appeal is from the grant of a Rule 12(b)(6) motion, and the factual record is limited to the allegations of Plaintiff-Appellant Roslyn La Liberte's ("La Liberte") First Amended Complaint (JA037-99) and facts that are properly subject to judicial notice.

As to the controlling legal issues, Reid raises, but misstates, five new issues

to be addressed in this reply brief.

    *First*, while acknowledging a Circuit split on the application of anti-SLAPP statutes in federal courts, Reid boldly states that "there is <u>no dispute</u> that mandatory fee shifting provisions are enforceable." (Def. Br. at 68) (emphasis in original). Not only did the Fifth Circuit recently hold the opposite, but the plain language of the California anti-SLAPP statute (the "Anti-SLAPP Statute") requires that an award of attorney's fees be made only after granting a motion made pursuant to its state-created special motion to strike procedure. *Cf.* Cal. Civ. Proc. Code § 425.16(c)(1) ("[I]n any action *subject to subdivision (b)*, a prevailing defendant *on a special motion to strike* shall be entitled to recover his or her attorney's fees and costs.") (emphasis added). To affirm the district court's award of attorney's fees pursuant to the Anti-SLAPP Statute, the Court must first determine that the Anti-SLAPP Statute, with its "probability" standard, does not conflict with the Federal Rules. It does.

    *Second*, regarding La Liberte's classification, Reid falsely asserts that California courts have redefined and expanded controlling Supreme Court of the United States ("SCOTUS") precedent to include as public figures private citizens who have attained no prominence on the identified public issue, so long as they attempted in some manner to influence its outcome. To the contrary, the California Supreme Court has substantively addressed the standards of the limited purpose

public figure doctrine only four times since SCOTUS decided *Gertz v. Robert Welch, Inc.*, 481 U.S. 323 (1974). On each occasion, California has strictly and faithfully applied SCOTUS precedent, and in each instance affirmed the fundamental SCOTUS requirement that limited purpose public figures attain "special prominence in the resolution of public questions" or "an influential role in ordering society," and thereby "thrust themselves into the forefront of particular controversies." La Liberte achieved no prominence or influence regarding SB 54, and she is a private figure for the purposes of this action.

*Third*, in her "right for any reason" request that the Court affirm the district court's order, Reid posits that the district court erred in finding that La Liberte sufficiently alleged actual malice with respect to her July 1 Instagram and Facebook posts (the "July 1 Posts"). (JA047, JA074, JA076). In particular, Reid relies on her own extrinsic declaration to assert that she did not review prior to her July 1 Posts the two emails sent to her by La Liberte's son on June 30 and July 1, 2018. (Def. Br. at 26). As an initial matter, *assuming arguendo* public figure status, La Liberte sufficiently alleged actual malice with respect to the June 29 Instagram post (the "June 29 Instagram Post") and, derivatively based upon the same information, the July 1 Posts, without regard to the additional emails sent directly to Reid on June 30 and July 1. La Liberte properly alleged: (1) Reid had just one, obviously biased, unreliable source whom she did not know; (2) despite

3

his obvious bias, Reid performed no investigation into her accusations whatsoever, including available public information; (3) Reid deliberately altered the sole source quote she did rely on to make it more condemnatory than it really was; and (4) her recklessness in defaming a private citizen is explained by her ongoing war against the President, her own personal animus, and her improper political motives. SCOTUS precedent makes clear that these allegations state a plausible case for actual malice.

*Fourth*, Reid has confused the concept of defamation by implication with defamation per quod. More specifically, Reid asserts that accusations that are defamatory by implication cannot be *per se* defamatory and thus La Liberte was required to plead special damages with respect to the July 1 Posts. (Def. Br. at 47-51). To the extent the July 1 Posts can be considered defamatory only by implication, Reid remains irreconcilably wrong. Defamation by implication has nothing to do with the *per se* versus *per quod* analysis, and thus nothing to do with presumed versus special damages. The defamatory meaning attributable to Reid's July 1 Posts requires no extrinsic information to understand; the posts overtly compare La Liberte's *conduct* to that of the universally understood racist conduct during desegregation.

*Fifth*, Reid asserts that it is irrelevant that she personally authored the defamatory accusations in this case because other people first said something

similar somewhere on the internet. However, the Communications Decency Act, 47 U.S.C. § 230 ("CDA"), does not protect from liability an "information content provider[]," which is defined as "any person … that is responsible, in whole or in part, for the creation or development of information[.]" 47 U.S.C. § 230(f)(3). Reid's position turns the CDA on its head. The June 29 Instagram Post and July 1 Posts are not re-posts of another third-party user's posts; they are posts authored and originally published by Reid, for which she is an "information content provider" as defined by the CDA.

