# No. 19-3574

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ROSLYN LA LIBERTE,

*Plaintiff-Appellant*,

v.

JOY REID,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Eastern District of New York
Case No. 1:18-cv-05398-DLI, Hon. Dora L. Irizarry

**BRIEF OF AMICI CURIAE 33 MEDIA ORGANIZATIONS
IN SUPPORT OF DEFENDANT-APPELLEE'S PETITION
FOR PANEL REHEARING AND REHEARING EN BANC**

**DAVIS WRIGHT TREMAINE LLP**
Laura R. Handman
John M. Browning
1251 Avenue of the Americas, 21st Fl.
New York, N.Y.  10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax
laurahandman@dwt.com
jackbrowning@dwt.com

Courtney T. DeThomas (Of Counsel)
1301 K Street, NW, Suite 500 E.
Washington, D.C.  20005
(202) 973-4200 Phone
courtneydethomas@dwt.com

*Attorneys for Amici Curiae for Amici
Curiae 33 Media Organizations*

# CORPORATE DISCLOSURE STATEMENTS

Advance Publications, Inc. certifies that it has no parent corporation, no publicly held corporation owns any of its stock.

ALM Media, LLC is privately owned, and no publicly held corporation owns 10% or more of its stock.

Atlantic Media, Inc. certifies that it has no parent corporation and no publicly held corporation owns any of its stock.

The Association of American Publishers ("AAP") is a non-profit association of book, journal and education publishers. AAP has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

Bloomberg L.P. states that it is a limited partnership; that its general partner is Bloomberg Inc.; and that no publicly held corporation owns ten percent or more of Bloomberg L.P.'s limited partnership interests.

California News Publishers Association ("CNPA") is a mutual benefit corporation organized under state law for the purpose of promoting and preserving the newspaper industry in California. No entity or person has an ownership interest of ten percent or more in CNPA.

The Committee to Protect Journalists is a nonprofit organization no parent corporation and no stock.

Dow Jones & Company, Inc. is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

First Look Media Works, Inc. is a non-profit non-stock corporation organized under the laws of Delaware. No publicly-held corporation holds an interest of 10% or more in First Look Media Works, Inc.

Fox Television Stations, LLC (FTS) is an indirect subsidiary of Fox Corporation, a publicly held company. No other publicly held company owns ten percent or more of the stock of Fox Corporation.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. BlackRock, Inc. and the Vanguard Group, Inc. each own ten percent or more of the stock of Gannett Co., Inc.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization based at the American University School of Communication in Washington. It issues no stock.

Los Angeles Times Communications LLC is wholly owned by Nant Media Holdings, LLC.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

MediaNews Group Inc. is a privately held company. No publicly-held company owns ten percent or more of its equity interests.

Media Law Resource Center, Inc. is a nonprofit membership association that has no parent corporation and issues no stock.

MPA – The Association of Magazine Media has no parent companies, and no publicly held company owns more than 10% of its stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

The News Leaders Association has no parent corporation and does not issue any stock.

Penguin Random House LLC is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately-held company.

POLITICO LLC's parent corporation is Capitol News Company. No publicly held corporation owns 10% or more of POLITICO LLC's stock.

Reveal from The Center for Investigative Reporting is a California nonprofit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code. It has no statutory members and no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization. It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

Tribune Publishing Company is a publicly held corporation. Alden Global Capital LLC and affiliates together own over 10% of Tribune Publishing Company's common stock. Nant Capital LLC, Dr. Patrick Soon-Shiong and

California Capital Equity, LLC together own over 10% of Tribune Publishing Company's stock.

Univision Communications Inc. is wholly owned by Broadcast Media Partners Holdings, Inc., which is wholly owned by Univision Holdings, Inc. Grupo Televisa, S.A.B. indirectly holds a 10% or greater ownership interest in the stock of Univision Holdings, Inc. No publicly held company owns 10% or more of Univision Communications Inc. or any of its parent companies, subsidiaries, or affiliates.

Vice Group Holding Inc. (dba Vice Media Group) is a privately owned company, and The Walt Disney Company is the only publicly traded company that owns 10% or more of its stock.

Vox Media, LLC has no parent corporation. NBCUniversal Media, LLC, a publicly held corporation, owns at least 10% of Vox's stock.