## ARGUMENT

### I. The District Court's Application of the Anti-SLAPP Statute's Special Motion to Strike Procedure and Award of Attorney's Fees Conflicts with the Federal Rules and Should Be Reversed.

There is no need for La Liberte to re-brief the applicability of the Anti-SLAPP Statute in federal court. However, despite Reid asserting that the "District Court dismissed the amended complaint pursuant to Rule 12(b)(6) standards and could not have been clearer about this," (Def. Br. at 28), she nevertheless urges this Court to approve application of the Anti-SLAPP Statute's fee-shifting provision.

Cardinal rules of statutory construction require that the Court apply the plain language and ordinary meaning of the Anti-SLAPP Statute unless it is ambiguous. *See, e.g.*, *Olson v. Auto. Club of S. California*, 42 Cal. 4th 1142, 1147 (2008) ("If the statute's text evinces an unmistakable plain meaning, we need go no further.")

(citations omitted); *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th 728, 735 (2003) (addressing Anti-SLAPP Statute and stating if "the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to extrinsic indicia of the intent of the Legislature") (cleaned up).

With regard to the fee-shifting provision, the Anti-SLAPP Statute provides: "in any action **subject to subdivision (b) [the special motion to strike procedure]**, a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." Cal. Civ. Code Proc. § 425.16(c)(1) (emphasis added). Thus, Reid's position that "[b]ecause the amended complaint is not viable under Rule 12(b)(6), the issue of whether the anti-SLAPP statute conflicts with the Federal Rules is moot," (Def. Br. at 29), is incorrect. The plain language of the Anti-SLAPP Statute unambiguously requires that the special motion to strike procedure be applied in order to award statutory attorney's fees.

This is not a novel issue. While Reid asserts that "there is <u>no dispute</u> that mandatory fee shifting provisions are enforceable," (Def. Br. at 68), her Amici acknowledge that the Fifth Circuit recently held to the contrary (Dkt. 62 at 34-35):

> Klocke also alleges that the TCPA's [Texas Citizen Participation Act] attorney's fees and sanctions provisions conflict with Rules 12(b)(6) and 56. But we need not discuss that issue in detail because those provisions are not applicable apart from the burden shifting early dismissal framework. *See* Tex. Civ. Prac. & Rem. Code § 27.009(a) ("If the court orders dismissal of a legal action *under this chapter*, the court shall award to the moving party" attorney's fees and possible sanctions.) (emphasis added). Suffice to say that because the TCPA

> does not apply in federal court, the district court erred by awarding
> fees and sanctions pursuant to it.

*Klocke v. Watson*, 936 F.3d 240, 247 n.6 (5th Cir. 2019). There is no meaningful

distinction between the TCPA's "under this chapter" language and the Anti-

SLAPP Statute's "in any action subject" to a special motion to strike pursuant to its

"subdivision (b)" language.

Moreover, contrary to Reid's position, the district court did expressly apply

the Anti-SLAPP Statute in order to award fees, it just did so by "analyz[ing] both

Defendant's motion to dismiss and motion to strike under the procedural standards

of Rule 12(b)(6)," rather than the "probability" of success standard required by the

plain language of the Anti-SLAPP Statute, citing *Planned Parenthood*, 890 F.3d

828, 834-35 (JA267-68). However, even the Ninth Circuit has for years been

questioning the wisdom of its application of the Anti-SLAPP Statute in federal

court, precisely because re-writing the plain language of the Anti-SLAPP Statute in

attempt to force its partial alignment with the federal rules is not the answer. *See,*

*e.g.*, *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, J.

concurring) (writing that the Anti-SLAPP statute is "quintessentially procedural,"

that it conflicts with the federal rules in part because "it authorizes attorneys' fees

against a plaintiff who loses the special motion by a standard far different from that

applicable under Federal Rule of Civil Procedure 11," and that the Ninth Circuit's

re-writing of the statute has created "a hybrid procedure where neither the Federal

Rules nor the state anti-SLAPP statute operate as designed"); *id.* (Paez, J. concurring) ("I, too, believe that *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999), is wrong and should be reconsidered. I agree that California's anti-SLAPP statute is 'quintessentially procedural,' and its application in federal court has created a hybrid mess that now resembles neither the Federal Rules nor the original state statute.").[1]

This Court should avoid that hybrid mess, refuse to re-write the plain language of the Anti-SLAPP Statute, refuse to apply the statute in a piecemeal fashion, and reverse the district court's award of attorney's fees and costs.