WP Company LLC d/b/a The Washington Post is a wholly-owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos. WP Company LLC and Nash Holdings LLC are both privately held companies with no securities in the hands of the public.

**TABLE OF CONTENTS**

                                                                          **Page**

IDENTITY AND INTEREST OF *AMICI CURIAE*...................................................1

SOURCE OF AUTHORITY TO FILE ...................................................................1

PRELIMINARY STATEMENT ...........................................................................2

 I. The Opinion Creates Splits that Will Attract Libel Tourists
   Seeking to Evade Substantive Protections Offered by State Anti-
   SLAPP Laws..................................................................................4

 II. The Opinion's "Media Access" Requirement for Limited Purpose
   Public Figures Diverges from Precedent and Will Chill Speech ..............8

   A. Ease of Access to the Media Is Not Dispositive .............................8

   B. The Panel Collapses the Distinction Between the All-
     Purpose and Limited Purpose Public Figure..................................11

   C. La Liberte's Public Figure Status Is Not Dependent on
     Reid's Social Media Posts...........................................................12

CONCLUSION.................................................................................................13

CERTIFICATE OF COMPLIANCE......................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adelson v. Harris*,
774 F.3d 803 (2d Cir. 2014) ....................................................................3, 4, 5, 6

*Contemporary Mission, Inc. v. N.Y. Times Co.*,
842 F.2d 612 (2d Cir. 1988) ...............................................................................9, 13

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)............................................................................................*passim*

*Gilmore v. Jones*,
370 F. Supp. 3d 630 (W.D. Va. 2019)................................................................10

*Green Grp. Holdings, LLC v. Schaeffer*,
2016 WL 6023841 (S.D. Ala. Oct. 13, 2016)....................................................2

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979)............................................................................................9, 12

*Lerman v. Flynt Distrib. Co.*,
745 F.2d 123 (2d Cir. 1984) ..............................................................................9, 11

*Makaeff v. Trump Univ., LLC*,
736 F.3d 1180 (9th Cir. 2013) ...........................................................................7

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)............................................................................................1, 4, 8

*Planned Parenthood Fed'n v. Ctr. for Med. Progress*,
890 F.3d 828 (9th Cir. 2018) .............................................................................6

*Reeves v. Am. Broad. Cos.*,
719 F.2d 602 (2d Cir. 1983) ..............................................................................5

*Resolute Forest Prods. v. Greenpeace Int'l*,
302 F. Supp. 3d 1005 (N.D. Cal. 2017)............................................................2

**State Cases**

*Holmes v. Winter*,
22 N.Y.3d 300 (2013) ...............................................................................7

*Khawar v. Globe Int'l, Inc.*,
19 Cal. 4th 254 (Cal. 1998).....................................................................12

**Rules**

Federal Rule of Appellate Procedure
29(a)(4)(E) ................................................................................................1
29(b)(3) .....................................................................................................1

Federal Rule of Civil Procedure
12(b)(6) .....................................................................................................6
56................................................................................................................6

Local Rule 29.1 ..............................................................................................1

**Regulations**

N.Y. State Assembly, Memorandum in Support of Legislation,
A05991A, 2019-20 Regular Sessions (2020) ..........................................7

**Other Authorities**

Daniel Novack & Christina Lee, *How New York Anti-SLAPP Law
Could Survive the 2nd Circ.*, LAW360 (Aug. 12, 2020) ........................8

Meg Cramer et al., *The Trump Campaign's Legal Strategy Includes
Suing a Tiny TV Station in Northern Wisconsin*, ProPublica (July
23, 2020) ..................................................................................................2

Hon. Robert D. Sack, 1 SACK ON DEFAMATION: LIBEL, SLANDER AND
RELATED PROBLEMS, § 5.3.3 (5th ed. 2017)..........................................9

Steven Waldman et al., *The Coronavirus Is Killing Local News*, The
Atlantic (Mar. 25, 2020) .........................................................................3

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici Curiae* ("Amici") are 33 news organizations and representatives predominantly based in New York and California, who frequently face strategic lawsuits against public participation ("SLAPPs") designed to deter constitutionally protected news reporting activities. *See* Appendix A (listing Amici).[1] The panel's holding that the California's anti-SLAPP statute is entirely inapplicable in federal courts – including its fee-shifting provision – has created splits within the Second Circuit and with the Ninth Circuit with broad ramifications for Amici. The reformulation of the standard for limited purpose public figures in the panel opinion ("Opinion" or "Op.") additionally has the effect of reducing the "breathing space" for journalists secured by *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964).