## II.     The California Supreme Court Strictly Applies SCOTUS Precedent Requiring Plaintiffs to Attain "Special Prominence" to Accord Public Figure Status.

Reid concocts a novel and expansive public figure test by erroneously arguing that the California Constitution provides additional protections beyond the First Amendment of the United States Constitution. (Def. Br. at 31-33). Reid cites inapposite cases that do not even involve defamation liability, much less an expansion of the federally defined public figure doctrine, and she provides

---

[1] For clarity, however, whether the Anti-SLAPP Statute is substantive or procedural is a moot point. "Courts do not 'wade into *Erie's* murky waters unless the federal rule is inapplicable or invalid.'" *Klocke*, 936 F.3d 240, 244-45 (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-99 (2010)).

misleading citations to California cases considering the public figure issue.

## A. California Does Not Impose Heightened Protection from Liability for Defamation.

The California cases Reid relies upon for her argument that California provides higher protection for liability from defamation than the federal Constitution actually expand citizens' access to public forums but do not limit citizens' defamation liability for what they say in such forums. *See, e.g.*, *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) ("The standard under the California Constitution for whether a particular area is a 'public forum' is one aspect of constitutional law in which the California Constitution varies from its federal cousin."); *cf. Los Angeles All. for Survival v. City of Los Angeles*, 22 Cal. 4th 352, 367 (2000) ("Merely because our provision is worded more expansively and has been interpreted as more protective than the First Amendment, however, does not mean that it is broader than the First Amendment in all its applications.").

In fact, the California Supreme Court has explicitly rejected the notion that California's Constitution provides additional protection from liability for defamation beyond the protections embodied in the United States Constitution and case law. In *Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711 (1989), the California Supreme Court rejected the defendants' contention that "a showing of malice is appropriate as a matter of policy under the California Constitution. … rely[ing] on observations by California courts that the California Constitution

provides greater protection than its federal counterpart for freedom of speech and the press." *Id.* at 745. Just like Reid's citations here, "[n]one of the cases relied on by defendants involved the issue of the proper standard of liability in a defamation action." *Id.* at 745-46. The California Supreme Court noted that "[w]e have recently applied the federal constitutional requirements without suggestion that our state Constitution creates higher obstacles to recovery for defamation," and that:

> Article 1, section 2, subdivision (a) of the California Constitution states, "Every person may freely speak, write and publish his or her sentiments on all subjects, *being responsible for the abuse of this right*. A law may not restrain or abridge liberty of speech or press." (Italics added). This provision makes clear that the right to speech is not unfettered and reflects a considered determination that the individual's interest in reputation is worthy of constitutional protection. The federal Constitution, by contrast, contains no express provision imposing responsibility for abuse of the right of free speech. This difference refutes defendant's policy argument that our state Constitution weighs in favor of a standard of fault higher than that required under the federal Constitution.
>
> Society's interest in the value of a private person's reputation **weighs against the judicial creation of a privilege (whether by construing a statute or the common law) that would impose burdens greater than those already required under the federal Constitution.**

*Id.* at 746 (second emphasis added).

> For the avoidance of doubt, the *Brown* court continued, holding:
>
> Moreover, expansion of the statutory privilege would unnecessarily complicate defamation law, which is now largely governed by constitutional doctrine. … ". . . The United States Supreme Court has chosen to formulate a constitutional privilege that is intended to advance 'robust and wide-open debate' **by measuring the 'public' status of the injured parties**, rather than the content of the

publication…. We do not think we ought to fashion our state's tort law in a manner that would only ***fine tune the United States constitutional standard in one respect***." …

Almost everyone agrees that the complexities created by *New York Times, supra*, 376 U.S. 254, and its progeny have rendered the law unmanageable. … We decline to add yet another wrinkle to the already crumpled face of constitutional defamation law.

*Id.* at 747-48 (citations omitted) (emphasis added); *see also Edwards v. Hall*, 234 Cal. App. 3d 886, 904-07 (1991) (holding "the *Brown* court's extensive refutation of the policy arguments advanced in favor of expanded constitutional protection for media defendants is a clear signal that such expansion is not warranted under our [California] state Constitution.") (citation omitted).