## SOURCE OF AUTHORITY TO FILE

Amici have moved for leave to file this brief pursuant to Federal Rule of Appellate Procedure 29(b)(3).

---

[1] Pursuant to FRAP 29(a)(4)(E) and Local Rule 29.1, Amici declare that (1) no party's counsel authored the brief in whole or in part; (2) no party or party's counsel contributed money intended to fund the brief's preparation or submission; and (3) no person, other than Amici, their members, or their counsel, contributed money intended to fund preparing or submitting the brief.

**PRELIMINARY STATEMENT**

The Opinion, which is a matter of "first impression" in this Circuit (Op. 4), is one of the rare decisions that deserves panel rehearing or en banc consideration because it creates splits within the Second Circuit and diverges sharply from the Ninth Circuit on a subject of extraordinary importance – the extent to which federal courts can provide protection against lawsuits designed to smother lawful speech about politics, racism and other controversial subjects. These splits will have a profound chilling effect on free speech at a moment when Amici, journalists and concerned citizens everywhere face a barrage of meritless litigation designed to drive them out of the political arena. Political campaigns, for instance, have filed lawsuits against news organizations, large and small, for airing constitutionally protected criticism of their candidate.[2] The pandemic exacerbates

---

[2] *See* Meg Cramer et al., *The Trump Campaign's Legal Strategy Includes Suing a Tiny TV Station in Northern Wisconsin*, ProPublica (July 23, 2020), available at https://www.propublica.org/article/2020-trump-inc-podcast-the-trump-campaigns-legal-strategy-includes-suing-a-tiny-tv-station-in-northern-wisconsin. Journalists are not the only target of SLAPP suits, which have increasingly been used to silence activists and individuals seeking to expose malfeasance in their local communities. *See, e.g.*, *Resolute Forest Prods. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005 (N.D. Cal. 2017); *Green Grp. Holdings, LLC v. Schaeffer*, 2016 WL 6023841 (S.D. Ala. Oct. 13, 2016).

this chilling effect because news organizations (like many others) cannot afford the costs of defending their journalists in court.[3]

Multiple aspects of the panel decision warrant reconsideration. *First*, the Opinion's wholesale rejection of California's anti-SLAPP statute – including its fee-shifting provision – cannot be reconciled with *Adelson v. Harris*, 774 F.3d 803 (2d Cir. 2014). *Adelson* held that it was "unproblematic" for trial courts in the Second Circuit to award attorneys' fees pursuant to a substantially similar provision of the Nevada anti-SLAPP statute. *Id.* at 809. Mandatory fee awards are the most crucial element of anti-SLAPP statutes because they deter baseless lawsuits before they are filed and forestall meritless appeals. But the panel's divergence from *Adelson* – and a settled corpus of Ninth Circuit law – substantially weakens this deterrent and invites libel tourists into the Second Circuit. Worse, the Opinion threatens to frustrate New York's recent expansion of its anti-SLAPP statute and deter adoption of the model anti-SLAPP law approved by the Uniform Law Commission, which both emphasize the importance of fee-shifting.

*Second*, the limited purpose public figure analysis established in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) cannot be squared with the Opinion's holding that public figure status "turn[s] on" "regular and continuing access to the

---

[3] *See* Steven Waldman et al., *The Coronavirus Is Killing Local News*, The Atlantic (Mar. 25, 2020), available at https://www.theatlantic.com/ideas/archive/2020/03/coronavirus-killing-local-news/608695/.

media." (Op. 24-25.) Making "media access" the dispositive question collapses the distinction between limited purpose and general purpose public figures. The universe of public figures would effectively be limited to celebrities and other individuals with equivalent ease of access to traditional media outlets – with devastating effects on the press' role in fostering "public debate[s]" about controversial political subjects like immigration, which the actual malice standard was designed to protect. *See Sullivan*, 376 U.S. at 279.[4]

These departures from precedent create a clear and present need for a panel rehearing or en banc consideration to clarify these exceptionally important issues, provide uniform guidance within the Circuit and prevent the chilling of protected speech.