## B. California Applies SCOTUS Precedent for Determining Public Figure Status.

Consistent with the California Supreme Court's refusal to expand protections from defamation liability beyond those provided by federal law, the California Supreme Court has repeatedly applied SCOTUS's *Gertz* standard to determine whether a defamation plaintiff should be deemed a limited purpose public figure. However, relying on inapposite case law and misleading citations, Reid inaccurately asserts that "[c]onsistent with its broad protection of free speech, California has a more expansive view of who is a limited purpose public figure than the minimum First Amendment requirements." (Def. Br. at 32-33). In particular, Reid inaccurately cites *Reader's Digest Ass'n v. Superior Court*, 37 Cal.

11

3d 244, 254-54 (1984), for the purported proposition that a "limited purpose public figure is anyone who has 'undertaken some voluntary act through which (s)he seeks to influence the resolution of the public issues involved.'" (*Id.*).

The court in *Reader's Digest*, however, clearly articulates the "forefront of particular controversies" requirement, which Reid doggedly tries to avoid:

> [T]he mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action. ***In sum***, *when called upon to make a determination of public figure status, courts should look for evidence of **affirmative actions** by which purported "public figures" **have thrust themselves into the forefront** of particular public controversies*. As is reflected in the evolution of the public figure doctrine, [in SCOTUS cases] *Butts* through *Gertz*, *Firestone* and *Wolston*, such a determination is often a close question which can only be resolved by considering the totality of the circumstances which comprise each individual controversy.

*Reader's Digest*, 37 Cal. 3d at 254-55 (emphasis added). Under *Gertz*, including as interpreted by the California Supreme Court in *Reader's Digest*, La Liberte could be deemed a limited public figure only if she thrust herself to the "*forefront*" of a public controversy or otherwise obtained "*special prominence*" in the resolution of the identified public issue. *See Gertz,* 418 U.S. 323, 351 (holding that "[s]ome occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have *thrust themselves to the **forefront** of particular public controversies in order to influence the resolution of the issues involved*," and reiterating that "[i]n

12

either case such persons assume ***special prominence*** in the resolution of public questions") (emphasis added).

Reid proposes a weak and novel limited public figure test that would erase the "forefront" or "special prominence" requirements, requiring that Reid show only that La Liberte attempted to influence the outcome of a public controversy, irrespective of La Liberte's role in the same. This test would strike at the core of public figure law, which assumes that the defamed person's prominence both warrants more latitude for public criticism and provides the defamed person with a public platform to defend herself and rebut the defamatory accusations.

California Supreme Court precedent never references the notion that California has a more expansive view on the limited purpose public figure doctrine, nor does it otherwise create a lesser standard for conferring such public status. In *Vegod Corp. v. American Broadcasting Cos.,* 25 Cal. 3d 763 (1979), for example, the California Supreme Court cited solely to SCOTUS precedent, from *New York Times v. Sullivan* to *Gertz*, specifically, and reiterated the special prominence standard:

> ". . . More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. ***[S]uch persons assume special prominence in the resolution of public questions***." . . .
> . . .
> Private persons by contrast have not undertaken an "***influential role in ordering society***."

*Id.* at 767 (quoting *Gertz*, 418 U.S. at 344-45, 351) (emphasis added). Other California cases are consistent with *Vegod* and *Reader's Digest*. *See, e.g., Brown*, 48 Cal. 3d at 745 (citing *Reader's Digest* "forefront of particular controversies" language and noting that a "'fairly high threshold of public activity' is necessary to elevate a person to public figure status") (citing Tribe, American Constitutional Law (2d ed. 1988) § 12-13, p. 881); *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 263 (1998) (reaffirming that "those classed as [limited purpose] public figures have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved"; that "such persons assume special prominence in the resolution of public questions"; and that "the private individual has not accepted public office or assumed an 'influential role in ordering society.'").

In short, California law is consistent with SCOTUS precedent defining limited purpose public figures as those who have assumed "an influential role" and "special prominence" in the affairs of society; their participation must be more than "trivial" and should instead reflect a "fairly high threshold of public activity" by which they "have thrust themselves into the forefront" of the identified public controversy. *Gertz*, 418 U.S. at 345, 351; *Khawar*, 19 Cal. 4th at 254, 263-64, 267; *Brown*, 48 Cal. 3d at 745; *Reader's Digest*, 37 Cal. 3d at 254-55; *Vegod*, 25 Cal. 3d at 766-67. Anything less would render people like La Liberte cannon

14

fodder for the public, forced to endure bombardments of public shaming without the means to defend or protect themselves.