## I. The Opinion Creates Splits that Will Attract Libel Tourists Seeking to Evade Substantive Protections Offered by State Anti-SLAPP Laws

The Opinion's all-or-nothing approach to the California anti-SLAPP statute conflicts with *Adelson* – as well as highly-developed case law from the Ninth Circuit – and creates uncertainty as to whether Second Circuit courts could ever enforce the fee-shifting provisions in most (if not all) anti-SLAPP laws. This

---

[4] The panel opinion also conflicts with existing law holding that charges of "racial animus" (Op. 29) – particularly in the context of charged political debates – are quintessential statements of opinion. *See* Dkt. 109-1 at 14-18. Unless rehearing is granted, the panel opinion will chill commentary on racism and other political issues.

uncertainty will make the Second Circuit an attractive target for defamation plaintiffs seeking to skirt anti-SLAPP protections, diminishing this Circuit's longstanding commitment to the First Amendment's "noble guarantee against laws abridging the freedom of the press." *Reeves v. Am. Broad. Cos.*, 719 F.2d 602, 603 (2d Cir. 1983).

*Adelson* requires federal courts to differentiate between the procedural and substantive elements of anti-SLAPP laws, but the Opinion urges courts to disregard the entire statute whenever the standard for deciding a special motion to strike diverges from the Federal Rules (even if, as here, that standard of dismissal was not applied). In *Adelson*, for instance, this Court looked at each component of Nevada's anti-SLAPP law in isolation to determine whether individual provisions applied in federal court. 774 F.3d at 809. The "mandatory fee shifting" provision was deemed "substantive" – and thus applicable – because it was "consequential enough that enforcement in federal proceedings will serve to discourage forum shopping and avoid inequity." *Id.* The Opinion, by contrast, never examined California's fee shifting statute on its own terms and never considered whether it was substantive. Op. 18. Instead, it rejected the entire California anti-SLAPP statute due to a perceived conflict between one of its procedural elements and federal law – *i.e.*, California's special motion to strike "requires the plaintiff to make a showing that the Federal Rules do not require" (*id.* at 15, 18) – and did so

5

even though the court below assessed the sufficiency of the complaint under the Rule 12(b)(6) standard.

The Ninth Circuit has developed an entire body of law based on its application of California's anti-SLAPP statute in federal courts and this corpus embraces *Adelson*'s nuanced analysis. The decisions are discussed in Reid's petition (*see* Dkt. 109-1 at 5-7), but the Ninth Circuit has held repeatedly that "some portions of California's anti-SLAPP law have been found to not conflict with the Federal Rules of Civil Procedure – such as … [the provisions] providing fees and costs." *Planned Parenthood Fed'n v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018). While the Ninth Circuit has rejected certain procedural aspects of California's statute, it has sought to harmonize the law with the Federal Rules rather than throwing it out entirely. *See id*. at 834 (holding that the Rule 12(b)(6) standard applies "when an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim" and Rule 56 applies when "an anti-SLAPP motion to strike challenges the factual sufficiency of a claim").

The Opinion's wholesale rejection of California's anti-SLAPP statute will lure libel tourists to the Second Circuit, which is a result that *Adelson* and the Ninth Circuit specifically sought to avoid. *Adelson* held that the Nevada fee-shifting privilege should be enforced in federal courts "to discourage forum shopping." *Adelson*, 774 F.3d at 809. The Ninth Circuit also warned against

6

giving SLAPP plaintiffs an incentive "to file or remove to federal courts strategic, retaliatory lawsuits that are more likely to have the desired effect of suppressing a SLAPP defendant's speech-related activities." *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1187 (9th Cir. 2013). Libel tourism in the Second Circuit would undermine New York's status as "the media capital of the country" and its robust protections for news reporting, which have "been recognized as the strongest in the nation." *Holmes v. Winter*, 22 N.Y.3d 300, 310, 316 (2013).