## C. Lower Court Decisions in California Are Not Binding Precedent.

Grasping for a foothold, Reid relies on incorrect and out-of-context statements of the limited purpose public figure test by certain lower courts of California, such as *Rudnick v. McMillan*, 25 Cal. App. 4th 1183 (1994), which took the same liberties Reid does with *Reader's Digest*. *Id.* at 1190 ("To qualify as a limited purpose public figure, a plaintiff 'must have undertaken some *voluntary* [affirmative] act[ion] through which he seeks to influence the resolution of the public issues involved.'") (quoting *Reader's Digest*, 37 Cal. 3d at 254). Like Reid, *Rudnick* selected a convenient sentence of *Reader's Digest*, which is in truth a mere rejection of an involuntary limited purpose public figure.

Like the Ninth Circuit, this Court should reject California lower court decisions that fly in the face of California Supreme Court precedent and clear federal constitutional law. *Cf. Makaeff*, 715 F.3d 254, 267 ("We believe these subsequent cases misread *Vegod*; we do not read *Vegod* to have opined either so broadly or so rigidly. In any event, we are not bound by California state decisions because whether Trump University is a limited public figure is a question determined under federal constitutional law.").

15

### D. La Liberte Did Not Attain Special Prominence.

Despite retaining an internet consulting expert and reaching well beyond the four corners of the Amended Complaint, Reid cannot point to any affirmative action undertaken by La Liberte other than appearing, with hundreds of others, at city council meetings and, in some instances, addressing those councils along with many others. The only other "evidence" of her alleged public figure status is a photograph taken of La Liberte and placed in the *Washington Post*, without any interview or other quote given by La Liberte. *Cf., e.g.*, *Vegod Corp.*, 25 Cal. 3d at 767 ("Distinguishing between private and public figure the court reasoned that public figures ordinarily will have significantly greater access to the media to contradict lie and error than will private individuals.") (citing *Gertz*, 481 U.S. at 344-45). Reid cannot point to any unusual media access, interviews, journals, social media posts, or other public commentary by La Liberte on the identified public issue of SB 54.

Unless this Court is prepared to hold that all individuals who attended city council meetings regarding SB 54 are limited purpose public figures, it should hold that La Liberte is a private figure plaintiff who is required to prove defamation pursuant only to a negligence standard.

### III. The CDA Is Inapplicable Because Reid Authored the Posts and Is Therefore an "Information Content Provider" as to All Accusations.

On the issue of the CDA, the district court got it right: "Under Section 230

of the CDA, users and providers of internet services are shielded from liability arising from defamation and other state law claims that are *premised on posts of, or links to, third-party content*. … Section 230's grant of immunity applies only if the provider or user is not also an 'information content' provider of the content that gives rise to the underlying claim." (JA271) (emphasis added). By contrast, the relief Reid seeks is unprecedented, asking this Court to hold that if anyone, somewhere on the internet, made accusations similar to those she authored herself, she is immune from liability.

The dispositive question is whether Reid is an "information content provider" – i.e., "any person … that is responsible, in whole or in part, for the creation or development of information[.]" 47 U.S.C. § 230(f)(3). Reid's status as a "user" of social media does not absolve her of being an "information content provider." *See, e.g.*, *Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281, 289 (2011) ("any piece of content can have multiple [content] providers"); *Jones v. Dirty World Entertainment Recordings, LLC*, 755 F.3d 398, 408 (6th Cir. 2014) (the CDA "applies only to the extent that an interactive computer service [or user] is not also the information content provider of the content at issue").

Here, as the district court recognized, La Liberte has properly alleged that Reid's June 29 Instagram Post and July 1 Posts are her own content, not reposts or links to a third-party's posts, (JA046-47; *cf.* JA067 *with* JA069, 74, 76), which

distinguishes cases affording CDA immunity.  *See, e.g.*, *Jones*, 755 F.3d at 415-16 ("Dirty World and Richie did not author the statements at issue . . . . To be sure, Richie was an information content provider as to his comment on the December 7 post," "[b]ut Jones did not allege that *Richie's* comments were defamatory") (emphasis in original); *Seldon v. Magedson*, 2012 WL 4475274, at *17 (S.D.N.Y. Jul. 10, 2012) ("[I]t is undisputed that defendants did not create the content to which plaintiff objects – the allegedly defamatory posts.  Instead, as discussed above, those posts were written and submitted by one or more website users."). *Shiamili* crystallizes the distinction, as "there [wa]s no allegation that defendants actually authored the statements" complained of by the plaintiff.  17 N.Y.3d at 290. However, the defendants were "'content providers' with respect to the heading, subheading, and illustration that accompanied the reposting," and which defendants had authored themselves.  *Id.* at 292.