The New York legislature recently bolstered these protections by passing a law expanding the State's anti-SLAPP statute to cover lawsuits targeting communications "in connection with an issue of public interest." A05991A, 2019-20 Regular Sessions (N.Y. 2020) (as passed, July 22, 2020). For a decade or more, advocates have sought to expand New York anti-SLAPP protection and the recent amendment reflects the urgent need to address predatory lawsuits against journalists, media organizations and concerned citizens. Indeed, legislators emphasized that "a mandatory award of attorney's fees is *necessary* to discourage SLAPP lawsuits – which attempt to chill free speech by definition – from being instituted." N.Y. State Assembly, Memorandum in Support of Legislation, A05991A, 2019-20 Regular Sessions (2020) (emphasis added). To be sure, the mechanisms of the New York anti-SLAPP bill differ from those of California and New York's fee-shifting provision should survive in federal court, even under the

7

Opinion's restrictive analysis. *See* Daniel Novack & Christina Lee, *How New York Anti-SLAPP Law Could Survive the 2nd Circ.*, LAW360 (Aug. 12, 2020), available at https://www.law360.com/articles/1300073/how-new-york-anti-slapp-law-could-survive-the-2nd-circuit. But the ambiguity created by the Opinion leaves open the possibility that a district court might reject the statute wholesale upon perceiving any conflict between its procedural mechanisms for granting dismissal and the Federal Rules. The Opinion presents an identical threat to the fee-shifting provisions in the model statute promulgated by the National Conference of Commissioners on Uniform State Laws after years of careful deliberation. *See* Uniform Public Expression Protection Act (Uniform Law Comm'n July 2020).

Anti-SLAPP laws are effective deterrents only when defendants like Amici can rely on their fee-shifting protections. The uncertainty created by the Opinion should be remedied by rehearing.

## II. The Opinion's "Media Access" Requirement for Limited Purpose Public Figures Diverges from Precedent and Will Chill Speech

### A. Ease of Access to the Media Is Not Dispositive

Treating access to media as a dispositive factor in the limited public figure analysis is inconsistent with *Gertz* and upends the Court's rationale for extending *New York Times Co. v. Sullivan*'s actual malice standard to "public figures." *Gertz* recognized that public figures "*usually* enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity

to counteract false statements than private individuals." *Gertz*, 418 U.S. at 344 (emphasis added). The Court did not, however, imply that such access should be the determinative – or even the primary – consideration. *Id.* at 345*; Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979) ("regular and continuing access to the media" are merely "one of the accoutrements" of public figures); Hon. Robert D. Sack, 1 SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS, § 5.3.3 (5th ed. 2017) (*Gertz* "does not imply that only people with access to the media are public figures"). Moreover, no California court has required public figures to have access to the media.

Instead, the "key inquiry" is "the nature and extent of [the] individual's participation in the particular controversy giving rise to the defamation," since public figures "voluntarily expose[] themselves to increased risk of injury from defamatory falsehood." *Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 617, 620 (2d Cir. 1988) (citing *Gertz*, 418 U.S. at 345, 352; *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167 (1979)). Yet the Opinion focuses almost exclusively on whether La Liberte had "maintained regular and continuing access to the media" prior to Reid's posts. *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984). As a result, the Court turns La Liberte's success in courting media attention into the dispositive factor, rather than one to be considered within the larger context of her efforts to insert herself into the controversy.

This has serious implications, particularly in the era of social media. Other courts have recognized that public controversies, and thus one's status as a limited purpose public figure, can "develop[] rapidly" – "within hours" even – in connection with social media posts that go viral. *Gilmore v. Jones*, 370 F. Supp. 3d 630, 669 n.43 (W.D. Va. 2019). But the panel's approach suggests that even when an individual voluntarily thrusts herself into a public controversy, she cannot be characterized as a limited purpose public figure unless she had commanded regular media attention *before* her views were criticized online. This is incompatible with *Gertz*, and creates great trepidation for media outlets covering contentious issues and those engaged in spirited debate online.

Far from being "pulled into a spotlight," La Liberte was a "passionate" activist in the pre-existing debate over California's "controversial" "sanctuary-state law," attending and speaking out against it at heavily attended city council meetings across California. (Op. 3, 5-6, 27; JA102-105.) And she did receive media attention prior to Vargas and Reid's posts (which included having her photograph published in connection with her anti-immigration activities in national and regional newspapers). She also had an opportunity to respond, but ultimately her decision to wade into a live political debate made her a limited purpose public figure.