Even if the Court finds that Reid is not liable as the author and original poster of the June 29 Instagram Post and/or July 1 Posts, she is liable on the alternative basis that she "materially contribute[d] to" the defamatory sting of the original tweet by Alan Vargas (*cf.* JA067 *with* JA069) by changing "they yelled" to La Liberte, specifically, "screamed."  *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008).  With respect to the July 1 Posts, Reid does not dispute that she, herself, authored the

18

posts but she contends by reference to extrinsic materials that the photograph was first provided by another user. In any case, the photograph in the July 1 Posts is also actionable because Reid specifically solicited its creation in her June 29 Instagram Post, stating "[m]ake the picture black and white and it could be the 1950s and the desegregation of a school." *See id.* at 1165 (holding that "[t]he CDA does not grant immunity for inducing third parties to express" defamatory content).

The CDA, which already fundamentally alters centuries of jurisprudence on the liability of republishers, does not afford Reid immunity from suit. She authored the posts herself and otherwise altered and/or solicited the posts upon which she claims to have relied.

## IV. The July 1st Posts Are Defamatory on Their Face Without Resort to Extrinsic Facts.

Reid's position that the July 1 Posts are defamatory only by implication and thus La Liberte was required to plead special damages confuses the fundamental difference between defamation *per se* and defamation *per quod*. (Def. Br. at 47-48). Pretermitting whether the July 1 Posts constitute straight or implied defamation, the July 1 Posts remain libelous on their face without resort to information outside the four corners of the Posts. It is black letter law that a publication which is defamatory by implication may still be libelous *per se*:

> *A statement can also be libelous per se if it contains a charge by implication from the language employed by the speaker* and a listener could understand the defamatory meaning without the necessity of

19

> knowing extrinsic explanatory matter. However, if the listener would not recognize the defamatory meaning without knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, the matter is deemed defamatory per quod and requires pleading and proof of special damages.

*McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 112 (2007) (citations omitted) (emphasis added).

The July 1 Posts require no explanation of extrinsic circumstances. It is not required that Reid's audience know specifically that the photograph utilized by Reid is famous or that it depicts desegregation in 1957 in Little Rock, Arkansas. All rational persons viewing the Little Rock photograph recognize that the photograph depicts a white woman engaging in racist conduct and discrimination against a minority. Surely, Reid is not suggesting that it would be irrational for a reasonable person to surmise that the photograph depicts racist conduct. Moreover, Reid made her purpose and comparison clear with her originally authored post:

> It was inevitable that this image would be made. It's also easy to look at old black and white photos and think: I can't believe that person screaming at a child, with their face twisted in rage, is real. B[ut] everyone one of them were. History sometimes repeats. And it is full of rage.

(JA047 ¶ 56, JA074, JA076).

By way of analogy, if a publication stated only that two people, Fred and Jane, were found in a compromising position and shot by a third-person, John, it

would not be defamatory on its face as to Fred and Jane but could be considered

defamatory *per quod* if readers knew the extraneous fact that Fred and Jane were

married to other people and were thus adulterers.  If, however, the publication

additionally stated that Fred is actually married to another woman, Anne, and Jane

is married to the gunman, John, the publication would be defamatory on its face for

the implicit but unstated premise that Fred and Jane were engaged in an

extramarital affair, because all facts necessary to draw that conclusion would be

present on the face of the publication.[2]

## V. The July 1 Posts Are Not Protected Opinion Because They Convey Provably False Accusations that La Liberte Engaged in Racist Misconduct.

The first task in assessing opinion is to isolate the defamatory meaning – here,

---

[2] While La Liberte disputes that the July 1 Posts are defamatory only by implication (a legal theory generally reserved for publications only of true facts but which carry with them an unstated defamatory meaning), to the extent Reid asserts that her cause of action for defamation per se must be dismissed because it is not labeled "defamation by implication," she is wrong.  *See, e.g.*, *Burns v. Neiman Marcus Grp., Inc.*, 173 Cal. App. 4th 479, 486 (2009) ("Treating as true all material facts properly pleaded, we determine de novo whether the factual allegations of the complaint are adequate to state a cause of action under any legal theory, regardless of the title under which the factual basis for relief is stated."); *Arce v. Kaiser Found. Health Plan, Inc.*, 181 Cal. App. 4th 471, 490 (2010) ("the test of the adequacy of a complaint is whether it alleges sufficient facts to support a particular cause of action and not whether it expressly alleges legal theories of liability underlying a cause of action.  A complaint is adequate if its factual allegations are sufficient to support a cause of action on any available legal theory (whether specifically pleaded or not).") (citation omitted).

that La Liberte engaged in racist misconduct and/or discrimination akin to desegregation – and determine whether that meaning is capable of being proven true or false.  The meaning here concerns alleged conduct that either occurred or did not, and it is therefore capable of being proven true or false.