### B. The Panel Collapses the Distinction Between the All-Purpose and Limited Purpose Public Figure

In order to qualify as a limited purpose public figure under the Opinion's rationale, a plaintiff requires a level of media access akin to that of the all-purpose public figure. *Gertz*, 418 U.S. at 351. By eliminating any practical distinction between these categories, the Opinion diverges sharply from prior authority.

Limited purpose public figures "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," thereby "invit[ing] attention and comment." *Gertz*, 418 U.S. at 345. This is precisely what La Liberte did. She "invited public attention to [her] views" on SB 54 when she "voluntarily injected" herself into the SB 54 controversy and "assumed a position of prominence" in that debate by virtue of her advocacy against the bill in multiple cities across California. (JA102-105); *Lerman*, 745 F.2d at 136–37. The panel's understandable concern that counting La Liberte as a public figure could "chill public participation in politics and community dialogue" (Op. 26) was resolved by *Gertz*, which calibrated the actual malice standard to balance the rights of individuals seeking to participate in public debates with the rights of others to report or comment upon those controversies as they unfold.

Whether or not La Liberte was successful in garnering media attention related to her views on SB 54 and "sanctuary cities" prior to Reid's – or even Vargas' – posts should not have any bearing on her status as a public figure. To

11

require as much would lead to absurd results. For instance, any plaintiff who voluntarily chose to engage in a public controversy, and was later subject to scrutiny related to her views on that topic, could avoid being labeled a public figure simply be declining to engage with traditional media organizations or by avoiding interviews on the subject (although, in this case, La Liberte did chose to defend herself through the media).

### C. La Liberte's Public Figure Status Is Not Dependent on Reid's Social Media Posts

Although "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure," *Hutchinson*, 443 U.S. at 135, this is not such a case. La Liberte had already received substantial public attention and comment with respect to Vargas' tweet and its connection to the broader SB 54 debate *before* the two allegedly defamatory social media posts at issue. (JA101; JA113-114; JA119-144)[5]

Reid did not make La Liberte a public figure by posting about her on social media. Nor did La Liberte "step[] forward solely to defend her reputation" in response to the viral June 25, 2018 photograph. (Op. 27.) Rather, she had already "voluntarily exposed [herself] to increased risk of injury" in connection with her

---

[5] La Liberte is quite unlike the plaintiff in *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254 (Cal. 1998), because she is not an accidental bystander – just the opposite. *Id*. at 259-60.

outspoken opposition to SB 54. *Contemporary Mission*, 842 F.2d at 620. Indeed, her ability to swiftly rebut Vargas' tweet through television appearances and interviews bears the "hallmark[s] of public-figure status" that the panel opinion now requires (Op. 5, 26), and shows that she did in fact have continuing access to the media in order to "counteract false statements" (*Gertz*, 418 U.S. at 344), access which social media makes easier to exploit.

## CONCLUSION

For these reasons and those set forth in Reid's petition, panel rehearing and/or rehearing en banc should be granted.

Dated:  New York, New York
        August 14, 2020

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: /s/ Laura R. Handman            .
    Laura R. Handman
    John M. Browning

1251 Avenue of the Americas, 21st Floor
New York, N.Y.  10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax
laurahandman@dwt.com
jackbrowning@dwt.com

Courtney T. DeThomas (Of Counsel)
1301 K Street, NW, Suite 500 East
Washington, D.C.  20005
(202) 973-4200 Phone
(202) 973-4499 Fax
courtneydethomas@dwt.com

*Attorneys for Amici Curiae for Amici Curiae 33 Media Organizations*

# CERTIFICATE OF COMPLIANCE

I, Laura R. Handman, do hereby certify that the foregoing Amicus Brief in Support of Defendant-Appellant's Petition for Panel Rehearing and Rehearing En Banc:

1) Complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) and 32(g)(1) because it contains 2,587 words, as calculated by the word-processing system used to prepare the brief; and

2) Complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point, Times New Roman font.