With respect to the standard to be applied on motion to dismiss, Reid is correct that the question of whether a defamatory statement is capable of being proven true or false is a question of law for the court in the first instance.  However, on a motion to dismiss, "[i]f the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury."  *Z.F. ex rel M.A.F. v. Ripon Unified School Dist.*, 2011 WL 356072, at *6 (E.D. Cal. Feb. 2, 2011) (quoting *Campanelli v. Regents of Univ. of Cal.*, 44 Cal. App. 4th 572, 578 (1996)).[3]

Moreover, it is surprising that Reid – who has made a name for herself advocating against racial discrimination – now attempts to disavow the universally

---

[3] Reid misrepresents the holding in *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 188 (2d Cir. 2000) by indicating that the quoted language requires dismissal of a defamation action if the question regarding fact or opinion "is a close one," when in reality the quoted language relates to appellate review of a jury verdict where the public figure plaintiff failed to establish that the allegedly defamatory statements were actually false.  (Def. Br. at 33).  Not only does Reid quote *Celle* completely out of context, but her reliance on *Celle* is suspect because *Celle* applies New York substantive law, which is different from applicable California law regarding protected opinion in the defamation context.  *See Gross v. New York Times Co.*, 82 N.Y.2d 146, 152 (1993) (recognizing that New York "has embraced a test [under the state's Constitution] for determining what constitutes a nonactionable statement of opinion that is more flexible *and is decidedly more protective [than Milkovich]*") (emphasis added).

understood meaning of the Little Rock photograph in a transparent attempt to avoid civil liability by pretending that she did not accuse La Liberte of engaging in racial discrimination in her July 1 Posts. It is even more surprising that Reid has taken the position that the white students screaming at the Little Rock Nine were not "making racist slurs." (Def. Br. at 36).

Reid readily admits that in her July 1 Posts, she compares La Liberte to the white students screaming at the Little Rock Nine. (Def. Br. at 34, 36). She contends, however, that her comparison to the Little Rock Nine photograph invokes "not racism" but only "rage" and that she was not contending that either photograph involved "making racist slurs." (Def. Br. at 36). These are irrelevant semantics.

Moreover, she contends that even her description of both photographs as involving expressions of "rage" with history "repeat[ing] itself" is simply her opinion and not a fact. This convenient opinion is, of course, at odds with every other public statement attributed to Reid. For example, Reid was publicly quoted in 2018 describing her admiration for an advisor to the Little Rock Nine: "There's no Little Rock Nine without her. Think about this: these were schoolchildren. She had to get mothers to be okay with their children integrating a hostile environment, where other adults would be screaming at them. It's unthinkable." *See* https://www.esquire.com/lifestyle/g19170223/joy-reid-international-womens-day-foto/?slide=6 (last visited Mar. 9, 2020).

Indeed, the lengths Reid will go in an attempt to lead this Court to error is evidenced by her misrepresentation that California law supports the proposition that "'yelling and screaming' without more does not substantively allege a defamatory statement under California law." (Def. Br. at 34-35 (citing *Williams v. Moffat*, 2007 WL 4166812, at \*4 (E.D. Cal. Nov. 20, 2007)). In *Williams*, the plaintiff asserted a number of claims, including a "libel" count asserting that a court employee "yell[ed] and scream[ed]" at her. The court dismissed this claim because "[i]t does not allege the substance of any defamatory statement or that it was communicated to a third person." *Id*. at \*4. In this case, La Liberte does not contend that Reid defamed La Liberte by yelling unidentified statements at her. Instead, Reid defamed La Liberte by falsely accusing *La Liberte* of engaging in racist misconduct toward a young boy who is a minority. *Cf. Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248, 1262 (2010) (rejecting opinion defense and holding that "general statements charging a person with being racist … without more … constitute mere name calling," but the publication at issue "expressly accuses [plaintiff] of engaging in racist firings," and "when viewed in that specific factual context, is not merely a hyperbolic characterization of Overhill's black corporate heart – it represents an accusation of concrete, wrongful conduct."). In any case, the "more" in this instance is that, in context, she falsely accused La Liberte of yelling and screaming at a child in a racist and discriminatory manner.