Dated:  August 14, 2020

/s/ Laura R. Handman
Laura R. Handman
*Counsel for Amici Curiae 33 Media Organizations*

# APPENDIX A

Descriptions of Amici:

**Advance Publications, Inc.** is a diversified privately-held company that operates and invests in a broad range of media, communications and technology businesses. Its operating businesses include Conde Nast's global magazine and digital brand portfolio, including titles such as The New Yorker, Vogue, Vanity Fair, Wired, and GQ, local news media companies producing newspapers and digital properties in 10 different metro areas and states, and American City Business Journals, publisher of business journals in over 40 cities.

**ALM Media, LLC** publishes over 30 national and regional magazines and newspapers, including *The American Lawyer, The National Law Journal, New York Law Journal* and *Corporate Counsel,* as well as the website Law.com. Many of ALM's publications have long histories reporting on legal issues and serving their local legal communities. ALM's *The Recorder,* for example, has been published in northern California since 1877; *New York Law Journal* was begun a few years later, in 1888. ALM's publications have won numerous awards for their coverage of critical national and local legal stories, including many stories that have been later picked up by other national media.

**Atlantic Media, Inc.** is a privately held media company that publishes The Atlantic and National Journal. These award-winning titles address topics in

national and international affairs, business, culture, technology and related areas, as well as cover political and public policy issues at federal, state and local levels. The Atlantic was founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others.

**The Association of American Publishers** ("AAP") is the largest national trade organization of U.S. book and journal publishers, representing organizations ranging from major commercial book and journal publishers to small, non-profit, university, and scholarly presses.

**Bloomberg L.P.** is the owner and operator of Bloomberg News. Bloomberg's newsroom of more than 2,700 journalists and analysts delivers thousands of stories a day, producing content that is featured across multiple platforms, including digital, TV, radio, print and live events.

**California News Publishers Association** ("CNPA") is a nonprofit trade association representing the interests of over 400 daily, weekly and student newspapers and news websites throughout California.

**The Committee to Protect Journalists** is an independent, nonprofit organization that promotes press freedom worldwide. We defend the right of journalists to report the news safely and without fear of reprisal.

**Dow Jones & Company** is the world's leading provider of news and business information. Through *The Wall Street Journal*, *Barron's*, MarketWatch,

Dow Jones Newswires, and its other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations. Dow Jones's professional information services, including the Factiva news database and Dow Jones Risk & Compliance, ensure that businesses worldwide have the data and facts they need to make intelligent decisions. Dow Jones is a News Corp company.

**The E.W. Scripps Company** serves audiences and businesses through local television, with 60 television stations in 42 markets. Scripps also owns Newsy, the next-generation national news network; podcast industry leader Stitcher; national broadcast networks Bounce, Grit, Escape, Laff and Court TV; and Triton, the global leader in digital audio technology and measurement services. Scripps serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling Bee.

**First Amendment Coalition** (FAC) is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people. The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

**First Look Media Works, Inc.** is a non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting. First Look Media Works operates the Press Freedom Defense Fund, which provides essential legal support for journalists, news organizations, and whistleblowers who are targeted by powerful figures because they have tried to bring to light information that is in the public interest and necessary for a functioning democracy.

Directly and through affiliated companies, **Fox Television Stations, LLC**, owns and operates twenty-eight local television stations throughout the United States. The twenty-eight stations have a collective market reach of thirty-seven percent of U.S. households. Each of the twenty-eight stations also operates Internet websites offering news and information for its local market.

**Gannett** is the largest local newspaper company in the United States. Our 260 local daily brands in 46 states and Guam — together with the iconic USA TODAY — reach an estimated digital audience of 140 million each month.

**Hearst Corporation** is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership of 24 daily and more than 52 weekly newspapers, including the San Francisco Chronicle, Houston Chronicle, and Albany Times Union; hundreds of magazines around the world, including Cosmopolitan, Good

Housekeeping, ELLE, Harper's BAZAAR and O, The Oprah Magazine; 33 television stations such as KCRA-TV in Sacramento, Calif. and KSBW-TV in Monterey/Salinas, CA, which reach a combined 19 percent of U.S. viewers; ownership in leading cable television networks such as A&E, HISTORY, Lifetime and ESPN; global ratings agency Fitch Group; Hearst Health; significant holdings in automotive, electronic and medical/pharmaceutical business information companies; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

**The Investigative Reporting Workshop,** based at the School of Communication (SOC) at American University, is a nonprofit, professional newsroom. The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

**Los Angeles Times Communications LLC** is one of the largest daily newspapers in the United States. Its popular news and information website, www.latimes.com, attracts audiences throughout California and across the nation.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry,

and excellence in journalism. Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**MediaNews Group Inc.** is a leader in local, multi-platform news and information, distinguished by its award-winning original content and high quality local media. It is one of the largest news organizations in the United States, with print and online publications across the country.