Despite the incredibly self-serving argument currently being espoused by Reid, it should be incontrovertible that the white students yelling at the Little Rock Nine in 1957 were engaged in racist misconduct as a matter of undisputed fact. Thus, Reid's admitted comparison between the actions of La Liberte and the actions of those white students constitutes an accusation of fact – albeit false – that La Liberte was also engaged in racist misconduct.

## VI. La Liberte Plausibly Alleged Actual Malice with Regard to All of Reid's False and Defamatory Accusations.

When analyzing the sufficiency of allegations that she acted with actual malice, Reid (like the district court), dodges SCOTUS precedent requiring that the Court assess cumulative objective and "circumstantial evidence," *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989), allegations that are sufficient for La Liberte to set forth "'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of actual malice." *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (noting that while "'[f]ailure to investigate does not in itself establish bad faith,' reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 733 (1968)).[4]

---

[4] The High Court should, consistent with Justice Thomas's recent concurring opinion, reconsider the actual malice requirement imposed on so-called public

With respect to both the June 29 Instagram Post and July 1 Posts, La Liberte has alleged nearly every objective indicia of a reckless disregard and purposeful avoidance of the truth (JA038-39, 45-47, 50-52):  reliance on a sole unreliable source with his own animus toward La Liberte; failure to investigate or seek to interview key witnesses to corroborate the story, despite publicly available contrary information; demonstrably altering her sole source quote to make it seem more condemnatory than it really was; and personal animus, spite, and ill motive causing Reid to act on a preconceived narrative.  While these allegations, individually, arguably may not support a finding of actual malice, in combination, they absolutely set forth plausible grounds for inferring actual malice.

Reid also attacks the additional objective indicia of her actual malice with respect to the July 1 Posts – that she actually had in her possession contrary information when she received multiple emails from La Liberte's son prior to publication.  She attacks the emails on the basis that she stated in her untested declaration that she did not read the emails prior to publication, which is both improper and irrelevant under the applicable standard.  Whether she read them or

_____

figures, on the basis that the decisions laying this framework "were policy-driven decisions masquerading as constitutional law." *McKee v. Cosby*, 139 S. Ct. 675, 676 (2019) (Thomas, C. concurring) ("The constitutional libel rules adopted by this Court in *New York Times* and its progeny broke sharply from the common law of libel, and there are sound reasons to question whether the First and Fourteenth Amendments displaced this body of common law.").

not, Reid had at her fingertips information in emails bearing the subject, "I am the Son of Roslyn Laliberte (Woman accused of racist slurs toward boy)," which emails contradicted her accusations and should have triggered Reid to engage in some investigation prior to publication. (JA047, 71-72).

Moreover, while Reid reaches to the corners of the internet to find others who denigrated La Liberte, her declaration does not contradict La Liberte's well-pleaded allegation that Reid's sole source was the demonstrably unreliable Alan Vargas and she did not rely on any other source. *Cf. Pep v. Newsweek, Inc.*, 553 F. Supp. 1000, 1002-03 (S.D.N.Y. 1983) ("'recklessness may be found where there are obvious reasons to doubt the veracity of the information'", and "[f]acts such as failure to investigate, or reliance on a questionable source are relevant to that determination: they may tend to show that a publisher did not care whether an article was truthful or not, or perhaps that the publisher did not want to discover facts which would have contradicted his source.") (citing *St. Amant*, 390 U.S. at 732)).

Reid's desire to stretch the facts beyond the 12(b)(6) record and her own knowledge at the time of publication is understandable, but what others may have said that she did not rely on, and what others may have done that she did not know – such as whether Vargas was an "eyewitness," which is not apparent from his tweet itself – are not appropriate for consideration by this Court.

## **CONCLUSION**

For the reasons cited herein and in La Liberte's opening brief, this Court

should reverse the district court's order.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Reply Brief of Plaintiff-Appellant Roslyn La Liberte with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system on March 11, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ G. Taylor Wilson
G. Taylor Wilson
WADE, GRUNBERG & WILSON, LLC
1230 Peachtree St.
Suite 1900
Atlanta, GA 30309

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Fed. R. App. P. 32 and Local Rule 32.1 because, excluding the parts of the document exempted by Fed. R. App. R. 32(f):

[X]    this brief contains 6,942 words
[ ]    this brief uses monospaced type and contains [state number of] lines

This brief complies with the typeface and type style requirements because:

[X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font; or
[ ]    this brief has been prepared in a monospaced typeface using [identify word processing program] in [identify font size and type style].

Dated: March 11, 2020

/s/ G. Taylor Wilson
G. Taylor Wilson
WADE, GRUNBERG & WILSON, LLC
1230 Peachtree St.
Suite 1900
Atlanta, GA 30309