**The Media Law Resource Center, Inc.** ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings.

**MPA – The Association of Magazine Media,** ("MPA") is the industry association for magazine media publishers. The MPA, established in 1919, represents the interests of close to 100 magazine media companies with more than 500 individual magazine brands. MPA's membership creates professionally researched and edited content across all print and digital media on topics that include news, culture, sports, lifestyle and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

**The National Press Photographers Association** ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.

**The New York Times Company** is the publisher of *The New York Times* and *The International Times,* and operates the news website nytimes.com.

**The News Leaders Association** was formed via the merger of the American Society of News Editors and the Associated Press Media Editors in September 2019. It aims to foster and develop the highest standards of trustworthy, truth-seeking journalism; to advocate for open, honest and transparent government; to fight for free speech and an independent press; and to nurture the next generation of news leaders committed to spreading knowledge that informs democracy.

**Penguin Random House** is a publishing company that can trace its history back to the mid-nineteenth century and one of it progenitors, Random House, published the first authorized edition of James Joyce's *Ulysses* in the English-speaking world, among other landmark titles. The portfolio operated by Penguin Random House has grown to encompass nearly 275 independent imprints and

brands across five continents. Penguin Random House publishes 15,000 new titles per year—catering to readers of all ages and at every stage of life—and sells close to 800 million print books, audiobooks, and ebooks annually. It has published hundreds of the most widely read authors in the world.

**POLITICO** is a global news and information company at the intersection of politics and policy. Since its launch in 2007, POLITICO has grown to nearly 300 reporters, editors and producers. It distributes 30,000 copies of its Washington newspaper on each publishing day and attracts an influential global audience of more than 35 million monthly unique visitors across its various platforms.

**Reveal from The Center for Investigative Reporting,** founded in 1977, is the nation's oldest nonprofit investigative newsroom. Reveal produces investigative journalism for its website https://www.revealnews.org/, the Reveal national public radio show and podcast, and various documentary projects. Reveal often works in collaboration with other newsrooms across the country.

**The Society of Environmental Journalists** is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and

stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**Tribune Publishing Company** is one of the country's leading media companies. The company's daily newspapers include the Chicago Tribune, New York Daily News, The Baltimore Sun, Sun Sentinel (South Florida), Orlando Sentinel, Hartford Courant, The Morning Call, the Virginian Pilot and Daily Press. Popular news and information websites, including www.chicagotribune.com, complement Tribune Publishing's publishing properties and extend the company's nationwide audience.

**Univision Communications Inc. (UCI)** is the leading media company serving Hispanic America. UCI is a leading content creator in the U.S. and includes the Univision Network, UniMas and Univision Cable Networks.

Launched in 1994, **VICE Media Group** has offices in 35 cities across the world and makes 1700 pieces of content every day through five key lines of business: VICE.com, an award-winning international network of digital content; VICE Studios, a feature film and television production studio; VICE TV, an Emmy-winning international television network; a Peabody award-winning NEWS

division; and VIRTUE, a global, full-service creative agency with 21 offices around the world.

**Vox Media, LLC** owns New York Magazine and several web sites, including Vox, The Verge, The Cut, Vulture, SB Nation, and Eater, with 170 million unique monthly visitors.

**The Washington Post** (formally, WP Company LLC d/b/a The Washington Post) is a news organization based in Washington, D.C. It publishes The Washington Post newspaper and the website www.washingtonpost.com, and produces a variety of digital and mobile news applications. The Post has won 47 Pulitzer Prizes for journalism, including awards in 2018 for national and investigative reporting.

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system with a resulting electronic notice to all counsel of record on August 14, 2020.

Dated:  August 14, 2020

/s/ Laura R. Handman
Laura R. Handman
*Counsel for Amici Curiae 33 Media Organizations*